# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ROMAN CATHOLIC ARCHBISHOP OF** )
**WASHINGTON, a corporation sole;** )
**5001 Eastern Avenue** )
**Hyattsville, MD 20782** )
)
**THE CONSORTIUM OF CATHOLIC** )
**ACADEMIES OF THE ARCHDIOCESE** )
**OF WASHINGTON, INC.;** )
**5001 Eastern Avenue** )
**Hyattsville, MD 20782** )
)
**ARCHBISHOP CARROLL HIGH** )
**SCHOOL, INC.;** )
**4300 Harewood Road, N.E.** )
**Washington, DC 20017** )
)
**DON BOSCO CRISTO REY HIGH** )
**SCHOOL OF THE ARCHDIOCESE OF** )
**WASHINGTON, INC.;** )
**1010 Larch Ave,** )
**Takoma Park, MD 20912** )
)
**MARY OF NAZARETH ROMAN** )
**CATHOLIC ELEMENTARY SCHOOL,** )
**INC.** )
**14131 Seneca Road** )
**Darnestown, MD 20874** )
)
**CATHOLIC CHARITIES OF THE** )
**ARCHDIOCESE OF WASHINGTON,** )
**INC.;** )
**924 G Street, N.W.** )
**Washington, DC 20001** )
)
**VICTORY HOUSING, INC.** )
**11400 Rockville Pike, Suite 505** )
**Rockville, MD  20852** )
)
**CATHOLIC INFORMATION CENTER,** )
**INC.** )
**1501 K St N.W.,** )
**Washington, DC 20005** )
)

CASE NUMBER: 13-1441
JUDGE: _____

DATE STAMP: _____

**THE CATHOLIC UNIVERSITY OF AMERICA,**
**620 Michigan Avenue, N.E.**
**Washington, DC 20064**

**THOMAS AQUINAS COLLEGE,**
**10,000 Ojai Road**
**Santa Paula, California 93060**

          *Plaintiffs*,

**v.**


**KATHLEEN SEBELIUS, in her official capacity as Secretary of the U.S. Department of Health and Human Services;**
**200 Independence Avenue, S.W.**
**Washington, DC 20201**

**THOMAS PEREZ, in his official capacity as Secretary of the U.S. Department of Labor,**
**200 Constitution Avenue, N.W.**
**Washington, DC 20210**

**JACOB J. LEW, in his official capacity as Secretary of the U.S. Department of the Treasury;**
**1500 Pennsylvania Avenue, N.W.**
**Washington, DC 20220**

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES;**
**200 Independence Avenue, S.W.**
**Washington, DC 20201**

**U.S. DEPARTMENT OF LABOR;**
**200 Constitution Avenue, N.W.**
**Washington, DC 20210**

**U.S. DEPARTMENT OF THE TREASURY.**
**1500 Pennsylvania Avenue, N.W.**
**Washington, DC 20220**

          *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## COMPLAINT

1.      This lawsuit is about one of America's most cherished freedoms: the freedom to practice one's religion without government interference.  It is not about whether people have a right to abortion-inducing products, sterilization, and contraception.  Those products and services are widely available in the United States, and nothing prevents the Government itself from making them more widely available.  Here, however, the Government seeks to require Plaintiffs—all of which are Catholic entities—to violate their sincerely held religious beliefs by providing, paying for, and/or facilitating access to those products and services.  American history and tradition, embodied in the First Amendment to the United States Constitution and the Religious Freedom Restoration Act ("RFRA"), safeguard religious entities from such overbearing and oppressive governmental action.  Plaintiffs therefore seek relief in this Court to protect this most fundamental of American rights.

2.      Plaintiffs provide a wide range of spiritual, educational, and social services to members of their communities, Catholic and non-Catholic alike.  Plaintiff Roman Catholic Archbishop of Washington, a corporation sole (the "Archdiocese"), not only provides pastoral care and spiritual guidance for nearly 600,000 Catholics, but also serves individuals throughout the D.C. area through its schools and multiple charitable programs.  The Archdiocese's programs serve those who are most often overlooked in the community, including those with disabilities, those challenged by an unexpected prenatal diagnosis, those re-entering society from imprisonment, and those poor and marginalized with nowhere else to turn.  Likewise, Plaintiffs Consortium of Catholic Academies of the Archdiocese of Washington, Inc. ("CCA" or the "Consortium"), Archbishop Carroll High School, Inc. ("Archbishop Carroll" or "Carroll"), and Don Bosco Cristo Rey High School of the Archdiocese of Washington, Inc. ("Don Bosco") are devoted to teaching a religiously and ethnically diverse student body consisting largely of

1

children from low-income families.  Plaintiff Mary of Nazareth Roman Catholic Elementary School, Inc. ("Mary of Nazareth") is a regional Catholic elementary school serving students from various parishes in the Archdiocese of Washington.  Plaintiff Catholic Charities of the Archdiocese of Washington, Inc. ("Catholic Charities"), the largest nongovernmental social service provider in the region, offers a host of social services to thousands in need throughout the District and Maryland.  For those citizens in the community who could not otherwise afford them, Catholic Charities provides free physical and mental health care, legal assistance, immigration assistance, employment training, early childhood services, education, counseling, emergency shelter, housing, and dental services.  In a similar vein, Plaintiff Victory Housing, Inc. ("Victory Housing") provides affordable housing and related social services for low- and moderate-income senior citizens and families.  Plaintiff Catholic Information Center, Inc. ("CIC") offers a variety of spiritual books and resources, as well as religious, intellectual, and professional programs for those living and working in Washington, D.C.  For its part, Plaintiff Catholic University of America ("CUA") offers nearly 7,000 undergraduate and graduate students a rigorous education, while at the same time serving the larger community through, *inter alia*, its research centers, intellectual offerings, and charitable outreach.  Likewise, Thomas Aquinas College ("TAC" or the "College") offers a Catholic liberal-arts education, fostering a community of scholars dedicated to the intellectual tradition and moral teachings of the Catholic Church.

3.     Plaintiffs' work is in every respect guided by and consistent with Roman Catholic belief, including the requirement that they serve those in need, regardless of their religion.  This is perhaps best captured by words attributed to St. Francis of Assisi: "Preach the Gospel at all times. Use words if necessary."  As Pope Emeritus Benedict XVI has more recently put it, "[L]ove for widows and orphans, prisoners, and the sick and needy of every kind, is as essential to [the

Catholic Church] as the ministry of the sacraments and preaching of the Gospel.  The Church cannot neglect the service of charity any more than she can neglect the Sacraments and the Word."  Or as Cardinal James Hickey, former Archbishop of Washington, once commented on the role of Catholic educators:  "We do not educate our students because *they* are Catholic; we educate them because *we* are Catholic."  Thus, Catholic individuals and organizations consistently work to create a more just community by serving any and all neighbors in need.

4.     Catholic Church teachings also uphold the firm conviction that sexual union should be reserved to married couples who are open to the creation of life; thus, artificial interference with the creation of life, including through abortion, sterilization, and contraceptives, is contrary to Catholic doctrine.

5.     Defendants have promulgated various rules (collectively, "the U.S. Government Mandate") that force Plaintiffs to violate their sincerely held religious beliefs.  These rules, first proposed on July 19, 2010, require Plaintiffs and other Catholic and religious organizations to provide, pay for, and/or facilitate access to abortion-inducing products, sterilization, and contraception, in violation of their sincerely held religious beliefs.  In response to the intense public criticism that the Government's original proposal provoked, including by some of the current Administration's most ardent supporters, the Government proposed changes to the rules that, it asserted, were intended to eliminate the substantial burden that the Mandate imposed on religious exercise.  In fact, however, these changes made that burden worse by significantly *increasing* the number of religious organizations subject to the U.S. Government Mandate, and by driving a wedge between religious organizations, such as Plaintiff Archdiocese, and their equally religious charitable arms, such as Plaintiffs Catholic Charities, Archbishop Carroll, Don Bosco, Mary of Nazareth, Victory Housing, CIC, and CCA.  In particular, contrary to its initial

interpretation, the Government now asserts that the U.S. Government Mandate prohibits the Archdiocese from ensuring that its religious affiliates provide health insurance consistent with Catholic doctrine.

6.  In its final form, the U.S. Government Mandate contains three basic components:

7.  First, it requires employer group health plans to cover, without cost-sharing requirements, all "FDA-approved contraceptive methods and contraceptive counseling"—a term that includes abortion-inducing products, contraception, sterilization, and related counseling and education.

8.  Second, the Mandate creates a narrow exemption for certain "religious employers," defined to include only organizations that are "organized and operate[] as . . . nonprofit entit[ies] and [are] referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."  The referenced Code section does not, nor is it intended to, address religious liberty. Instead, it is a paperwork-reduction provision that addresses whether and when tax-exempt nonprofit entities must file an annual informational tax return, known as a Form 990.  As the Government has repeatedly affirmed, this exemption is intended to protect only "the unique relationship between a house of worship and its employees in ministerial positions." 78 Fed. Reg. 8456, 8461 (Feb. 6, 2013).  Consequently, the only organizations that qualify for the exemption are "churches, synagogues, mosques, and other houses of worship, and religious orders."  *Id.*  This is the narrowest "conscience exemption" ever adopted in federal law.  It grants the Government broad discretion to sit in judgment of which groups qualify as "religious employers," thus favoring certain religious organizations and denominations over others and entangling the Government in matters of religious faith and practice.

9.    Third, the U.S. Government Mandate creates a second class of religious entities that, in the Government's view, are not sufficiently "religious" to qualify for the "religious employer" exemption.  These religious entities, deemed "eligible organizations," are subject to a so-called "accommodation" that is intended to eliminate the burden that the Mandate imposes on their religious beliefs.  The "accommodation," however, is illusory:  it continues to require "eligible organizations" to provide, pay for, and/or facilitate access to the objectionable products and services for their employees.

10.    In particular, Plaintiffs CCA, Archbishop Carroll, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, CIC, CUA, and Thomas Aquinas College do not qualify under the Government's narrow definition of "religious employer," even though they are religious organizations under any reasonable definition of the term.  Instead, they are "eligible organizations" subject to the so-called "accommodation."  But notwithstanding the "accommodation," these Plaintiffs are required to contract with an insurance company (or, for self-insured organizations, a third-party administrator), which, as a result, is required to provide or procure "free" abortion-inducing products, contraception, sterilization, and related counseling for these particular Plaintiffs' employees.  Consequently, the religious organizations' actions trigger the provision of the "free" objectionable products and services.  Plaintiffs cannot avoid facilitating the provision of the objectionable products and services—for example, by contracting with an insurance company that will not provide or procure the objectionable products and services or even dropping their health-insurance plans altogether—without subjecting themselves to crippling fines, other negative consequences, and/or lawsuits by individuals and governmental entities.

11.   Plaintiffs, moreover, must facilitate the provision of the objectionable services in other ways that further exacerbate their religiously impermissible cooperation in the provision of the objectionable products and services.  For example, in order to be eligible for the so-called "accommodation," Plaintiffs who do not qualify for the "religious employer" exemption must provide a "certification" to their insurance provider or third-party administrator setting forth their religious objections to the Mandate.  Once this "certification" is provided, it automatically triggers an obligation on the part of the insurance provider or third-party administrator to provide or procure the objectionable products and services for these Plaintiffs' employees.  For self-insured Plaintiffs, moreover, before they can even provide the certification, they must first find and identify a third party administrator who is willing to provide the very coverage Plaintiffs find objectionable, and their self-certification constitutes the religious organization's "*designation* of the third party administrator(s) as plan administrator and claims administrator *for contraceptive benefits*." 78 Fed. Reg. at 39,879 (emphases added).  Plaintiffs' actions, therefore, directly result in the provision of the objectionable products and services to their employees, contrary to their sincerely held religious beliefs.

12.   Plaintiff Archdiocese of Washington appears to qualify as a "religious employer," and, as such, is eligible for the "religious employer" exemption.  However, the Archdiocese operates a self-insurance plan that encompasses not only individuals directly employed by the Archdiocese itself, but, in addition, individuals employed by affiliated Catholic organizations including, but not limited to, Plaintiffs CCA, Archbishop Carroll, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and CIC.  Because Plaintiffs CCA, Archbishop Carroll, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and CIC do not themselves appear to qualify as exempt "religious employers," the U.S. Government Mandate requires that

the Archdiocese either (1) sponsor a plan that will provide, pay for, and/or facilitate the provision

of the objectionable products and services to the employees of Plaintiffs CCA, Archbishop

Carroll, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, CIC, and other

organizations, or (2) no longer extend its plan to these organizations, subjecting them to massive

fines if they do not contract with another insurance provider that will provide the objectionable

coverage.

13.    This appears to be a reversal of the Government's original interpretation of the

Mandate.  As originally understood, the exemption would have allowed Plaintiffs CCA,

Archbishop Carroll, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and CIC

to remain on the Archdiocese' plan, which, in turn, would have shielded them from the Mandate

if the Archdiocese was exempt.  *See* 77 Fed. Reg. 16,501, 16,502 (Mar. 21, 2012).  The

Government's revised interpretation of the Mandate, as contained in the Final Rule, removes this

protection and thereby *increases* the number of religious organizations subject to the Mandate.  In

so doing, the Mandate seeks to divide the Catholic Church, artificially separating its "houses of

worship" from its ministries, directly contrary to Pope Emeritus Benedict XVI's admonition that

"[t]he Church cannot neglect the service of charity any more than she can neglect the Sacraments

and the Word."

14.    The U.S. Government Mandate is irreconcilable with the First Amendment, RFRA,

the Administrative Procedure Act, and other laws.  The Government has not demonstrated any

compelling interest in forcing Plaintiffs to provide, pay for, and/or facilitate access to abortion-

inducing products, sterilization, and contraception.  Nor has the Government demonstrated that

the U.S. Government Mandate is the least restrictive means of advancing any interest it has in

increasing access to these products and services, which are already widely available and which

the Government could make more widely available without conscripting Plaintiffs as conduits for the dissemination of products and services to which they so strongly object. The Government, therefore, cannot justify its decision to force Plaintiffs to provide, pay for, and/or facilitate access to these products and services in violation of their sincerely held religious beliefs.

15. Accordingly, Plaintiffs seek a declaration that the U.S. Government Mandate cannot lawfully be applied to Plaintiffs, an injunction barring its enforcement, and an order vacating the Mandate.

## I.     PRELIMINARY MATTERS

16. "Roman Catholic Archbishop of Washington, and his successors in office, in accordance with the discipline and government of the Roman Catholic Church, a corporation sole," is the legal name for Plaintiff Archdiocese of Washington. The Archdiocese is a nonprofit corporation sole, incorporated by Congress in 1948. It is considered to be a Washington, D.C., corporation; its principal place of business is in Hyattsville, Maryland. It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

17. Plaintiff CCA is a nonprofit corporation incorporated in Washington, D.C. Its principal place of business is in Hyattsville, Maryland. It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

18. Plaintiff Archbishop Carroll is a nonprofit corporation incorporated in Washington, D.C. Its principal place of business is in Washington, D.C. It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

19.     Plaintiff Don Bosco is a nonprofit corporation incorporated in Maryland.  Its principal place of business is in Takoma Park, Maryland.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

20.     Plaintiff Mary of Nazareth is a nonprofit corporation incorporated in Maryland.  Its principal place of business is in Darnestown, Maryland.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

21.     Plaintiff Catholic Charities is a nonprofit corporation incorporated in Washington, D.C.  Its principal place of business is in Washington, D.C.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

22.     Plaintiff Victory Housing is a nonprofit corporation incorporated in Maryland.  Its principal place of business is in Rockville, Maryland.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

23.     Plaintiff CIC is a nonprofit corporation incorporated in Washington, D.C.  Its principal place of business is in Washington, D.C.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

24.     Plaintiff Catholic University of America is a nonprofit Washington, D.C., corporation with its principal place of business in Washington, D.C.  It is organized exclusively

for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

25.     Plaintiff Thomas Aquinas College is a non-profit California corporation with its principal place of business in Santa Paula, California.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

26.     Defendant Kathleen Sebelius is the Secretary of the U.S. Department of Health and Human Services ("HHS").  She is sued in her official capacity.

27.     Defendant Thomas Perez is the Secretary of the U.S. Department of Labor.  He is sued in his official capacity.

28.     Defendant Jacob J. Lew is the Secretary of the U.S. Department of the Treasury. He is sued in his official capacity.

29.     Defendant U.S. Department of Health and Human Services is an executive agency of the United States within the meaning of RFRA and the Administrative Procedure Act ("APA").

30.     Defendant U.S. Department of Labor is an executive agency of the United States within the meaning of RFRA and the APA.

31.     Defendant U.S. Department of the Treasury is an executive agency of the United States within the meaning of RFRA and the APA.

32.     This is an action for declaratory and injunctive relief under 5 U.S.C. § 702, 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 2000bb-1.

33.     An actual, justiciable controversy currently exists between Plaintiffs and Defendants.  Absent a declaration resolving this controversy and the validity of the U.S. Government Mandate, Plaintiffs will be required to provide, pay for, and/or facilitate access to

objectionable products and services in contravention of their sincerely held religious beliefs, as described below.

34.     Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

35.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(4), and 1346(a)(2).

36.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1).

**A.     The Archdiocese**

37.     Plaintiff Archdiocese of Washington encompasses 139 parishes serving Washington, D.C., and Maryland's Calvert, Charles, Montgomery, Prince George's, and St. Mary's counties, including the nearly 600,000 Catholics residing therein.  Originally part of the Archdiocese of Baltimore—the oldest diocese in the United States—Washington, D.C., was named a separate archdiocese by Pope Pius XII in 1939.  The five neighboring Maryland counties were added shortly thereafter.  The Archdiocese was incorporated by an Act of Congress in 1948, establishing a corporation sole in the name of the Archbishop.  The parishes of the Archdiocese and fifty-three schools are part of the corporation sole.  The charitable work of the Archdiocese is also performed through a number of separate, affiliated corporations, including (among others) CCA, Archbishop Carroll, Don Bosco, Mary of Nazareth, Victory Housing, CIC, and Catholic Charities.

38.     The Archdiocese has been led since 2006 by Cardinal Donald W. Wuerl, formerly the Bishop of Pittsburgh.  Cardinal Wuerl is assisted in his ministry by four auxiliary bishops and by a staff of clergymen, religious brothers and sisters, and lay people.  The Archdiocese has approximately 2,100 benefits-eligible employees.

39.     The Archdiocese itself—that is, the corporation sole—carries out a tripartite spiritual, educational, and social service mission, reflecting the several dimensions of its ministry. The spiritual ministry of the Archdiocese is conducted largely through its parishes: through the ministry of its priests, the Archdiocese ensures the regular availability of the sacraments to all Catholics living in or visiting the D.C. area.  It also provides numerous other opportunities for prayer, worship, and faith formation.  In addition to overseeing the sacramental life of its parishes, the Archdiocese coordinates Catholic campus ministries at six colleges and universities within its borders.

40.     The Archdiocese conducts its educational mission through its schools.  The first Catholic school opened in the nation's capital nearly 200 years ago, before the city had a public school system.

41.     Much of the Archdiocese's educational mission is performed through fifty-three elementary schools that are part of the corporation sole.  Those schools serve nearly 14,300 students and employ over 1200 teachers (including principals) and an additional number of school staff.  The educational work of the Archdiocese is also carried out through the Consortium of Catholic Academies, Mary of Nazareth Roman Catholic Elementary School, Archbishop Carroll High School, and Don Bosco Cristo Rey High School, which are archdiocesan schools managed and operated by separate, affiliated corporations. Together, these schools, whether part of the corporation sole or incorporated separately, are referred to as "Archdiocesan schools."

42.     Archdiocesan schools welcome students in all financial conditions, from all backgrounds, and of any or no faith.  In order to make a Catholic education available to as many children as possible, the Archdiocese expends substantial funds in tuition assistance programs; it awarded $5 million in tuition assistance for the 2011-2012 school year.  Through direct subsidies

to parishes for students in need, the Archdiocese gives an additional $4.5 million to Catholic education on an annual basis.  Forty-six percent of the students in the fifty-three elementary schools that are part of the corporation sole are minorities.

43.     The Catholic educational system has demonstrated a particular dedication to teaching the underserved.  For example, St. Augustine's School, located in D.C.'s U Street neighborhood, was founded by free blacks and former slaves in 1858 and began educating black students four years before public education for black children became mandatory in the District of Columbia.  It is currently led by a Nigerian order of nuns and serves nearly 200 students, 100% of whom are minorities and 59% of whom are not Catholic.  Schools like St. Augustine's are no less an expression and outgrowth of genuine Catholic belief because they primarily serve non-Catholics.  Indeed, quite the opposite: the Archdiocese sees these schools as a vital part of its mission to offer to every student, in every place, a safe, morally sound, and academically rigorous education.

44.     The schools of the Archdiocese offer a unique educational experience.  As Cardinal Wuerl has said about Catholic education, "we educate people not just for exams, but for life eternal.  We educate the whole person: mind, body, and spirit."  To that end, the Archdiocesan schools have established priorities that make them stand out from other educational institutions.  Students are taught faith—not just the basics of Christianity, but how to have a relationship with God that will remain with them after they leave their Catholic school.  Service, the giving of one's time and effort to help others, is taught as both a requirement of true faith and good citizenship.  Finally, high academic standards help each student reach his or her potential. Three Archdiocesan schools were among the forty-nine private schools nationwide to receive the

U.S. Department of Education's Blue Ribbon Schools Award in the 2012–2013 school year. Nationally, over 99% of students in Catholic high schools graduate.

45.   The Archdiocese also operates seven early childhood development programs that provide an Archdiocesan-approved curriculum for preschool students ages three to four.

46.   The social service work of the Archdiocese is performed largely through its parishes, which, like the fifty-three elementary schools discussed above, are also part of the corporation sole.  The parishes that comprise the Archdiocese maintain their own charitable efforts, serving the needs of their communities with programs including parish chapters of the St. Vincent DePaul Society, adopt-a-family programs at Christmas, meals served to the homeless, and visits to nursing homes.  The Archdiocese oversees all of the social service work undertaken by its parishes.  Neither the Archdiocese nor its parishes keeps a tally of persons served through these outreach programs, nor do they request to know the religious affiliation of those served. Like the entire Catholic Church, the Archdiocese is committed to serving anyone in need, regardless of religion.

47.   The Archdiocese operates a self-insured health plan.  That is, the Archdiocese does not contract with a separate insurance company that provides health care coverage to its employees.  Instead, the Archdiocese itself functions as the insurance company underwriting its employees' medical costs.

48.   Plaintiffs CCA, Archbishop Carroll, Don Bosco, Mary of Nazareth, CIC, Victory Housing, and Catholic Charities also offer coverage through the Archdiocese's self-insurance plan.

49.   Consistent with Church teachings, this plan does not cover abortion-inducing products, contraceptives, or sterilization.  In very limited circumstances, the Archdiocese's health

plan administrator can override the exclusion of certain products commonly used as contraceptives if a physician certifies that they were prescribed with the intent of treating certain medical conditions, not with the intent to prevent pregnancy.

50. The Archdiocese's plan is administered by a third party administrator, NCAS. NCAS handles the administrative aspects of the Archdiocese's self-insured employee health plan, but NCAS bears none of the risks for benefits nor does it provide any of the funds used to pay health care providers.

51. The Archdiocese's self-insured health plan does not meet the Affordable Care Act's definition of a "grandfathered" plan. The Archdiocese has not included and does not include a statement in plan materials provided to participants or beneficiaries informing them that it believes its plan is a grandfathered health plan within the meaning of section 1251 of the Affordable Care Act. *See, e.g.*, 26 C.F.R. § 54.9815-1251T(a)(2)(i).

52. The plan year for the Archdiocese (and the organizations it insures) begins on January 1.

### B. The Consortium of Catholic Academies

53. The Consortium of Catholic Academies was founded in order to centralize resources, staff and teacher training, and oversight for inner-city parish elementary schools in Washington, D.C. There are currently four CCA schools—Sacred Heart, in the Mount Pleasant neighborhood of Northwest D.C.; St. Anthony, located in the Brookland neighborhood of Northeast D.C.; and St. Francis Xavier and St. Thomas More, both located in Southeast D.C.

54. According to its bylaws, CCA's purpose is to engage in charitable, educational, and/or religious activities of every description in accordance with the teachings of the Roman Catholic Church, as exclusively determined by the Roman Catholic Archbishop of Washington. Specifically, it exists to provide management and support for Catholic elementary schools.

55.     CCA plays a crucial role in the effort to provide inner-city children in Washington, D.C. with a safe, morally sound, and academically rigorous alternative to the District's public school system.

56.     CCA welcomes students in all financial conditions, from all backgrounds, and of any or no faith.  Forty percent of CCA's 794 students live at or below the federal poverty line.  Only one percent of students enrolled in CCA schools are non-minority students.  Sixty-four percent of CCA's students are non-Catholic.

57.     CCA employs approximately 119 teachers and staff.  Like the Archdiocese, CCA employs individuals of all faiths.  CCA does not know how many of its employees are Catholic.

58.     CCA does not appear to qualify as an entity described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, CCA does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

59.     CCA is an affiliated corporation of the Archdiocese.  The Archdiocese directly oversees the curriculum and management of the CCA schools through its Catholic Schools Office.

60.     CCA employees are offered health insurance through the Archdiocese's health plan.

**C.     Archbishop Carroll**

61.     Archbishop Carroll High School, in Northeast D.C., was at its founding in 1951 the first fully integrated high school in Washington.

62.     Archbishop Carroll offers its diverse student body a rigorous college preparatory education in a supportive learning environment.  For example, it is one of a select number of high schools in the D.C. area offering the International Baccalaureate Programme; in the first year the

16

Programme was offered, nearly 20% of Carroll juniors enrolled.  Over 98% of Carroll graduates go on to college.

63.     Consistent with its Catholic identity, Archbishop Carroll teaches its students to integrate faith and life.  It stresses the importance of building a just society and provides numerous opportunities for students to participate in charitable work.  Its annual Thanksgiving Food Drive, for example, is one of the largest high school food drives in the country.

64.     Archbishop Carroll welcomes students in all financial conditions, from all backgrounds, and of any or no faith.  It has a co-ed student body of nearly 450 students.  Of these students, 99% are non-white and 77% are non-Catholic.

65.     Archbishop Carroll has seventy employees.  Like the Archdiocese, Archbishop Carroll employs individuals of all faiths.

66.     Archbishop Carroll is an affiliated corporation of the Archdiocese.  The Archdiocese supports and oversees the curriculum of Archbishop Carroll.

67.     Archbishop Carroll does not appear to qualify as an entity described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, Archbishop Carroll does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

68.     Archbishop Carroll employees are offered health insurance through the Archdiocese's health plan.

**D.     Don Bosco**

69.     Don Bosco Cristo Rey High School, in Takoma Park, Maryland, is a joint project of the Archdiocese and the Salesians of Don Bosco that serves students from economically challenged families.

70.     Don Bosco offers its diverse student body a rigorous college preparatory education in a supportive learning environment.  All students participate in the Corporate Work

17

Study Program where they gain professional work experience and earn money to pay for a portion of their education.  For the last three years, 100% of Don Bosco's graduating class was accepted to college.

71.      Consistent with its Catholic identity, Don Bosco teaches its students to integrate faith and life.  It stresses the importance of building a just society and provides numerous opportunities for students to participate in charitable work.  For example, past activities have included student participation in the Help the Homeless Walkathon; the Mass, March, and Rally for Life; a canned food drive; and a back pack drive.

72.      Don Bosco welcomes students from low-income families who have demonstrated the need and motivation to help earn their own tuition money through a work study program. Students come from all backgrounds, and are of any or no faith.  The school has a co-ed student body of 298 students.

73.      Don Bosco has 51 employees.  Like the Archdiocese, Don Bosco employs individuals of all faiths.

74.      Don Bosco is an affiliated corporation of the Archdiocese.  The Archdiocese supports and oversees the curriculum of Don Bosco.

75.      Don Bosco does not appear to qualify as an entity described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, Don Bosco does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

76.      Don Bosco's employees are offered health insurance through the Archdiocese's health plan.

**E.    Mary of Nazareth**

18

77.     Mary of Nazareth Roman Catholic Elementary School, in Darnestown, Maryland prepares children for lives of service to God and neighbor, through a rigorous academic program rooted in the faith and teachings of the Roman Catholic Church.

78.     Mary of Nazareth provides students with a well-rounded curriculum, which focuses on the spiritual, developmental, emotional, cognitive, and physical well-being of its students.  Teachers utilize a variety of resources, teaching methods and assessments to cater to the various learning styles and diverse needs of each student.

79.     Mary of Nazareth's success has been recognized by the U.S. Department of Education, which recently bestowed upon the school its Blue Ribbon School Award.

80.     Consistent with its Catholic identity, Mary of Nazareth teaches its students to integrate faith and life.  It stresses the importance of building a just society and provides numerous opportunities for students to participate in charitable work.  For example, students have raised funds to help the homeless, collected winter coats for the poor, collected change to support a pregnancy center, purchased a llama and buffalo for an African community, and held a carwash to support hurricane victims.  Individual grade levels often have their own service projects.  For example, kindergartners recycled soda tabs to help the military; first grade sent care packages to the Marines; second grade made storyboards for abused mothers; third grade sent letters to Army personnel in Afghanistan; fourth grade created coloring books and crafts for children in the hospital; fifth grade collected toys for the Children's Inn; sixth grade hosts and plays games with seniors from a local nursing home; seventh grade sorts and shelves food at a food pantry; and eighth grade serves meals at a soup kitchen.

81.     Mary of Nazareth welcomes students in all financial conditions, from all backgrounds, and of any or no faith.  It has a co-ed student body of approximately 545 students.

82.    Mary of Nazareth has 44 employees.  Like the Archdiocese, Mary of Nazareth employs individuals of all faiths.

83.    Mary of Nazareth is an affiliated corporation of the Archdiocese.  The Archdiocese supports and oversees the curriculum of Mary of Nazareth.

84.    Mary of Nazareth does not appear to qualify as an entity described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, Mary of Nazareth does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

85.    Mary of Nazareth's employees are offered health insurance through the Archdiocese's health plan.

**F.    Catholic Charities**

86.    Catholic Charities, the largest non-governmental social service provider in the region, provided services to over 100,000 people last year.  Its purpose is to carry out the mandates of the Gospel and the social teaching of the Church through works of Christian charity, service, and social justice by providing competent and caring social services, special assistance to those in great need, and programs of community outreach and advocacy using the skills and talents of professional staff and volunteers.  Catholic Charities pursues these goals through its own programs and through partnerships with parishes, community groups, and governmental agencies.

87.    The seventy-seven programs run by Catholic Charities in fifty-three locations provide a panoply of services, including financial assistance, dental and medical care, pro bono legal aid, adult education, emergency shelters, care for the developmentally disabled, English as a Second Language courses, and many others.

88.    For example, the Spanish Catholic Center is one of the programs operated by Catholic Charities.  It is an integral part of the social service network serving the Washington,

D.C. area's large and growing immigrant population, with a special outreach to Latinos.  The offerings at the Spanish Catholic Center's four locations include medical and dental care, English classes, job training programs, and a food pantry.  In 2011, the Center served more than 23,000 people through more than 68,000 interactions.  Staff at the Spanish Catholic Center speak eight languages and are well-equipped to serve immigrants from around the world.

89.     Anchor Mental Health, another of Catholic Charities' flagship programs, fights poverty by helping adults with mental illness obtain a diagnosis and treatment plan that will put them on the path to independent lives.  Located in Northeast D.C., it is a full-service mental health clinic that has served more than 1500 persons of all races, religions, and ethnic backgrounds.  A partner program operated by Catholic Charities, ChAMPS, or Children & Adolescent Mobile Psychiatric Service, provides help for families and children experiencing a behavioral or mental health crisis.  A crisis response team is available twenty-four hours a day to respond to calls made to the ChAMPS hotline; the team will go to the child's home or school to offer assistance and begin recovery—at no cost to the child's family.

90.     Catholic Charities is an affiliated corporation of the Archdiocese.

91.     Catholic Charities serves people in need without regard to their religion.  It does not ask whether people whom it serves are Catholic and, therefore, it does not know whether they are Catholic.

92.     Catholic Charities has approximately 890 employees.  Catholic Charities does not inquire about the religious commitments of its applicants for employment, and, as a result, it does not know how many of its employees are Catholic.

93.     Catholic Charities does not appear to qualify as an entity described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, Catholic Charities does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

94.     Catholic Charities employees are offered health insurance through the Archdiocese's health plan.

### G.     Victory Housing

95.     Since 1979, Victory Housing has provided affordable housing to residents of the Washington, D.C. area.  Its mission is to build, acquire, renovate, manage and operate affordable housing and to provide related services for low- to moderate-income frail and independent senior citizens and low-income families, consistent with Gospel values and Catholic social teachings.

96.     Victory Housing provides a variety of services relative to the needs of the community.  For seniors in need of assistance with day-to-day tasks, Victory Housing offers assisted living facilities that provide an inviting, non-institutional setting where an experienced staff balances personalized service with an active sense of community.  For fixed income seniors, Victory Housing offers safe, comfortable housing in a variety of locations designed to keep residents close to their families and connected to their communities.  For working families with modest incomes and a need for affordable rental housing close to jobs and transportation, Victory Housing provides workforce housing by acquiring, developing, and revitalizing distressed apartments in up-and-coming neighborhoods.

97.     Currently Victory Housing operates 28 facilities in neighborhoods throughout the greater Washington, D.C. area.  It provides a total of 1,911 residential units across the archdiocese and 1,693 of those units are occupied by those with incomes below 60% of the median income.

98.     Victory Housing is an affiliated corporation of the Archdiocese.

99.     Victory Housing serves people in need without regard to their religion.

100.    Victory Housing has approximately 184 employees.

101.    Victory Housing does not appear to qualify as an entity described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, Victory Housing does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

102.    Victory Housing's employees are offered health insurance through the Archdiocese's health plan.

**H.    Catholic Information Center**

103.    The Catholic Information Center provides a variety of spiritual, intellectual, and professional services from its location in downtown Washington, D.C.

104.    The CIC operates the city's largest Catholic bookstore and has designed its own "lifetime reading plan"—a selection of books recommended for learning more about and growing deeper in the Catholic faith over a lifetime.

105.    The CIC is more than just a bookstore, however.  Daily mass is offered at an on-site chapel, and priests and other staff are available to provide spiritual direction to visitors.  In 2012, more than 700 people frequented the Catholic Information Center bookstore every week, including over 200 a week coming for daily Mass and Confession, and 75 a week to meet for spiritual direction.

106.    The CIC also sponsors a variety of events and programs designed to enable participants to live an integrated life and to engage in all areas of human endeavors.  For example, CIC's Young Professionals Program provides monthly opportunities for young adults to gather for fellowship and conversation with prominent thinkers, clerics, and intellectuals.  In 2012–13, CIC welcomed such notable public intellectuals as Robert George, Mary Ann Glendon, George Weigel, Michael Novak, Bill Donahue, and Arthur Brooks.

107.    CIC is an affiliated corporation of the Archdiocese.

108.    CIC has approximately 9 employees.

109.    CIC does not appear to qualify as an entity described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, CIC does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

110.    CIC's employees are offered health insurance through the Archdiocese's health plan.

### I.    The Catholic University of America

111.    Located in the heart of Washington, D.C., CUA is the national university of the Roman Catholic Church in the United States and the only institution of higher education founded and sponsored by the bishops of this country.  It was established in 1887 with the support and approval of the Holy See.  The University was originally a graduate research center; it opened its doors to undergraduates in 1904.  "At every level" the University is "dedicated to the advancement of learning and particularly to the development of knowledge in the light of Christian revelation, convinced that faith is consistent with reason and that theology and other religious studies themselves profit from the broader context of critical inquiry, experimentation and reflection."

112.    As described in its mission statement, "The Catholic University of America is committed to being a comprehensive Catholic and American institution of higher learning, faithful to the Teachings of Jesus Christ as handed on by the Church.  Dedicated to advancing the dialogue between faith and reason, The Catholic University of America seeks to discover and impart the Truth through excellence in teaching and research, all in service to the Church, the nation, and the world."

113.   The University embraces the riches of the Catholic intellectual tradition, as reflected in *Ex Corde Ecclesiae*, "consecrat[ing] itself without reserve to the cause of truth."  "As a Catholic university, it desires to cultivate and impart an understanding of the Christian faith within the context of all forms of human inquiry and values."  At the same time, "[a]s a member of the American academic community, it accepts the standards and procedures of American institutions and seeks to achieve distinction within the academic world."  To those ends, the University is composed of twelve schools, including Arts & Sciences, Engineering, Nursing, Music, and others.  Three of the schools are pontifical faculties, accredited by the Holy See.  Awarding undergraduate degrees in seventy-two programs, master's degrees in 103 programs, and doctoral or terminal degrees in sixty-six programs, the University pursues the highest academic achievement in every discipline.

114.   As the first Catholic university in the United States founded as a graduate institution, research plays a prominent role in the University's mission.  The bishops sought to establish "a place where the Church could do its thinking, an institution that would go beyond the preservation of learning and teaching to also encompass the advancement of knowledge through research."  As the home to twenty-one institutes and research centers, the University continues that tradition today.

115.   Though committed to remaining a distinctly Catholic institution, the University opens its doors to students, academics, and prospective employees of all faiths and creeds.  Over 3600 students are currently enrolled in the University's undergraduate programs, and nearly 3300 are enrolled in its graduate and law programs.  The school maintains a regular (full-time) faculty of 426 members and an additional 417 temporary faculty members.  CUA also employs approximately 923 staff members.

116.   The University's mission to educate and serve others extends beyond the borders of CUA's campus.  For example, the University has developed numerous faith-based charitable programs in which its students, professional staff, and faculty participate.  These programs serve individuals regardless of faith, race, or financial condition and range from volunteer opportunities in D.C. (where students can participate in a variety of activities, such as serving the homeless or working as tutors) to service/missions trips abroad (where students assist the underprivileged in communities in Central and South America).  CUA also hosts a number of educational events, lectures, and programs on its campus that are open to the public.  The University is home to the Catholic University of America Press, which publishes between thirty-five to forty books annually in fields including theology, philosophy, literature, history, and political theory.

117.   Faith is at the heart of all of the University's efforts.  Indeed, the University's commitment to Catholic teachings permeates campus life.  Most full-time undergraduates are housed on campus in residence halls that are predominantly (and will soon be entirely) single-sex.  The University maintains a visitation policy that does not permit men to be overnight guests in the women's residence halls and vice versa.  The University's student handbook reminds students that the University "is committed to the teachings and moral values of the Catholic Church," including the belief that sexual union should be "'expressed only in a monogamous heterosexual relationship of lasting fidelity in marriage.'"  And the University does not make artificial contraception available to its students, faculty, or staff at its on-campus health care facility unless necessary for medical treatment unrelated to contraception.

118.   CUA's Catholic educational mission is furthered by its leadership.  The President of the University has always been a Catholic, and twelve of the University's fifteen Presidents

have been clerics or members of a religious order.  The President is elected by the University's

Board of Trustees and confirmed by the Vatican Congregation for Catholic Education.  The

Board itself is entrusted with supervising the management of the University and determining

University policy.  Twenty-four of the Board's forty-eight elected members must be clerics; at

least eighteen of those twenty-four must be members of the United States Conference of Catholic

Bishops.  The Archbishop of Washington serves as the chancellor of the University, acting as a

liaison between the University and the United States Conference of Catholic Bishops, as well as

between the University and the Holy See.

119.    More than 90% of full-time undergraduate students receive some form of

financial aid, with the Office of Student Financial aid awarding nearly $40 million in

institutional grants and scholarships as well as more than $2 million in federal and state grant

funds to undergraduate students in the 2010–11 school year.

120.    CUA does not appear to qualify as an entity described in section 6033(a)(3)(A)(i)

or (iii) of the Internal Revenue Code.  Accordingly, CUA does not qualify as a "religious

employer" under the exemption to the U.S. Government Mandate.

121.    CUA's employees are offered United Healthcare health care plans.  These plans

do not cover abortion-inducing products or sterilization.  Consistent with Church teachings,

CUA's plans cover products commonly used as contraceptives only when prescribed with the

intent of treating a medical condition, not with the intent to prevent pregnancy.

122.    The plan year for CUA's employer health plan begins on December 1.

123.    CUA makes available to its students a health plan provided by AETNA.  Like

CUA's employee plans, the plan offered to CUA students does not cover abortion-inducing

products or sterilization.  The health plan CUA offers to its students covers products commonly

used as contraceptives only when prescribed with the intent of treating a medical condition, not with the intent to prevent pregnancy or induce abortion.

124.    The plan year for CUA's student health plan begins on August 14.

125.    The health plans offered by CUA to its employees and students do not meet the Affordable Care Act's definition of a "grandfathered" plan.  CUA has not included and does not include a statement in plan materials provided to participants or beneficiaries informing them that it believes its plans are grandfathered health plans within the meaning of section 1251 of the Affordable Care Act.  *See, e.g.*, 26 C.F.R. § 54.9815-1251T(a)(2)(i).

### J.  Thomas Aquinas College

126.    Thomas Aquinas College, a California non-profit corporation located in Santa Paula, California, is a small liberal-arts school committed to fidelity to the Catholic Church.

127.    TAC was launched in 1969, when a small group of Catholic educators wrote an essay identifying the problems they perceived in American higher education generally and Catholic colleges in particular. The essay, entitled *Thomas Aquinas College: A Proposal for the Fulfillment of Catholic Liberal Education*, proposed a solution to those problems in the form of a new Catholic college.   As explained in the proposal, the founders were determined to establish a school that would remain both authentically Catholic and deeply committed to liberal arts education.

128.    The College welcomed its first freshman class in 1971, and it has remained faithful to its founding mission ever since. The College currently has 370 full-time students enrolled in its four-year program of Catholic liberal education.

129.    TAC does not offer electives, nor do its students choose majors or minors. Instead, every student participates in the same course of study, which includes rigorous classes in

theology, philosophy, natural science, mathematics, language, and music.  In addition, the

curriculum includes a four-year seminar largely devoted to history and literature.  Classes at TAC

are all taught in tutorial or seminar style; there are no lecture courses.

130.    The intellectual tradition and moral teachings of the Catholic Church infuse the

whole life of the College.  The curriculum is ordered to theology, and the College strives in all

things to remain faithful to the Magisterium (that is, the authoritative teaching body) of the

Catholic Church.

131.    The College seeks to hire faculty who are committed Catholics.  In keeping with

the College's commitment to remain faithful to the Magisterium of the Church, and in accordance

with Pope John Paul II's 1990 Encyclical, *Ex Corde Ecclesiae*, Catholic members of the College

faculty make a public Profession of Faith and take an Oath of Fidelity to the teachings of the

Church.  Approximately 93% of its current employees (including both faculty and non-faculty

staff) are Catholic.  Although the College does occasionally retain non-Catholic faculty, its

institutional commitment makes such appointments unusual.  The College has four Catholic

priests to minister to the spiritual needs of the students.  Catholic Holy Days of Obligation are

observed by the College as holidays and all employees receive them as paid holidays.

132.    The College has 78 benefits-eligible employees.

133.    The students at TAC actively embrace the Catholic faith.  Most students attend

weekday Mass in addition to Sunday Mass and participate regularly in other devotional practices.

A number of students serve as Catholic catechism instructors to children at local parishes.

Although TAC warmly welcomes non-Catholic students, approximately 97% of its current

students are Catholic.

134.    As another manifestation of their faith, which encourages care for the neediest, students at TAC regularly hold food drives, blood drives, and charitable fundraisers on campus.

135.    Each year, approximately 10% of the graduates of the College enter a seminary, convent, or other type of training for a life of consecrated service to God and the Church.  In keeping with the genuine love for learning the College instills in its students, the most popular field among TAC graduates is education:  almost one-third of alumni (28%) work as educators, many of them at Catholic institutions.

136.    The College's religious beliefs also include traditional Christian teaching on the nature and purpose of human sexuality.  In particular, the College believes that human sexuality is ordered to traditional marriage and the birth and education of children.  The College's commitment to these teachings permeates every aspect of campus life.  For example, all TAC students (except those who are married) live in single-sex residence halls, which are off-limits to members of the opposite sex at all times.  The College's  health care staff does not make artificial contraception available to the College's students or employees.

137.    The College does not appear to qualify as an entity described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, The College does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

138.    TAC offers its employees a health plan through the RETA Trust, which is a self-insurance trust set up by the Catholic bishops of California in 1999 for the purpose of providing medical coverage consistent with Catholic moral teaching.  Consistent with Church teachings, the RETA Trust shares TAC's religious objections to providing, procuring, or facilitating access to abortion-inducing products, abortion, sterilization, or contraceptives.  Accordingly, TAC's

plan offered through the RETA Trust only covers products prescribed with the intent of treating a medical condition, not with the intent to prevent pregnancy or induce abortion.

139.    The third-party administrator for the RETA Trust is Benefit Allocation Systems.

140.    TAC's plan year begins on July 1.

141.    The health plan offered by TAC to its employees does not meet the Affordable Care Act's definition of a "grandfathered" plan.  The RETA Trust has not included and does not include a statement in plan materials provided to participants or beneficiaries informing them that it believes its plans are grandfathered health plans within the meaning of section 1251 of the Affordable Care Act.  *See, e.g.*, 26 C.F.R. § 54.9815-1251T(a)(2)(i).

## II.   **STATUTORY AND REGULATORY BACKGROUND**

### A.   **Statutory Background**

142.    In March 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010)  (collectively, the "Affordable Care Act" or the "Act").  The Affordable Care Act established many new requirements for "group health plan[s]," broadly defined as "employee welfare benefit plan[s]" within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(1), that "provide[] medical care . . . to employees or their dependents."  42 U.S.C. § 300gg-91(a)(1).

143.    As relevant here, the Act requires an employer's group health plan to cover certain women's "preventive care."  Specifically, it indicates that "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum[,] provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for

purposes of this paragraph."  42 U.S.C. § 300gg-13(a)(4).  Because the Act prohibits "cost

sharing requirements," the health plan must pay for the full costs of these "preventive care"

services without any deductible or co-payment.

144.    "[T]he Affordable Care Act preserves the ability of individuals to retain coverage

under a group health plan or health insurance coverage in which the individual was enrolled on

March 23, 2010."  75 Fed. Reg. 41,726, 41,731 (July 19, 2010); 42 U.S.C. § 18011.  These so-

called "grandfathered health plans do not have to meet the requirements" of the U.S. Government

Mandate.  75 Fed. Reg. at 41,731.  HHS estimates that "98 million individuals will be enrolled in

grandfathered group health plans in 2013."  *Id.* at 41,732.

145.    Federal law provides several mechanisms to enforce the requirements of the Act,

including the U.S. Government Mandate.  For example:

a.      Under the Internal Revenue Code, certain employers who fail to offer

"full-time employees (and their dependents) the opportunity to enroll in minimum

essential coverage under an eligible employer-sponsored plan" will be exposed to

significant annual fines of $2,000 per full-time employee.  *See* 26 U.S.C. § 4980H(a),

(c)(1).

b.      Under the Internal Revenue Code, group health plans that fail to provide

certain required coverage may be subject to a penalty of $100 a day per affected

beneficiary.  *See* 26 U.S.C. § 4980D(b); *see also* Jennifer Staman & Jon Shimabukuro,

Cong. Research Serv., RL 7-5700, Enforcement of the Preventive Health Care Services

Requirements of the Patient Protection and Affordable Care Act (2012) (asserting that

this applies to employers who violate the "preventive care" provision of the Affordable

Care Act).

c.      Under ERISA, plan participants can bring civil actions against insurers for unpaid benefits.  29 U.S.C. § 1132(a)(1)(B); *see also* Cong. Research Serv., RL 7-5700.

d.      Similarly, the Secretary of Labor may bring an enforcement action against group health plans of employers that violate the U.S. Government Mandate, as incorporated by ERISA.  *See* 29 U.S.C. § 1132(b)(3); *see also* Cong. Research Serv., RL 7-5700 (asserting that these penalties can apply to employers and insurers who violate the "preventive care" provision of the Affordable Care Act).

146.    Several of the Act's provisions, along with other federal statutes, reflect a clear congressional intent that the executive agency charged with identifying the "preventive care" required by § 300gg-13(a)(4) should exclude all abortion-related services.

147.    For example, the Weldon Amendment, which has been included in every HHS and Department of Labor appropriations bill since 2004, prohibits certain agencies from discriminating against an institution based on that institution's refusal to provide abortion-related services.  Specifically, it states that "[n]one of the funds made available in this Act [to the Department of Labor and the Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."  Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011).  The term "health care entity" is defined to include "an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, *a health insurance plan*, or any other kind of health care facility, organization, or plan." *Id.* § 507(d)(2) (emphasis added).

148.    The legislative history of the Act also demonstrates a clear congressional intent to prohibit the executive branch from requiring group health plans to provide abortion-related services.  For example, the House of Representatives originally passed a bill that included an amendment by Congressman Bart Stupak prohibiting the use of federal funds for abortion services.  *See* H.R. 3962, 111th Cong. § 265 (Nov. 7, 2009).  The Senate version, however, lacked that restriction.  S. Amend. No. 2786 to H.R. 3590, 111th Cong. (Dec. 23, 2009).  To avoid a filibuster in the Senate, congressional proponents of the Act engaged in a procedure known as "budget reconciliation" that required the House to adopt the Senate version of the bill largely in its entirety.  Congressman Stupak and other pro-life House members, however, indicated that they would refuse to vote for the Senate version because it failed to adequately prohibit federal funding of abortion.  In an attempt to address these concerns, President Barack Obama issued an executive order providing that no executive agency would authorize the federal funding of abortion services.  *See* Exec. Order No. 13535, 75 Fed. Reg. 15,599 (Mar. 24, 2010).

149.    The Act, therefore, was passed on the central premise that all agencies would uphold and follow "longstanding Federal laws to protect conscience" and to prohibit federal funding of abortion.  *Id.*  That executive order was consistent with a 2009 speech that President Obama gave at the University of Notre Dame, in which he indicated that his Administration would honor the consciences of those who disagree with abortion, and draft sensible conscience clauses.

### B.    Regulatory Background – Defining "Preventive Care" and the Narrow Exemption

150.    In a span of less than two years, Defendants promulgated the U.S. Government Mandate, subverting the Act's clear purpose to protect the rights of conscience.  The Mandate immediately prompted intense criticism and controversy, in response to which the Government has undertaken various revisions.  None of these revisions, however, alleviates the burden that the

Mandate imposes on Plaintiffs' religious beliefs.  To the contrary, these revisions have resulted in a final rule that is significantly worse than the original one.

### (1) The Original Mandate

151.    On July 19, 2010, Defendants issued interim final rules addressing the statutory requirement that group health plans provide coverage for women's "preventive care."  75 Fed. Reg. 41,726 (citing 42 U.S.C. § 300gg-13(a)(4)).  Initially, the rules did not define "preventive care," instead noting that "[t]he Department of HHS is developing these guidelines and expects to issue them no later than August 1, 2011."  *Id.* at 41,731.

152.    To develop the definition of "preventive care," HHS outsourced its deliberations to the Institute of Medicine ("IOM"), a non-governmental "independent" organization.  The IOM in turn created a "Committee on Preventive Services for Women," composed of 16 members who were selected in secret without any public input.  At least eight of the Committee members had founded, chaired, or worked with "pro-choice" advocacy groups (including five different Planned Parenthood entities) that have well-known political and ideological views, including strong animus toward Catholic teachings on abortion and contraception.

153.    Unsurprisingly, the IOM Committee invited presentations from several "pro-choice" groups, such as Planned Parenthood and the Guttmacher Institute (named for a former president of Planned Parenthood), without inviting any input from groups that oppose government-mandated coverage for abortion, contraception, and sterilization.  Instead, opponents were relegated to lining up for brief open-microphone sessions at the close of each meeting.

154.    At the close of this process, on July 19, 2011, the IOM issued a final report recommending that "preventive care" for women be defined to include "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient

education and counseling for [all] women with reproductive capacity."  IOM, Clinical Preventive

Services for Women: Closing the Gaps 164–65 (2011), *available at* http://www.iom.edu/Reports/

2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx.

     155.    The extreme bias of the IOM process spurred one member of the Committee, Dr.

Anthony Lo Sasso, to dissent from the final recommendation, writing: "[T]he committee process

for evaluation of the evidence lacked transparency and was largely subject to the preferences of

the committee's composition.  Troublingly, the process tended to result in a mix of objective and

subjective determinations filtered through a lens of advocacy."  *Id*. at 232.

     156.    At a press briefing the next day, the chair of the IOM Committee fielded a

question from a representative of the U.S. Conference of Catholic Bishops regarding the

"coercive dynamic" of the Mandate, asking whether the Committee considered the "conscience

rights" of those who would be forced to pay for coverage that they found objectionable on moral

and religious grounds.  In response, the chair illustrated her cavalier attitude toward the religious-

liberty issue, stating bluntly: "[W]e did not take into account individual personal feelings." *See*

Linda Rosenstock, Chair, Inst. Of Med. Comm. On Preventive Servs. For Women, Press Briefing

(July 20, 2011), *available at* http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-

Women-Closing-the-Gaps.aspx.  The chair later expressed concern to Congress about considering

religious objections to the Mandate because to do so would risk a "slippery slope" that could

occur by "opening up that door" to religious liberty.  *See* Executive Overreach: The HHS

Mandate Versus Religious Liberty:  Hearing Before the H. Comm. On the Judiciary, 112th Cong.

(2012) (testimony of Linda Rosenstock, Chair, Inst. Of Med. Comm. On Preventive Servs. For

Women).

157.    Less than two weeks after the IOM report, without pausing for notice and comment, HHS issued a press release on August 1, 2011, announcing that it would adopt the IOM's definition of "preventive care," including all "FDA-approved contraception methods and contraceptive counseling." *See* U.S. Dep't of Health & Human Servs., "Affordable Care Act Ensures Women Receive Preventive Services at No Additional Cost," *available at* http://www.hhs.gov/news/press/2011pres/08/20110801b.html.  HHS ignored the religious, moral and ethical dimensions of the decision and the ideological bias of the IOM Committee and stated that it had "relied on independent physicians, nurses, scientists, and other experts" to reach a definition that was "based on scientific evidence."  Under the final "scientific" definition, the category of mandatory "preventive care" extends to "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." *See* U.S. Dep't of Health & Human Servs., "Women's Preventive Services: Required Health Plan Coverage Guidelines," http://www.hrsa.gov/womensguidelines.

158.    The Government's definition of mandatory "preventive care" also includes abortion-inducing products.  For example, the FDA has approved "emergency contraceptives" such as the morning-after pill (otherwise known as Plan B), which can prevent an embryo from implanting in the womb, and Ulipristal (otherwise known as HRP 2000 or ella), which likewise can induce abortions.

159.    Shortly after announcing its definition of "preventive care," the Government proposed a narrow exemption from the Mandate for a small category of "religious employers" that met all of the following four criteria: "(1) The inculcation of religious values is the purpose of the organization"; "(2) The organization primarily employs persons who share the religious

tenets of the organization"; "(3) The organization serves primarily persons who share the religious tenets of the organization"; and "(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. 46,621, 46,626 (Aug. 3, 2011) (codified at 45 C.F.R. § 147.130(a)(iv)(B)).

160.    As the Government itself admitted, this narrow exemption was intended to protect only "the unique relationship between a house of worship and its employees in ministerial positions." *Id.* at 46,623. It provided no protection for most religious universities, elementary and secondary schools, hospitals, and charitable organizations.

161.    The sweeping nature of the Mandate was subject to widespread and withering criticism. Religious leaders from across the country protested that they should not be punished or considered less religious simply because they chose to live out their faith by serving needy members of the community who might not share their beliefs. As Cardinal Wuerl later wrote, "Never before has the government contested that institutions like Archbishop Carroll High School or Catholic University are religious. Who would? But HHS's conception of what constitutes the practice of religion is so narrow that even Mother Teresa would not have qualified."

162.    Despite such pleas, the Government at first refused to reconsider its position. Instead, the Government "finalize[d], without change," the narrow exemption as originally proposed. 77 Fed. Reg. at 8725, 8729 (Feb. 15, 2012). At the same time, the Government announced that it would offer a "a one-year safe harbor from enforcement" for religious organizations that remained subject to the Mandate. *Id.* at 8728. As noted by Cardinal Timothy Dolan, the "safe harbor" effectively gave religious groups "a year to figure out how to violate our consciences."

163.    A month later, under continuing public pressure, the Government issued an

Advance Notice of Proposed Rulemaking ("ANPRM") that, it claimed, set out a solution to the

religious-liberty controversy created by the Mandate.  77 Fed. Reg. 16,501.  The ANPRM did not

revoke the Mandate, and in fact reaffirmed the Government's view at the time that the "religious

employer" exemption would not be changed.  *Id.* at 16,501-08.  Instead, the ANPRM offered

hypothetical "possible approaches" that would, in the Government's view, somehow solve the

religious-liberty problem without granting an exemption for objecting religious organizations.  *Id.*

at 16,507.  As the U.S. Conference of Catholic Bishops soon recognized, however, any semblance

of relief offered by the ANPRM was illusory. Although it was designed to "create an appearance

of moderation and compromise, it [did] not actually offer any change in the Administration's

earlier stated positions on mandated contraceptive coverage." *See* Comments of U.S. Conference

of Catholic Bishops, at 3 (May 15, 2012), *available at* http://www.usccb.org/about/general-

counsel/rulemaking/upload/comments-on-advance-notice-of-proposed-rulemaking-on-preventive-

services-12-05-15.pdf.

### (2) Plaintiffs' First Lawsuit and the Government's Promise of Non-Enforcement

164.    On May 21, 2012, Plaintiffs (except for TAC, Don Bosco, Victory Housing, Mary

of Nazareth, and CIC) filed suit in U.S. District Court for the District of Columbia seeking to

enjoin the U.S. Government Mandate on the ground that, among other things, it violated their

rights of religious conscience under RFRA and the First Amendment.  *See Roman Catholic*

*Archbishop of Washington v. Sebelius*, No. 1:12-cv-00815 (D.D.C.).  In response to this and

similar litigation, the Government promised that "the regulations [would] *never* be enforced in

their present form," and that the Government was planning to make "amendments to the

regulations in an effort to accommodate religious organizations with religious objections to

contraceptive coverage before the rolling expiration of the safe harbor begins in August 2013."

*Id.*, Defs.' Supp. Br. [Dkt. # 38] at 4 (emphasis added).

165.     According to the Government, "the forthcoming amendments [were] intended to

address the very issue that plaintiffs raise here by establishing alternative means of providing

contraceptive coverage without cost-sharing while accommodating religious organizations'

religious objections to covering contraceptive services."  Mem. of Law in Support of Defs.' Mot.

to Dismiss [Dkt. # 19] at 18.  Indeed, the Government assured this Court, "[o]nce defendants

complete the rulemaking outlined in the ANPRM plaintiffs' challenge to the current regulations

likely will be moot." *Id.* at 20.

166.     In response to the Government's motion to dismiss, Plaintiffs made clear that

even if the ANPRM were enacted, it would still require them to provide, pay for, and/or facilitate

the provision of objectionable insurance coverage for their employees and, therefore, would *not*

relieve the burden on their religious exercise.  Indeed, Plaintiffs submitted six uncontested factual

affidavits expressly so stating.  *See* Pl. Mem. in Opp. [Dkt. #21], Ex. A, Affidavit of Archdiocese

of Washington, Chief Financial Officer, at 13–14 (noting that the ANPRM "still requires the

Archdiocese to facilitate the provision of products and services antithetical to the Catholic faith,

since the Archdiocese's employees would only receive free contraceptives, sterilization,

abortifacients, and related counseling by virtue of their employment at the Archdiocese"); *id.* Ex.

B, Affidavit of Archdiocese of Washington, General Counsel, at 5 (cataloguing "harms [that]

currently exist, and will continue to exist, regardless of the ANPRM"); *id.* Ex. D, Affidavit of

Consortium of Catholic Academies, Executive Director, at 6 ("[T]he ANPRM would not, in fact,

eliminate the burden that the Mandate imposes" because it would "still require [CCA] to provide,

pay for, and/or facilitate the provision of services that violate [CCA's] sincerely held religious

beliefs."); *id.* Ex. E, Affidavit of Archbishop Carroll High School, Vice Principal, at 5 ("The possibilities discussed in the ANPRM would not, in fact, eliminate the burden that the Mandate imposes on ACHS's religious beliefs."); *id.* Ex. F, Affidavit of Catholic Charities, President and CEO, at 6 (same); *id.* Ex. G, Affidavit of Catholic University, Chief of Staff and VP for University Relations, at 8 (noting that the ANPRM would "not in any way alleviate" the harms imposed by Mandate, because the University would still "be forced" to "facilitate" objectionable coverage "by providing both the insurer relationship and the employment through which its employees will have access to health care").

167.    Confronted with these undisputed affidavits, the Government assured the Court that "the ANPRM is a mere starting point, and plaintiffs have ample opportunity to express their concerns and help shape the forthcoming amendments," elaborating:  "The entire purpose of amending the preventive services coverage regulations is to accommodate religious objections such as those raised by plaintiffs.  But plaintiffs simply assume that no such amendment could ever alleviate the need for judicial review.  That assumption is baseless, and prejudges defendants' ongoing rulemaking process."  Def. Reply in Support of Mot. to Dismiss [Dkt. # 24], at 10 & 12 n.10.

168.    Based on the Government's representations, the district court granted the Government's motion to dismiss for lack of ripeness to await the outcome of the "ongoing rulemaking process."  *See* Order, *Roman Catholic Archbishop of Washington v. Sebelius*, No. 13-5091 (D.C. Cir. June 21, 2013) (Dkt. # 17).  Importantly, the Court noted that the Government had made a "binding commitment" not to enforce the Mandate as it then existed, *id.* at 8 n.4, and stated that Plaintiffs would be free to bring another challenge if the Government's promised "accommodation" failed to relieve the burden on their religious freedom.

### (3) The Government's Final Offer and the Empty "Accommodation"

169.    On February 1, 2013, the Government issued a Notice of Proposed Rulemaking

("NPRM"), setting forth in further detail its proposal to "accommodate" the rights of Plaintiffs

and other religious organizations.  Contrary to the Government's previous assurances, however,

the NPRM adopted the proposals contained in the ANPRM.  The NPRM, like the Government's

previous proposals, was once again met with strenuous opposition, including over 400,000

comments.  For example, the U.S. Conference of Catholic Bishops stated that "the

'accommodation' still requires the objecting religious organization to fund or otherwise facilitate

the morally objectionable coverage.  Such organizations and their employees remain deprived of

their right to live and work under a health plan consonant with their explicit religious beliefs and

commitments."  Comments of U.S. Conference of Catholic Bishop, at 3 (Mar. 20, 2013),

*available at* http://www.usccb.org/about/general-counsel/rulemaking/upload/2013-NPRM-

Comments-3-20-final.pdf.  Likewise, Plaintiff Archdiocese noted that the NPRM's proposed

"accommodation" was nothing more than "an accounting maneuver" and did not redress the

burden that the Mandate imposes on religious liberty and that, as a result, the Archdiocese had no

choice but to "continue[] to strenuously oppose the Mandate, including the proposed changes."

Comments of Archdiocese of Washington, at 2 (Apr. 4, 2013), *available at* www.becketfund.org/

wp-content/uploads/2013/04/Comments-4-4-13-Archdiocese-of-Washington.pdf.

170.    Defendants apparently gave no consideration to these or other comments

submitted in opposition to the NPRM's proposed "accommodation."

171.    In fact, on April 8, 2013, the same day the notice-and-comment period ended,

Defendant Sebelius indicated that the accommodation would be implemented, regardless of

opposition.  She stated: "We have just completed the open comment period for the so-called

accommodation, and by August 1st of this year, every employer will be covered by the law with one exception. Churches and church dioceses as employers are exempted from this benefit. But Catholic hospitals, Catholic universities, other religious entities will be providing coverage to their employees starting August 1st. . . . [A]s of August 1st, 2013, every employee who doesn't work directly for a church or a diocese will be included in the benefit package."  The Forum at Harvard School of Public Health, A Conversation with Kathleen Sebelius, U.S. Secretary of Health and Human Services, Apr. 8, 2013, *available at* http://theforum.sph.harvard.edu/events/ conversation-kathleen-sebelius  (Episode 9 at 2:25) (last visited July 12, 2013) (emphases added).

172.    Unsurprisingly, therefore, on June 28, 2013, the Government issued a final rule that adopted substantially all of the NPRM's proposal without significant change.  *See* 78 Fed. Reg. 39,870 (July 2, 2013) ("Final Rule").

173.    The Final Rule makes three changes to the Mandate.  As described below, none of these changes relieves the unlawful burdens placed on Plaintiffs and other religious organizations. Indeed, one of them appears to significantly *increase* that burden by significantly increasing the number of religious organizations subject to the Mandate.

174.    *First*, the Final Rule makes what the Government concedes to be a non-substantive, cosmetic change to the definition of "religious employer."  In particular, it eliminates the first three prongs of that definition, such that, under the new definition, an exempt "religious employer" is simply "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 78 Fed. Reg. at 39,896 (codified at 45 C.F.R. § 147.131(a)).  As the Government has admitted, this new definition does "not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules."  78 Fed. Reg. at 8461.

Instead, it continues to "restrict[]the exemption primarily to group health plans established or maintained by churches, synagogues, mosques, and other houses of worship, and religious orders." *Id.* In this respect, the Final Rule mirrors the intended scope of the original "religious employer" exemption, which focused on "the unique relationship between a house of worship and its employees in ministerial positions." 76 Fed. Reg. at 46,623. Religious organizations that have a broader mission are still not, in the Government's view, "religious employers."

175. The "religious employer" exemption, moreover, creates an official, Government-favored category of religious groups that are exempt from the Mandate, while denying this favorable treatment to all other religious groups. The exemption applies only to those groups that are "refer[red] to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code." This category, however, includes only (i) "churches, their integrated auxiliaries, and conventions or associations of churches," and (iii) "the exclusively religious activities of any religious order." The IRS, moreover, has adopted an intrusive 14-factor test to determine whether a group meets these qualifications. *See Found. of Human Understanding v. United States*, 88 Fed. Cl. 203, 220 (2009). Among these 14 factors is whether the group has " a recognized creed and form of worship," "a definite and distinct ecclesiastical government," "a formal code of doctrine and discipline," "a distinct religious history," "an organization of ordained ministers" "a literature of its own," "established places of worship," "regular congregations, "regular religious services," "Sunday schools for the religious instruction of the young," and "schools for the preparation of its ministers." *Id.* Not only do these factors favor some religious denominations and organizations at the expense of others, but they also require the Government to make intrusive judgments regarding religious beliefs, practices, and organizational features to determine which entities fall into the favored category.

176.    *Second*, the Final Rule establishes an illusory "accommodation" for certain nonexempt objecting religious entities that qualify as "eligible organizations."  To qualify as an "eligible organization," a religious entity must (1) "oppose[] providing coverage for some or all of [the] contraceptive services," (2) be "organized and operate[] as a non-profit entity"; (3) "hold[] itself out as a religious organization," and (4) self-certify that it meets the first three criteria, and provide a copy of the self-certification either to its insurance company or, if the religious organization is self-insured, to its third-party administrator.  26 C.F.R. § 54.9815-2713A(a).  The provision of this self-certification then automatically requires the insurance issuer or third-party administrator to provide or arrange "payments for contraceptive services" for the organization's employees, without imposing any "cost-sharing requirements (such as a copayment, coinsurance, or a deductible)." *Id*. § 54.9816-2713A(b)(2), (c)(2).  The objectionable coverage, moreover, is directly tied to the organization's health plan, lasting only as long as the employee remains on that plan.  *See* 29 C.F.R. § 2590.715-2713 45 C.F.R. § 147.131(c)(2)(i)(B).  In addition, self-insured organizations are prohibited from "directly or indirectly, seek[ing] to influence the[ir] third party administrator's decision" to provide or procure contraceptive services.  26 C.F.R. § 54.9815-2713.

177.    This so-called "accommodation" fails to relieve the burden on religious organizations.  Under the original version of the Mandate, a non-exempt religious organization's decision to offer a group health plan resulted in the provision of coverage for abortion-inducing products, contraception, sterilization, and related counseling.  Under the Final Rule, a non-exempt religious organization's decision to offer a group health plan, coupled with a self-certification, still results in the provision of coverage—now in the form of "payments"—for abortion-inducing products, contraception, sterilization, and related counseling.  *Id*. § 54.9816-2713A(b)-(c).  In

both scenarios, Plaintiffs' actions trigger the provision of "free" contraceptive coverage to their

employees in a manner contrary to their beliefs.  The provision of the objectionable products and

services is directly tied to Plaintiffs' insurance policies, as the objectionable "payments" are

available only so long as an employee is on the organization's health plan.  *See* 29 C.F.R. §

2590.715-2713A (for self-insured employers, the third-party administrator "will provide or

arrange separate payments for contraceptive services . . . for so long as [employees] are enrolled

in [their] group health plan"); 45 C.F.R. § 147.131(c)(2)(i)(B) (for employers that offer insured

plans, the insurance issuer must "[p]rovide separate payments for any contraceptive services . . .

for plan participants and beneficiaries for so long as they remain enrolled in the plan").  For self-

insured organizations, moreover, the self-certification constitutes the religious organization's

"*designation* of the third party administrator(s) as plan administrator and claims administrator for

contraceptive benefits."  78 Fed. Reg. at 39,879 (emphasis added).  Thus, employer health plans

offered by non-exempt religious organizations are the vehicle by which "free" abortion-inducing

products, contraception, sterilization, and related counseling are delivered to the organizations'

employees.

178.    Needless to say, this shell game does not address Plaintiffs' fundamental religious

objection to improperly facilitating access to the objectionable products and services.  As before,

Plaintiffs are coerced, through threats of crippling fines and other pressure, into facilitating access

to contraception, abortion-inducing products, sterilization, and related counseling for their

employees, contrary to their sincerely held religious beliefs.

179.    The so-called "accommodation," moreover, requires Plaintiffs to cooperate in the

provision of objectionable coverage in other ways as well.  For example, in order to be eligible

for the so-called "accommodation," non-exempt Plaintiffs must provide a "certification" to their

insurance provider or third-party administrator setting forth their religious objections to the

Mandate.  For self-insured Plaintiffs, before they can even provide the certification, they must

first find and identify a third party administrator who is willing to provide the very coverage

Plaintiffs find objectionable.  Once this "certification" is provided, it automatically triggers an

obligation on the part of the insurance provider or third-party administrator to provide or procure

the objectionable products and services for these Plaintiffs' employees.   Moreover, it is only

through Plaintiff Archdiocese's contractual relationship with the third party administrator that any

employee of the "eligible" Plaintiffs will receive the objectionable coverage.

180.    The U.S. Government Mandate also requires Plaintiffs to subsidize the

objectionable products and services.

181.    For organizations that procure insurance through a separate insurance provider,

the Government asserts that the cost of the objectionable products and services will be "cost

neutral" and, therefore, that Plaintiffs will not actually be paying for it.

182.    The Government's "cost-neutral" assertion, however, is implausible.  It rests on

the assumption that cost "savings" from "fewer childbirths" will be at least as large as the direct

costs of paying for contraceptive products and services and the costs of administering individual

policies.  78 Fed. Reg. at 8463.  Some employees, however, will choose not to use contraception

notwithstanding the Mandate.  Others would use contraception regardless of whether it is being

paid for by an insurance company.  And yet others will shift from less expensive to more

expensive products once coverage is mandated and cost-sharing is prohibited.  Consequently,

there can be no assurance that cost "savings" from "fewer childbirths" will offset the cost of

providing contraceptive services.

183.    More importantly, even if the Government's "cost-neutral" assertion were true, it is irrelevant.  The so-called "accommodation" is nothing more than a shell game.  Premiums previously paid by the objecting employers to cover, for example, "childbirths," will now be redirected to pay for contraceptive products and services.  Thus, the objecting employer is still required to pay for the objectionable products and services.

184.    For self-insured organizations, the Government's "cost-neutral" assumption appears to be similarly implausible.  The Government asserts that third-party administrators required to provide or procure the objectionable products and services will be compensated by reductions in user fees that they otherwise would pay for participating in federally-facilitated health exchanges.  *See* 78 Fed. Reg. 39,882.   Such fee reductions are to be established through a highly regulated and bureaucratic process for evaluating, approving, and monitoring fees paid in compensation to third-party administrators.  Such regulatory regimes, however, do not fully compensate the regulatory entities for the costs and risks incurred.  As a result, few if any third-party administrators are likely to participate in this regime, and those that do are likely to increase fees charged to the self-insured organizations.

185.    Either way, as with insured plans, self-insured organizations likewise will be required to subsidize contraceptive products and services notwithstanding the so-called "accommodation."

186.    For all of these reasons, the U.S. Government Mandate continues to require Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing products, contraception, sterilization, and related education and counseling, in violation of their sincerely-held religious beliefs.

187.   *Third,* the Government's interpretation of the Final Rule appears to actually *increase* the number of religious organizations that are subject to the U.S. Government Mandate. Under the Government's initial interpretation of the "religious employer" exemption, if a nonexempt religious organization "provided health coverage for its employees through" a plan offered by a separate, "affiliated" organization that was "exempt from the requirement to cover contraceptive services, then neither the [affiliated organization] nor the [nonexempt entity would be] required to offer contraceptive coverage to its employees."  77 Fed. Reg. at 16,502.

188.   For example, Plaintiff Archdiocese of Washington operates a self-insurance plan that covers not only the Archdiocese itself, but other affiliated Catholic organizations—including Plaintiffs Archbishop Carroll, CCA, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and CIC.  Under the original interpretation of the exemption, if the Archdiocese was an exempt "religious employer," then Archbishop Carroll, CCA, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and CIC received the benefit of that exemption, regardless of whether they independently qualified as "religious employers," since they could continue to participate in the Archdiocese's exempt plan.  These affiliated organizations, therefore, could benefit from the Archdiocese's exemption even if they, themselves, could not meet the Government's unprecedentedly narrow definition of "religious employer."

189.   The Final Rule eliminates this safeguard.  Instead, it interprets the exemption to require  "each employer" to "independently meet the definition of eligible organization or religious employer in order to take advantage of the accommodation or the religious employer exemption with respect to its employees and their covered dependents."  78 Fed. Reg. at 39,886; *see also* 78 Fed. Reg. at 8467 (NPRM).  Since Plaintiffs Archbishop Carroll, CCA, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and CIC do not appear to meet the

Government's narrow definition of "religious employers," they are now subject to the U.S. Government Mandate.

190.    Moreover, since Plaintiffs Archbishop Carroll, CCA, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and CIC are part of Plaintiff Archdiocese of Washington's self-insurance plan, the Archdiocese is now required by the Mandate to do one of two things:  sponsor a plan that will provide the employees of these organizations with "free" contraception, abortion-inducing products, sterilization, and related counseling, or, alternatively, decline to extend its plan to these organizations, subjecting them to massive fines if they do not contract with another insurance provider that will provide the objectionable coverage.

191.    The first option forces the Archdiocese to act contrary to its sincerely-held religious beliefs. The second option compels the Archdiocese to submit to the government's interference with its structure and internal operations by accepting a construct that divides churches from their ministries.

192.    In this respect, the Mandate seeks to divide the Catholic Church.  The Church's faith in action, carried out through its charitable and educational arms, is every bit as central to the Church's religious mission as is the administration of the Sacraments.  In the words of Pope Emeritus Benedict XVI, "[t]he Church cannot neglect the service of charity any more than she can neglect the Sacraments and the Word."  Yet the Mandate seeks to separate these consubstantial aspects of the Catholic faith, treating one as "religious" and the other as not.  The Mandate therefore deeply intrudes into internal Church governance.

193.    In sum, the Final Rule not only fails to alleviate the burden that the U.S. Government Mandate imposes on Plaintiffs' religious beliefs; it in fact makes that burden significantly worse by increasing the number of religious organizations that are subject to the

Mandate.  The U.S. Government Mandate, therefore, requires Plaintiffs to act contrary to their sincerely held religious beliefs.

## III.   THE U.S. GOVERNMENT MANDATE IMPOSES A SUBSTANTIAL BURDEN ON PLAINTIFFS' RELIGIOUS LIBERTY

### A.   The U.S. Government Mandate Substantially Burdens Plaintiffs' Religious Exercise

194.   Responding to the U.S. Government Mandate, Cardinal Wuerl has declared that "what is at stake here is a question of human freedom."  And indeed it is.  Since the founding of this country, our law and society have recognized that individuals and institutions are entitled to freedom of conscience and religious practice.  Absent a compelling reason, no government authority may compel any group or individual to act contrary to their religious beliefs.  As noted by Thomas Jefferson, "[n]o provision in our Constitution ought to be dearer to man than that which protects the rights of conscience against the enterprises of civil authority."

195.   The U.S. Government Mandate violates Plaintiffs' rights of conscience by forcing them to participate in an employer-based scheme to provide insurance coverage to which they strenuously object on moral and religious grounds.

196.   It is a core tenet of Plaintiffs' religion that abortion, contraception, and sterilization are serious moral wrongs.

197.   Plaintiffs' Catholic beliefs therefore prohibit them from providing, paying for, and/or facilitating access to abortion-inducing products, contraception, or sterilization, including by contracting with an insurance company or third-party administrator that will, as a result, provide or procure the objectionable products and services to Plaintiffs' employees.  Likewise, Plaintiffs object to being forced to take other actions that facilitate access to the objectionable products and services, including the Mandate's self-certification requirement.

198.   Plaintiffs' beliefs are deeply and sincerely held.

199.    The U.S. Government Mandate, therefore, requires Plaintiffs to do precisely what their sincerely held religious beliefs prohibit—provide, pay for, and/or facilitate access to objectionable products and services or else incur crippling sanctions or other negative consequences.

200.    The U.S. Government Mandate therefore imposes a substantial burden on plaintiffs' religious beliefs.

201.    The Mandate's exemption for "religious employers" does not alleviate the burden.

202.    The "religious employer" exemption does not apply to Plaintiffs CCA, Archbishop Carroll, CCA, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, CIC, CUA, or TAC.

203.    Although Plaintiff Archdiocese is a "religious employer," the Mandate still requires it either to (1) sponsor a plan that will provide Plaintiffs Archbishop Carroll, CCA, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and CIC, and other affiliated Catholic organizations, with access to the objectionable products and services, or (2) no longer extend its plan to these organizations, subjecting them to massive fines if they do not contract with another insurance provider that will provide the objectionable coverage.

204.    The first option forces the Archdiocese to act contrary to its sincerely-held religious beliefs.

205.    The second option compels the Archdiocese to submit to the government's interference with its structure and internal operations by accepting a construct that divides churches from their ministries.

206.    The so-called "accommodation" does not alleviate the burden on Plaintiffs' sincerely held religious beliefs.

207.     Notwithstanding the so-called "accommodation," Plaintiffs are still required to provide, pay for, and/or facilitate access to the objectionable products and services.

208.     Plaintiffs' Catholic beliefs do not simply prohibit them from using or directly paying for the objectionable coverage. Their beliefs also prohibit them from facilitating access to the objectionable products and services in the manner required by the Mandate.

209.     Finally, the Plaintiffs cannot avoid the U.S. Government Mandate without incurring crippling fines or other negative consequences. If they eliminate their employee health plans, for those Plaintiffs with more than fifty employees, they are subject to annual fines of $2,000 per full-time employee. If they keep their health plans but refuse to provide or facilitate the objectionable coverage, they are subject to daily fines of $100 a day per affected beneficiary.

210.     Potential liability for significant fines and uncertainty regarding Plaintiffs' ability to offer and provide health benefits undermines Plaintiffs' ability to retain and recruit employees. Were Plaintiffs to stop offering health benefits, they would be at a competitive disadvantage to institutions who do not have religious objections to the Mandate.

211.     These fines and other negative consequences therefore coerce Plaintiffs into violating their religious beliefs.

212.     In short, while the President claims to have "found a solution that works for everyone" and that ensures that "religious liberty will be protected," his promised "accommodation" does neither. Unless and until this issue is definitively resolved, the U.S. Government Mandate does and will continue to impose a substantial burden on Plaintiffs' religious beliefs.

### B.     The U.S. Government Mandate Is Not a Neutral Law of General Applicability

213.     The U.S. Government Mandate is not a neutral law of general applicability. It offers multiple exemptions from its requirement that employer-based health plans include or

facilitate coverage for abortion-inducing products, sterilization, contraception, and related education and counseling.  It was, moreover, implemented by and at the behest of individuals and organizations who disagree with Plaintiffs' religious beliefs regarding abortion and contraception, and thus targets religious organizations for disfavored treatment.

214.   For example, the Mandate exempts all "grandfathered" plans from its requirements, thus excluding tens of millions of people from the mandated coverage.  As the government has admitted, "98 million individuals will be enrolled in grandfathered group health plans in 2013."  75 Fed. Reg. at 41,732. Elsewhere, the government has put the number at 87 million. *See* Healthcare.gov, "Keeping the Health Plan You Have" (June 14, 2010), http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-have-grandfathered.html.  And according to one district court last year, "191 million Americans belong[ed] to plans which may be grandfathered under the ACA."  *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1291 (D. Colo. 2012).

215.   Similarly, small employers (*i.e.*, those with fewer than 50 employees) are exempt from certain enforcement mechanisms to compel compliance with the Mandate.  *See* 26 U.S.C. § 4980H(a) (exempting small employers from the assessable payment for failure to provide health coverage).

216.   In addition, the Mandate exempts an arbitrary subset of religious organizations that qualify for tax-reporting exemptions under Section 6033 of the Internal Revenue Code.

217.   The U.S. Government Mandate, moreover, was promulgated by Government officials, and supported by non-governmental organizations, who strongly oppose certain Catholic teachings and beliefs.  For example, on October 5, 2011, Defendant Sebelius spoke at a fundraiser for NARAL Pro-Choice America.  Defendant Sebelius has long supported abortion

rights and criticized Catholic teachings and beliefs regarding abortion and contraception.

NARAL Pro-Choice America is a pro-abortion organization that likewise opposes many Catholic

teachings.  At that fundraiser, Defendant Sebelius criticized individuals and entities whose beliefs

differed from those held by her and the other attendees of the NARAL Pro-Choice America

fundraiser, stating: "Wouldn't you think that people who want to reduce the number of abortions

would champion the cause of widely available, widely affordable contraceptive services?  Not so

much."

218.    In addition, the Mandate was modeled on a California law that was motivated by

discriminatory intent against religious groups that oppose contraception.

219.    The IOM Committee that initially adopted the definition of "preventive care" was

overwhelmingly stacked with individuals who similarly oppose many Catholic teachings, leading

the lone dissenter on the Committee to lament that the Committee's recommendation reflected the

members' "subjective determinations filtered through a lens of advocacy."  IOM, *supra*, at 232.

220.    Consequently, Plaintiffs allege that the purpose of the U.S. Government Mandate,

including the narrow exemption, is to discriminate against religious institutions and organizations

that oppose abortion and contraception.

### C.    The U.S. Government Mandate Is Not the Least Restrictive Means of Furthering a Compelling Governmental Interest

221.    The U.S. Government Mandate is not narrowly tailored to serve a compelling

governmental interest.

222.    The Government has no compelling interest in forcing Plaintiffs to violate their

sincerely held religious beliefs by requiring them to participate in a scheme for the provision of

abortion-inducing products, sterilization, contraceptives, and related education and counseling.

The Government itself has relieved numerous other employers from this requirement by

exempting grandfathered plans and plans of employers it deems to be sufficiently religious. Moreover, these services are widely available in the United States.  The U.S. Supreme Court has held that individuals have a constitutional right to use such services.  And nothing that Plaintiffs do inhibits any individual from exercising that right.

223.    Even assuming the interest was compelling, the Government has numerous alternative means of furthering that interest without forcing Plaintiffs to violate their religious beliefs.  For example, the Government could have provided or paid for the objectionable services itself through other programs established by a duly enacted law.  Or, at a minimum, it could have created a broader exemption for religious employers, such as those found in numerous state laws throughout the country and in other federal laws.  The Government therefore cannot possibly demonstrate that requiring Plaintiffs to violate their consciences is the least restrictive means of furthering its interest.

224.    The U.S. Government Mandate, moreover, would simultaneously undermine both religious freedom—a fundamental right enshrined in the U.S. Constitution—and access to the wide variety of social and educational services that Plaintiffs provide.  Plaintiffs Archdiocese, CCA, Don Bosco, Mary of Nazareth, and Archbishop Carroll educate children whose families want an alternative to the public school system, while Catholic Charities, Victory Housing, and CIC provide a range of social and intellectual services to the citizens of the District of Columbia and Maryland.  Likewise, CUA and TAC provide their students with a high-quality education in numerous fields of study.  As President Obama acknowledged in his announcement of February 10, 2012, religious organizations like Plaintiffs do "more good for a community than a government program ever could."  The negative consequences resulting from a refusal to comply with the U.S. Government Mandate, however, would undermine these good works.

225.     That is unconscionable.  Accordingly, Plaintiffs seek a declaration that the U.S.

Government Mandate cannot lawfully be applied to Plaintiffs, an injunction barring its

enforcement, and an order vacating the Mandate.

### IV.     THE U.S. GOVERNMENT MANDATE THREATENS PLAINTIFFS WITH IMMINENT INJURY THAT SHOULD BE REMEDIED BY A COURT

226.     The U.S. Government Mandate is causing serious, ongoing hardship to Plaintiffs

that merits relief now.

227.     On June 28, 2013, Defendants finalized the U.S. Government mandate, including

the narrow "religious employer" exemption and the so-called "accommodation" proposed in the

NPRM.  By the terms of the Final Rule, Plaintiffs must comply with the Mandate by the

beginning of the next plan year on or after January 1, 2014.

228.     For Thomas Aquinas College, the next plan year begins on July 1, 2014.  For

Catholic University, the next plan year begins on December 1, 2013.

229.     For all other Plaintiffs, the next plan year begins on January 1, 2014.

230.     Defendants have given no indication that they will not enforce the essential

provisions of the Mandate that impose a substantial burden on Plaintiffs' rights.  Consequently,

absent the relief sought herein, Plaintiffs will be required to provide, pay for, and/or facilitate

access to contraception, abortion-inducing products, sterilization, and related education and

counseling, in violation of their sincerely held religious beliefs.

231.     The U.S. Government Mandate is also harming Plaintiffs in other ways.

232.     Health plans do not take shape overnight.  A number of analyses, negotiations,

and decisions must occur each year before Plaintiffs can offer a health benefits package to their

employees.  For example, an employer using an outside insurance issuer—like CUA—must work

with actuaries to evaluate its funding reserves, and then negotiate with the insurer to determine

the cost of the products and services it wants to offer its employees.  An employer that is self-insured—like the Archdiocese—after consulting with its actuaries, must similarly negotiate with its third-party administrator ("TPA").

233.    Under normal circumstances, Plaintiffs must begin the process of determining their health care package for a plan year at least one year before the plan year begins. The multiple levels of uncertainty surrounding the U.S. Government Mandate make this already lengthy process even more complex.

234.    In addition, if Plaintiffs do not comply with the U.S. Government Mandate, they may be subject to government fines and penalties.  Plaintiffs require time to budget for any such additional expenses.

235.    The U.S. Government Mandate and its uncertain legality, moreover, undermine Plaintiffs' ability to hire and retain employees, thus placing them at a competitive disadvantage in the labor market relative to organizations that do not have a religious objection to the Mandate.

236.    Plaintiffs therefore need judicial relief now in order to prevent the serious, ongoing harm that the U.S. Government Mandate is already imposing on them.

## V.    CAUSES OF ACTION

### COUNT I
### Substantial Burden on Religious Exercise
### in Violation of RFRA

237.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

238.    RFRA prohibits the Government from substantially burdening an entity's exercise of religion, even if the burden results from a rule of general applicability, unless the Government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

58

239.     RFRA protects organizations as well as individuals from Government-imposed substantial burdens on religious exercise.

240.     RFRA applies to all federal law and the implementation of that law by any branch, department, agency, instrumentality, or official of the United States.

241.     The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing products, contraception, sterilization procedures, and related counseling, in a manner that is directly contrary to their religious beliefs.

242.     The U.S. Government Mandate substantially burdens Plaintiffs' exercise of religion.

243.     The Government has no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

244.     Requiring Plaintiffs to comply with the U.S. Government Mandate is not the least restrictive means of furthering a compelling governmental interest.

245.     By enacting and threatening to enforce the U.S. Government Mandate against Plaintiffs, Defendants have violated RFRA.

246.     The U.S. Government Mandate also requires student health plans, including the one currently offered by CUA, to facilitate access to abortion-inducing products, sterilization, contraception, and related education and counseling in a manner that is directly contrary to their religious beliefs..

247.     To require CUA's student health plan to facilitate access to services that violate CUA's religious beliefs substantially burdens the University's exercise of religion.

248.     The Government has no compelling government interest to require CUA's student health plan to facilitate access to services that violate CUA's religious beliefs.

249.     Requiring CUA's student health plan to facilitate access to services that violate CUA's religious beliefs is not the least restrictive means of furthering a compelling government interest.

250.     Plaintiffs have no adequate remedy at law.

251.     Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT II
### Substantial Burden on Religious Exercise in Violation of
### the Free Exercise Clause of the First Amendment

252.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

253.     The Free Exercise Clause of the First Amendment prohibits the Government from substantially burdening an entity's exercise of religion.

254.     The Free Exercise Clause protects organizations as well as individuals from Government-imposed burdens on religious exercise.

255.     The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing products, contraception, sterilization procedures, and related counseling, in a manner that is directly contrary to their religious beliefs.

256.     The U.S. Government Mandate substantially burdens Plaintiffs' exercise of religion.

257.     The U.S. Government Mandate is not a neutral law of general applicability, because it is riddled with exemptions for which there is not a consistent, legally defensible basis. It offers multiple exemptions from its requirement that employer-based health plans include or facilitate access to abortion-inducing products, sterilization, contraception, and related education and counseling.

258.     The U.S. Government Mandate is not a neutral law of general applicability because it was passed with discriminatory intent.

259.     The U.S. Government Mandate implicates constitutional rights in addition to the right to free exercise of religion, including, for example, the rights to free speech, free association, and freedom from excessive government entanglement with religion.

260.     The Government has no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

261.     The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

262.     By enacting and threatening to enforce the U.S. Government Mandate, the Government has burdened Plaintiffs' religious exercise in violation of the Free Exercise Clause of the First Amendment.

263.     The Government also requires student health plans, including the one currently offered by CUA, to facilitate access to abortion-inducing products, sterilization, contraception, and related education and counseling in a manner that is directly contrary to their religious beliefs.

264.     To require CUA's student health plan to facilitate access to products and services that violate its religious beliefs substantially burdens CUA's exercise of religion.

265.     The Government has no compelling government interest to require CUA's student health plan to facilitate access to products and services that violate CUA's religious beliefs.

266.     Requiring CUA's student health plan to facilitate access to products and services that violate CUA's religious beliefs is not the least restrictive means of furthering a compelling government interest.

267.    Plaintiffs have no adequate remedy at law.

268.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

### COUNT III
### Compelled Speech in Violation of
### the Free Speech Clause of the First Amendment

269.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

270.    The First Amendment protects against the compelled affirmation of any religious or ideological proposition that the speaker finds unacceptable.

271.    The First Amendment protects organizations as well as individuals against compelled speech.

272.    Expenditures are a form of speech protected by the First Amendment.

273.    The First Amendment protects against the use of a speaker's money to support a viewpoint that conflicts with the speaker's religious beliefs.

274.    The U.S. Government Mandate would compel Plaintiffs to provide health care plans to their employees that include or facilitate access to products and services that violate their religious beliefs.

275.    The U.S. Government Mandate would compel Plaintiffs to subsidize, promote, and facilitate education and counseling services regarding these objectionable products and services.

276.    The U.S. Government Mandate would compel Plaintiffs to issue a certification of its beliefs that, in turn, would result in the provision of objectionable products and services to Plaintiffs' employees.

277.    By imposing the U.S. Government Mandate, Defendants are compelling Plaintiffs to publicly subsidize or facilitate the activity and speech of private entities that are contrary to

their religious beliefs, and compelling Plaintiffs to engage in speech that will result in the provision of objectionable products and services to Plaintiffs' employees.

278.    The U.S. Government Mandate is viewpoint-discriminatory and subject to strict scrutiny.

279.    The U.S. Government Mandate furthers no compelling governmental interest.

280.    The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

281.    For the same reasons, Defendants' requirement that student health plans, like the one currently offered by CUA, facilitate access to abortion-inducing products, sterilization, contraception, and related education and counseling, also violates the Free Speech Clause of the First Amendment.

282.    Plaintiffs have no adequate remedy at law.

283.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT IV
### Prohibition of Speech
### in Violation of the First Amendment

284.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

285.    The First Amendment protects the freedom of speech, including the right of religious groups to speak out to persuade others to refrain from engaging in conduct that may be considered immoral.

286.    The Mandate violates the First Amendment freedom of speech by imposing a gag order that prohibits Plaintiffs from speaking out in any way that might "influence," "directly or indirectly," the decision of a third-party administrator to provide or procure contraceptive products and services to Plaintiffs' employees.

287.    Plaintiffs have no adequate remedy at law.

288.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that

warrants relief.

## COUNT V
### Official "Church" Favoritism and Excessive Entanglement with Religion in Violation of the Establishment Clause of the First Amendment

289.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

290.    The Establishment Clause of the First Amendment prohibits the Government from

adopting an official definition of a "religious employer" that favors some religious groups while

excluding others.

291.    The Establishment Clause also prohibits the Government from becoming

excessively entangled in the affairs of religious groups by scrutinizing their beliefs, practices, and

organizational features to determine whether they meet the Government's favored definition.

292.    The "religious employer" exemption violates the Establishment Clause in two

ways.

293.    First, it favors some religious groups over others by creating an official definition

of "religious employers" that excludes legitimate religious ministries.  Religious groups that meet

the Government's official definition receive favorable treatment in the form of an exemption from

the Mandate, while other religious groups do not.  This also has the effect of discriminating

among religious denominations.

294.    Second, the "religious employer" exemption also violates the Establishment

Clause because it requires the Government to determine whether groups qualify as "religious

employers" based on intrusive judgments about their beliefs, practices, and organizational

features.  The exemption turns on an intrusive 14-factor test to determine whether a group meets

the requirements of section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal

64

Revenue Code. These 14 factors probe into matters such as whether a religious group has "a distinct religious history" or "a recognized creed and form of worship." But it is not the Government's place to determine whether a group's religious history is "distinct," or whether the group's "creed and form of worship" are "recognized." By directing the Government to engage in such inquiries, the "religious employer" exemption runs afoul of the Establishment Clause prohibition on excessive entanglement with religion.

295.    Plaintiffs have no adequate remedy at law.

296.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

### COUNT VI
### Interference in Matters of Internal Church Governance in Violation of the Religion Clauses of the First Amendment

297.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

298.    The Free Exercise Clause and Establishment Clause and the Religious Freedom Restoration Act protect the freedom of religious organizations to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.

299.    Under these Clauses, the Government may not interfere with a religious organization's internal decisions concerning the organization's religious structure, ministers, or doctrine.

300.    Under these Clauses, the Government may not interfere with a religious organization's internal decision if that interference would affect the faith and mission of the organization itself.

301.    Plaintiffs are religious organizations affiliated with the Roman Catholic Church.

302.    The Catholic Church views abortion, sterilization, and contraception as intrinsically immoral, and prohibits Catholic organizations from condoning or facilitating those practices.

303.    Plaintiffs have abided and must continue to abide by the teaching of the Catholic Church on these issues.

304.    The Government may not interfere with or otherwise question the final decision of the Catholic Church that its religious organizations must abide by these views.

305.    Plaintiffs have therefore made the internal decision that the health plans they offer to their employees may not cover, subsidize, or facilitate abortion, sterilization, or contraception.

306.    Plaintiff Archdiocese of Washington has further made the internal decision that its affiliated religious entities, including those affiliates who are Plaintiffs in this case, should offer their employees health-insurance coverage through the Archdiocese's plan, which allows the Archdiocese to ensure that these affiliates do not offer coverage for services that are contrary to Catholic teaching.

307.    The U.S. Government Mandate interferes with Plaintiffs' internal decisions concerning their structure and mission by requiring them to facilitate practices that directly conflict with Catholic beliefs.

308.    The U.S. Government Mandate's interference with Plaintiffs' internal decisions affects their faith and mission by requiring them to facilitate practices that directly conflict with their religious beliefs.

309.    Because the U.S. Government Mandate interferes with the internal decision-making of Plaintiffs in a manner that affects Plaintiffs' faith and mission, it violates the

Establishment Clause and the Free Exercise Clause of the First Amendment and the Religious

Freedom Restoration Act.

310.    For the same reasons, Defendants' requirement that student health plans, like the

one currently offered by CUA, include coverage for abortion-inducing products, sterilization,

contraception, and related education and counseling,  also violates the Establishment Clause and

the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act.

311.    Plaintiffs have no adequate remedy at law.

312.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that

warrants relief.

## COUNT VII
## Illegal Action in Violation of the APA

313.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

314.    The APA requires that all Government agency action, findings, and conclusions

be "in accordance with law."

315.    The U.S. Government Mandate, its exemption for "religious employers," and its

so-called "accommodation" for "eligible" religious organizations are illegal and therefore in

violation of the APA.

316.    The Weldon Amendment states that "[n]one of the funds made available in this

Act [to the Department of Labor and the Department of Health and Human Services] may be

made available to a Federal agency or program . . . if such agency, program, or government

subjects any institutional or individual health care entity to discrimination on the basis that the

health care entity does not provide, pay for, provide coverage of, or refer for abortions."

Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125

Stat. 786, 1111 (2011).

317.     The term "health care entity" is defined to include "an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, *a health insurance plan*, or any other kind of health care facility, organization, or plan." *Id.* § 507(d)(2) (emphasis added).

318.     The U.S. Government Mandate requires employer-based health plans to provide coverage for abortion-inducing products, contraception, sterilization, and related education.  By issuing the U.S. Government Mandate, Defendants have exceeded their authority, and ignored the direction of Congress.

319.     The U.S. Government Mandate violates RFRA.

320.     The U.S. Government Mandate violates the First Amendment.

321.     The U.S. Government Mandate is not in accordance with law and thus violates 5 U.S.C. § 706(2)(A).

322.     For the same reasons, Defendants' requirement that student health plans like CUA's must include coverage for abortion-inducing products, sterilization, contraception, and related education and counseling, also violates RFRA, the First Amendment, the Weldon Amendment, and the APA.  The requirement therefore is not in accordance with law and thus violates 5 U.S.C. § 706(2)(A).

323.     In addition, the Affordable Care Act states that, "[n]othing in this title (or an amendment made by this title) shall be construed to prohibit an institution of higher education . . . from offering a student health insurance plan . . . ."  42 U.S.C. § 18118(c).  This provision has been interpreted as prohibiting any law that has the effect of prohibiting an institution of higher education from offering a student health plan.  76 Fed. Reg. 7767, 7769 (Feb. 11, 2011).  The requirement that student health plans offered through a health insurance issuer facilitate

access to abortion-inducing products, sterilization, contraception, and related education and counseling, however, has the effect of prohibiting CUA from offering a student health insurance plan.  Defendants' requirement that student health plans offered through a health insurance issuer include abortion-inducing products, sterilization, contraception, and related education and counseling, therefore, also violates 42 U.S.C. §  18118(c) and thus is not in accordance with law under 5 U.S.C. § 706(2)(A).

324.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

325.    Plaintiffs have no adequate remedy at law.

326.    Defendants' failure to act in accordance with law imposes an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT VIII
### Erroneous interpretation of the exemption with respect to multi-employer plans

327.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

328.    The Mandate explicitly exempts "group health plan[s] established or maintained by a religious employer (and health insurance coverage provided in connection with a group health plan established or maintained by a religious employer)" from "any requirement to cover contraceptive services."  45 C.F.R. § 147.131(a).

329.    In the ANPRM, Defendants acknowledged that the religious employer exemption was "available to religious employers in a variety of arrangements." 77 Fed. Reg. at 16,502.

330.    Specifically, Defendants indicated that a nonexempt entity could "provide[] health coverage for its employees through" a plan offered by a separate, "affiliated" organization that is a "distinct common-law employer." *Id.*

69

331.    In such a situation, Defendants stated that if the "affiliated" organization was "exempt from the requirement to cover contraceptive services, then neither the [affiliated organization] nor the [nonexempt entity would be] required to offer contraceptive coverage to its employees." *Id.*

332.    This reading reflects the plain and unambiguous text of the regulation, which by its terms exempts "group health plan[s]" so long as they are "established or maintained by a religious employer."

333.    Nonetheless, when issuing the Final Rule, Defendants reversed course, rejecting a "plan-based approach" and adopting an "employer-by-employer approach" whereby "each employer [must] independently meet the definition of religious employer . . . in order to avail itself of the exemption."  78 Fed. Reg. at 39,886.

334.    An employer-based approach contradicts the plain text of the regulation, which exempts "group health plan[s]," not individual employers.

335.    The Archdiocese meets the Mandate's definition of a religious employer, and therefore, the group health plan it has "established or maintained" is exempt from providing coverage for abortion-inducing products, sterilization, contraception, and related education and counseling.

336.    The Defendants erroneous interpretation of the religious employer exemption, however, precludes the Archdiocese's affiliated entities, including Plaintiffs Catholic Charities, CCA, Archbishop Carroll, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and CIC from obtaining the benefit of the exemption by participating in the exempt group health plan established and maintained by the Archdiocese.

337.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

338.    Plaintiffs have no adequate remedy at law.

339.    Defendants' erroneous interpretation  imposes an immediate and ongoing harm on Plaintiffs that warrants relief.

**WHEREFORE,** Plaintiffs respectfully pray that this Court:

1.    Enter a declaratory judgment that the U.S. Government Mandate violates Plaintiffs' rights under RFRA;

2.    Enter a declaratory judgment that the U.S. Government Mandate violates Plaintiffs' rights under the First Amendment;

3.    Enter a declaratory judgment that the U.S. Government Mandate was promulgated in violation of the APA;

4.    Enter an injunction prohibiting the Defendants from enforcing the U.S. Government Mandate against Plaintiffs;

5.    Enter an order vacating the U.S. Government Mandate;

6.    Enter a declaratory judgment that Defendants' requirement that student health plans facilitate access to abortion-inducing products, sterilization, contraception, and related education and counseling violates Plaintiffs' rights under RFRA and the First Amendment; enter an injunction prohibiting the Defendants from enforcing that requirement against Plaintiffs; and enter an order vacating the requirement;

7.    Enter a declaratory judgment that Defendants have erroneously interpreted the

scope of the religious employer exemption, and that nonexempt organizations may obtain the benefit of the religious employer exemption if they provide insurance through a group health plan established and maintained by a religious employer.

8.      Award Plaintiffs attorneys' and expert fees under 42 U.S.C. § 1988; and

9.      Award all other relief as the Court may deem just and proper.


Respectfully submitted, this the 20th day of September, 2013.


/s/ Noel J. Francisco

Noel J. Francisco
D.C. Bar No. 464752
njfrancisco@jonesday.com
Eric S. Dreiband
esdreiband@jonesday.com
D.C. Bar No. 497285
David T. Raimer
D.C. Bar No. 994558
dtraimer@jonesday.com
Anthony J. Dick*
D.C. Bar No. 1015585
ajdick@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939


*Counsel for Plaintiffs*

*Application for Admission Pending*