IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MOST REVEREND DAVID A. ZUBIK,
*Bishop of the Roman Catholic Diocese of*
*Pittsburgh, as Trustee of the Roman Catholic*
*Diocese of Pittsburgh, a Charitable Trust*, ET
AL.,

        Plaintiffs,

           v.

KATHLEEN SEBELIUS, *In Her Official*
*Capacity as Secretary of the U.S. Department*
*of Health and Human Services*, ET AL.,

        Defendants.

13cv1459
**ELECTRONICALLY FILED**

---

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MOST REVEREND LAWRENCE T.
PERSICO, *Bishop of the Roman Catholic*
*Diocese of Erie, as Trustee of the Roman*
*Catholic Diocese of Erie, a Charitable Trust*,
ET AL.,

        Plaintiffs,

           v.

KATHLEEN SEBELIUS, *In Her Official*
*Capacity as Secretary of the U.S. Department*
*of Health and Human Services*, ET AL.,

        Defendants.

13cv0303 Erie
**ELECTRONICALLY FILED**

**MEMORANDUM OPINION RE: PLAINTIFFS' MOTIONS
FOR EXPEDITED PRELIMINARY INJUNCTION
(13-CV-1459: DOC. NO. 4; 13-CV-0303E: DOC. NO. 6)**

## I.     Introduction

Presently before the Court are two cases which challenge the application of provisions of the Patient Protection and Affordable Care Act ("ACA"). These cases present the Court with the issue of whether the Dioceses of Pittsburgh and Erie, which are exempt from provisions of the ACA requiring employers to provide health insurance coverage for contraceptive products, services, and counseling ("the contraceptive mandate"), are divisible from their nonprofit, religious affiliated/related charitable and educational organizations which, under the current provisions, will be compelled to facilitate/initiate coverage of contraceptive products, services, and counseling, beginning January 1, 2014, in violation of their sincerely-held religious beliefs.[1]

On October 8, 2013, in the Pittsburgh division of the United States District Court of the Western District of Pennsylvania, Plaintiffs: Most Reverend David A. Zubik, as Trustee of the Roman Catholic Diocese of Pittsburgh, a charitable trust; the Roman Catholic Diocese of Pittsburgh, as the Beneficial Owner of the Pittsburgh series of the Catholic Benefits Trust; and Catholic Charities of the Diocese of Pittsburgh, Inc. ("Pittsburgh Plaintiffs"), filed a Complaint in which they assert eight causes of action against Defendants: United States Departments of Health and Human Services, Labor, and Treasury, and their respective Secretaries. *Zubik v. Sebelius*, Civil Action 2:13-cv-1459 (W.D. Pa. 2013). Pittsburgh Plaintiffs simultaneously filed a Motion for Expedited Preliminary Injunction, asking this Court to issue a preliminary

---

[1] Generally, the three most relevant sincerely-held religious beliefs of the Catholic faith at issue in these cases are: (1) the sanctity of human life from conception to natural death; (2) unity of worship, faith, and good works ("faith without good works is dead"); and (3) the facilitation of evil is as morally odious as the proliferation of evil. See Hearing testimony: Bishop Zubik, pg. 21, lines 12-14, pg. 28, lines 17-20, pg. 35, lines 17-18, pg. 42, lines 21-25; Bishop Persico, pg. 73, lines 7-9, pg. 75, lines 16-19, pg. 79, lines 24-25, pg. 80, lines 6-8, pg. 83, lines 6-9. These three sincerely-held religious beliefs and their intersection with the ACA will be more thoroughly discussed, *infra*.

injunction to enjoin the issuance, application, and enforcement of the contraceptive mandate, as codified in 45 C.F.R. § 147.130(a)(1)(iv).  Doc. No. 4.

Also, on October 8, 2013, in the Erie division of this District Court, Plaintiffs: Most Reverend Lawrence T. Persico, as Trustee of the Roman Catholic Diocese of Erie, a charitable trust; the Roman Catholic Diocese of Erie; St. Martin Center, Inc.; Prince of Peace Center, Inc.; and Erie Catholic Preparatory School ("Erie Plaintiffs"), filed a Complaint in which they assert the same eight causes of action against the same Defendants ("the Government") related to the implementation of the contraceptive mandate of the ACA. *Persico v. Sebelius*, Civil Action 1:13-cv-303 (W.D. Pa. 2013).  Erie Plaintiffs also filed a Motion for Expedited Preliminary Injunction asking the Court to issue a preliminary injunction to enjoin the issuance, application, and enforcement of the contraceptive mandate, as codified in 45 C.F.R. § 147.130(a)(1)(iv). Doc. No. 6.

Plaintiffs allege that the contraceptive mandate, as applied via the "accommodation," requires them to facilitate/initiate the process for providing health insurance coverage for abortion-inducing drugs, sterilization services, contraceptives, and related educational and counseling services ("contraceptive products, services, and counseling").  The Dioceses, as "religious employers," are exempt from these provisions.  See generally Stipulations of Fact, ¶ 31; 13-cv-1459, Doc. No. 1, ¶ 44-46.  A safe harbor for non-grandfathered, non-exempt organizations (including Plaintiffs: Catholic Charities, St. Martin Center, Prince of Peace Center, and Erie Catholic) from enforcement of these provisions has been extended until December 31, 2013.  Additional Stipulated Facts, ¶ 7, citing 77 Fed. Ref. 8725, 8727 (Feb. 15, 2012).  Non-exempt Plaintiffs in both cases must comply with the contraceptive mandate on or before January

3

1, 2014, or potentially face substantial governmental penalties.  13-cv-303, Doc. No. 1, ¶ 164; Declaration of David Murphy[2] (P-91), ¶ 9.

Plaintiffs allege that facilitating/initiating the process for providing health insurance coverage for contraceptive products, services, and counseling would cause immediate and irreparable injury to their fundamental rights and religious liberties, in violation of the Religious Freedom Restoration Act ("RFRA") and the First Amendment to the United States Constitution.[3] Doc. No. 4, 2.

This Memorandum Opinion will address both cases because the cases (although not consolidated) involve: similar facts (including the same religious tenets), the same counsel, the same causes of action advanced against the same Defendants, and the same legal tests apply to the Motions for Expedited Preliminary Injunction.

After consideration of Plaintiffs' Motions (13-cv-0303: Doc. No. 6; 13-cv-1459: Doc. No. 4), the Parties' submissions, the testimony presented during an evidentiary hearing, the hearing Exhibits, and an *amici curiae* brief,[4] Plaintiffs' Motions for Expedited Preliminary Injunction will be GRANTED.

---

[2] David Murphy is employed as the Chief Financial Officer of the Diocese of Erie.  P-91, ¶ 2.

[3] Plaintiffs also assert violations of the Administrative Procedure Act ("APA"), Count VII, and erroneous interpretation of the exemption with respect to multi-employer plans, Count VIII.  13-cv-303, Doc. No. 1, ¶¶ 240-264; Doc. No. 1, ¶¶ 255-279.  For the purposes of this Memorandum Opinion, the Court will focus its analysis on Plaintiffs' arguments related to alleged violations of the RFRA and the First Amendment of the United States Constitution.

[4] The American Civil Liberties Union Foundation and the American Civil Liberties Union Foundation of Pennsylvania have filed a brief of *Amici Curiae* in Opposition to Pittsburgh Plaintiffs' Motion for Expedited Preliminary Injunctions.  13-cv-1459, Doc. No. 29.

## II.    Findings of Fact[5]

### A.  Plaintiffs

The Pittsburgh Plaintiffs in *Zubik v. Sebelius* are: (1) the Most Reverend David A. Zubik,

Bishop and Trustee of the Roman Catholic Diocese of Pittsburgh ("the Bishop" or "Bishop

Zubik"); (2) the Roman Catholic Diocese of Pittsburgh, a Pennsylvania Charitable Trust ("the

Diocese" or "the Diocese of Pittsburgh"); and (3) Catholic Charities of the Diocese of Pittsburgh,

Inc. ("Catholic Charities"), an affiliate nonprofit corporation of the Diocese of Pittsburgh.  Doc.

No. 1, 4.

The Pittsburgh Plaintiffs are interrelated because of their affiliation with the Catholic

Church and their shared sincerely-held religious beliefs and mission.  Bishop Zubik is the

spiritual leader of the Diocese and is responsible for the spiritual, charitable, and educational

arms of the Diocese.  Catholic Charities is a nonprofit corporation affiliated with the Diocese and

---

[5] The Government does not challenge Plaintiffs' factual contentions as set forth in Declarations in Support of the Motions for Expedited Preliminary Injunction or the sincerity of Plaintiffs' religious beliefs as set forth in the Complaints.  Stipulations of Fact (filed in 13-cv-303, Doc. No. 39 and 13-1459, Doc. No. 43), ¶¶ 52-56, 114-117; Doc. No. 16, ¶ 5(a)-(b); Declarations re-filed as part of the record as 13-cv-303, Doc. Nos. 54-50-54-56; 13-cv-1459, Doc. Nos. 55-86-55-56.  Plaintiffs' Exhibits P-1-P-36, P-46, P-51, P-75, P-79, P-85, P-86-P-92 were admitted without objection (the same Exhibits and Exhibit numbers were used in reference to both cases).  The Parties also filed Additional Stipulated Facts.  13-cv-303, Doc. No. 58; 13-cv-1459, Doc. No. 59.

The Court appreciates the Parties' efficient, thorough, and extensive Stipulations of Fact, and the professionalism of counsel throughout this entire matter.  Throughout the Opinion, the Court will cite to the Parties' Joint Stipulations, Plaintiffs' respective Complaints, hearing Exhibits, and where possible, to Declarations in Support and hearing testimony.

The burdens imposed on Plaintiffs by the contraceptive mandate, the Government's stated compelling interest, and potential alternatives to the contraceptive mandate, are not agreed upon by the parties, because the Government is unwilling to stipulate to these matters.  13-cv-303, Doc. No. 30, (II)(2)(b); 13-cv-1459, Doc. No. 25, (II)(2)(b).

The Findings of Fact also are founded upon credibility determinations made by this Court based upon the Court's observation of the witnesses.

For ease of reference, when discussing the case pending in Erie, documents referenced are filed in 13-cv-303; for the case pending in Pittsburgh, all documents are filed in 13-cv-1459.

with a principal place of administration in Pittsburgh, Pennsylvania.  The Diocese of Pittsburgh

and Catholic Charities are organized exclusively for charitable, religious, and educational

purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.  Doc. No. 1,

¶¶ 11-13.

The Plaintiffs in *Persico v. Sebelius* are: (1) the Most Reverend Lawrence T. Persico,

Bishop and Trustee of the Roman Catholic Diocese of Erie ("the Bishop" or "Bishop Persico");

(2) St. Martin Center, Inc. ("St. Martin Center"), a nonprofit corporation affiliated with Catholic

Charities, with its principal place of business in Erie, Pennsylvania; (3) Prince of Peace Center,

Inc. ("Prince of Peace Center"), a nonprofit corporation affiliated with Catholic Charities, with

its principal place of business in Farrell, Pennsylvania; and (4) Erie Catholic Preparatory School

("Erie Catholic"), a nonprofit corporation, with its principal place of business in Erie,

Pennsylvania.  Doc. No. 1, ¶¶ 11-14.

The Erie Plaintiffs are interrelated because of their affiliation with the Catholic Church

and their shared sincerely-held religious beliefs and mission.  St. Martin Center, Prince of Peace

Center, Erie Catholic, and the Diocese of Erie are organized exclusively for charitable, religious,

and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

Doc. No. 1, ¶¶ 11-14.


**B.  Immediate Harm Claimed by Plaintiffs**

The Dioceses of Pittsburgh and Erie provide health insurance coverage to employees of

their nonprofit, religious affiliated/related entities (such as Catholic Charities, St. Martin Center,

Prince of Peace Center, and Erie Catholic) which are directed by the Dioceses to implement the

spiritual, charitable, and educational mission of the Dioceses.

### 1. Immediate Harm as to the Dioceses

Based upon the credible testimony of Bishop Zubik and Bishop Persico, as Trustees for the Plaintiff nonprofit, religious affiliated/related organizations, the practical results of the application of the contraceptive mandate, via the "accommodation," would be that the Dioceses would be required to either:

(a) provide their nonprofit, religious affiliated/related organizations with a separate insurance policy that covers contraceptive products, services, and counseling (which the Dioceses refuse to do, according to the trial testimony). Hearing Testimony, Bishop Zubik, pg. 43, lines 2-10; Hearing Testimony Bishop Persico, pg. 80, lines 1-8, pg. 82, lines 14-16, pg. 91, lines 7-9; or

(b) decline to continue offering health coverage to their nonprofit, religious affiliated/related organizations. This would force the nonprofit, religious affiliated/related organizations to enter into their own arrangements with a health insurance provider that would arrange no-cost coverage of contraceptive products, services, and counseling. 13-cv-303, Doc. No. 1, ¶ 118; Doc. No. 1, ¶ 159; Declaration of Susan Rauscher[6] (P-86),[7] ¶¶ 13-15; Declaration of David S. Stewart[8] (P-87), ¶ 18.

---

[6] Susan Rauscher is employed as the Executive Director of Catholic Charities of the Diocese of Pittsburgh. P-86, ¶ 2.

[7] All Declarations in these cases were originally filed as attachments to Plaintiffs' Motions for Expedited Preliminary Injunctions. 13-cv-303, Doc. Nos. 9-8, 9-9, 9-10, 9-11; 13-cv-1459, Doc. Nos. 4-10, 4-11, 4-12. During the hearing on Plaintiffs' pending Motions, the Declarations were assigned Exhibit numbers and admitted into evidence. P-86-P-92. The Court will cite to Declarations by the relevant Exhibit numbers. These documents have been filed and can be found at: 13-cv-303, Doc. Nos. 54-50 through 54-56 and 13-cv-1459, Doc. Nos. 55-50 through 55-56.

[8] David Stewart is employed as the Risk/Benefits Manager of the Diocese of Pittsburgh. P-87, ¶ 2.

The contraceptive mandate would be unequally applied to Plaintiffs and would result in some schools, organizations, *etc.*, being exempt from the mandate, while other organizations would not. 13-cv-1459, Doc. No. 1, ¶ 31. The result would cause a division between the Dioceses and their nonprofit, religious affiliated/related spiritual/charitable/educational organizations which fulfill portions of Dioceses' mission. Id. Further, any nonprofit, religious affiliated/related organizations expelled from the Dioceses' health insurance plans would require significant restructuring of the plans which would adversely affect the benefits received from pooling resources. 13-cv-303, Doc. No. 1, ¶ 119; Doc. No. 1, ¶ 159.

### 2. Immediate Harm as to Nonprofit, Religious Affiliated/Related Organizations

Based upon the credible testimony of Susan Rauscher (Executive Director of Catholic Charities of the Diocese of Pittsburgh), Father Scott William Jabo (President of Erie Catholic), and Mary Claire Maxwell (Executive Director of Catholic Charities of the Diocese of Erie), and the Stipulations of the Parties, the nonprofit, religious affiliated/related organizations expelled from a Diocese's health plan would be forced to choose one of the following courses of action:

(a) purchase health insurance coverage that includes contraceptive products, services, and counseling [which would violate their sincerely-held religious beliefs, according to the trial testimony]. Cardinal Dolan Deposition[9] (13-cv-303, Doc. No. 52; 13-cv-1459, Doc. No. 53), pg. 25, lines 15-19, 23-25, pg, 26, lines 1-12; Hearing Testimony, Bishop Zubik, pg. 28, lines 16-22; Declaration of Father Ronald P. Lengwin (P-88), ¶¶ 12-13;

---

[9] Cardinal Dolan's testimony was presented at the hearing via video-taped deposition that was taken on November 7, 2013, in New York City, New York. 13-cv-303, Doc. No. 52; 13-cv-1459, Doc. No. 53.

(b) provide a self-certification to their third-party administrator ("TPA"), thus

facilitating/initiating the process by which the TPA will obtain coverage for the

contraceptive products, services, and counseling for the organizations' employees

("the accommodation"[10]) [which the Bishops would refuse to permit].  Plaintiffs'

Exhibit 10 "Certification"; Hearing Testimony, Bishop Zubik, pg. 43, lines 2-10;

Hearing Testimony, Bishop Persico, pg. 80, lines 1-8, pg. 82, lines 14-16, pg. 91,

lines 7-9;

(c) drop health insurance coverage for employees (*i.e.,* fail to offer "full-time

employees (and their dependents) the opportunity to enroll in minimum essential

coverage under an eligible employer-sponsored plan") (*i.e.,* comprehensive

coverage), and be subject to annual fines of $2,000 per full-time employee.

Stipulations of Fact, ¶ 51; see 26 U.S.C. § 4980H(a), (c)(1); 13-cv-303, Doc. No.

1, ¶ 150.  Said assessed payment shall be "paid upon notice and demanded by the

---

[10] Per the "accommodation," the organization must self-certify that it: (1) "opposes providing coverage for some or all of [the] contraceptive services"; (2) is "organized and operates as a nonprofit entity"; and (3) "holds itself out as a religious organization."  The organization must then provide a signed self-certification to its insurance company, or if self-insured, to its TPA.  26 CFR § 54.9815-2713A(a).

Per trial testimony, the self-certification would be completed by the head of the respective nonprofit, religious affiliated/related charitable and educational organizations at the direction of the Bishop of the Diocese.  Hearing Testimony, Susan Rauscher, pg. 57, line 1, pg. 60, line 15-16; Hearing Testimony, Father Jabo, pg. 95, lines 6-7, pg. 98, lines 7-8; Hearing Testimony, Mary Maxwell, pg. 114, lines 20-23.  The Court notes that Bishop Zubik testified that he believed that he would have to sign the self-certification because of his position as Chairman of the Membership Board of Catholic Charities.  Hearing Testimony, Bishop Zubik, pg. 43, lines 5-7.

As a result of the self-certification, the designated insurance company or TPA is required to arrange contraceptive services coverage of the organization's employees.  Such services are provided without "cost-sharing requirements (such as copayment, coinsurance, or a deductible.)"  Id. at § 54.9815-2713A(b)(2), (c)(2); 13-cv-303, Doc. No. 1, ¶¶ 99, 110.   After providing the signed self-certification, the Dioceses would be obliged to provide the TPA with the names of individuals insured through the Diocesan health plan who are employees of non-exempt entities and sponsor the insurance.  Hearing Testimony, Bishop Zubik, pg. 35, lines 17-19, Doc. No. 4-12, ¶ 31.

Secretary," "assessed and collected in the same manner as taxes". . . and provided

for "on an annual, monthly or other periodic basis as the Secretary may

prescribe." See 26 U.S.C. §§ 4980H(d)(1)-(2), 6671(a); or

(d) purchase health insurance coverage for full-time employees without contraceptive

products, services, and counseling, and potentially be subject to a tax penalty of

$100 per day per affected beneficiary.[11] Stipulations of Fact, ¶ 50(a); Additional

Stipulated Facts, ¶ 13; see 26 U.S.C. § 4980D(b); 13-cv-303, Doc. No. 1, ¶ 150;

Declaration of David Murphy (P-91), ¶ 17; 13-1459: Declaration of Susan

Rauscher (P-86), ¶ 22; Doc. No. 1, ¶ 70.

Any of these courses of action would harm the Dioceses and their nonprofit, religious

affiliated/related charitable and educational organizations. Potential effects of imposition of

fines include: decreased donations, loss of employees to other employers, loss of services, and

such fines may "close [the organizations'] doors, denying thousands in the local community its

charitable services." Declaration of Susan Rauscher (P-86), ¶¶ 28-30. During the Injunction

Hearing, credible testimony was presented that fines related to the contraceptive mandate will

compel Plaintiff nonprofit, religious affiliated/related organizations to limit services or close.

Hearing Testimony, Susan Rauscher (re: Catholic Charities of the Diocese of Pittsburgh), pg. 61,

lines 17-18 (fines could not be paid "without significant changes to the organization."), pg. 62,

lines 21-25; Hearing Testimony Father Jabo (re: Erie Catholic), pg. 99, lines 8-10 ("In essence

we'd have to shut our doors completely because we cannot sustain ourselves. As a school with a

budget, limited resources, we would close our doors."); Hearing Testimony of Mary Maxwell

---

[11] The Parties have stipulated that "it is not possible to determine the exact amount of tax Plaintiffs could
be assessed under this penalty." Additional Stipulated Facts, ¶ 14; 13-cv-303, Doc. No. 58; 13-1459,
Doc. No. 59. Where applicable, the Court will refer to testimony presented as to estimated fines that may
be levied on various Plaintiffs for non-compliance.

(re: St. Martin Center and Prince of Peace Center), pg. 115, lines 23-25 (fines "would be devastating for all of our clients, the poor – these are single women, children."); Declaration of Mary Maxwell (P-90), ¶ 20; Declaration of Father Scott Detisch, Ph.D.[12] (P-92), ¶ 32.

Currently, Plaintiffs are experiencing and may continue to experience increased administrative burdens, lost personnel hours, and the fear of increased insurance premiums. Deposition of Cardinal Timothy Michael Dolan (13-cv-303, Doc. No. 52; 13-cv-1459, Doc. No. 53), pg. 40, lines 22-25, pg. 41, 1-7; Declaration of David S. Stewart (P-87), ¶¶ 23-26.

Failure to comply with the contraceptive mandate would expose the organizations, and ultimately the Dioceses, to civil actions by ERISA-covered plan participants for unpaid benefits, and enforcement actions by the Secretary of Labor. Stipulations of Fact, ¶ 50(b)-(c); Doc. No. 1, ¶ 81(c)-(d); see 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(5), and 1132(b)(3). The Secretary of HHS may impose a civil monetary penalty for failure to provide certain required coverage. Stipulations of Fact, ¶ 50(d); 42 U.S.C. § 300gg-22(b)(2)(C)(i). Failure to pay levied fines would subject Plaintiffs to additional fines and potential property liens. See 26 U.S.C. §§ 6321, 6672.

### C. The Organization and Religious Mission of the Dioceses

#### 1. Organization of Dioceses

Bishop Zubik, in his capacity as Bishop and Trustee of the Diocese of Pittsburgh, manages 200 parishes and their charitable trusts. Stipulations of Fact, ¶ 118. The Diocese provides services throughout six counties in Southwestern Pennsylvania – Allegheny, Beaver,

---

[12] Father Detisch is serving as a theological advisor to Bishop Persico on matters of Catholic doctrine, including moral theology. P-92, ¶ 2.

11

Butler, Greene, Lawrence, and Washington – including a Catholic population of approximately 700,000 people.  Stipulations of Fact, ¶ 119; 13-cv-1459, Doc. No. 1, ¶¶ 25-33.

Bishop Persico, in his capacity as the Bishop and Trustee of the Diocese of Erie, is responsible for 117 parishes serving approximately 187,500 people over a thirteen-county region in Northwestern Pennsylvania.  Stipulations of Fact, ¶¶ 57, 65; 13-cv-303, Doc. No. 1, ¶¶ 26, 29.

### 2. Religious Mission of the Dioceses through Good Works

Plaintiffs sincerely believe that religious worship, faith, and good works are essential and integral components of the Catholic faith and constitute the core mission of the Catholic Church.[13]  Declaration of Susan Rauscher (P-86), ¶ 21.  "The Church's deepest nature is expressed in her three-fold responsibility: of proclaiming the word of God (kerygma-martyria), celebrating the sacraments (leitourgia), and exercising the ministry of charity (diakonia).  These duties presuppose each other and are inseparable."  Plaintiff's Exhibit 3, "Apostolic Letter Issued 'Motu Proprio' on the Supreme Pontiff Benedict XVI on the Service of Charity," pg. 1; Cardinal Dolan Deposition, (13-cv-303, Doc. No. 52, 13-cv-1459, Doc. No. 53), pg. 36, lines 1-36, pg. 38, lines 11-13 ("That's your daily life.  That's everything we do, dream, believe, breathe, wake, sleep, is our – is our faith."); Hearing Testimony, Bishop Zubik, pg. 21, lines 12-14; Declaration of Father Ronald P. Lengwin[14] (P-88), ¶ 37.  "The service of charity is also a constructive element of the Church's mission and an indispensable expression of her very being . . . ; all the faithful have the right and duty . . . to provide charitable services."  Plaintiffs' Exhibit 3, pg. 1.

---

[13] Hearing Testimony of Bishop Zubik, pg. 42, lines 21-25, pg. 43, line 1 ("We argue that the purpose of faith is not simply what we do in our churches on the weekend, but what we do at our work places and especially how we have the obligation to be reaching out to people who are in need.  So that's an absolute essential to our faith and there is no split between the two."); Hearing Testimony of Bishop Persico, pg. 73, lines 7-9 ("Well, if we look at [S]cripture, faith without good works is dead, so I don't see how we can separate it.  It's essential.  It's who we are as Christians.").

[14] Father Lengwin is the Vicar General and General Secretary of the Diocese of Pittsburgh.  P-88, ¶ 2.

### D. Nonprofit Religious Affiliated/Related Charitable and Educational Organizations of the Dioceses of Pittsburgh and Erie

#### 1. Role of Bishops in Organizations

As the heads of their respective Dioceses, the Bishops carry out the "good works" of the Catholic Church through: educating children regardless of their religion, promoting spiritual growth (including conducting religious services, operating seminaries, and hosting religious orders), and providing community service to others regardless of the recipient's religion or other factors. Stipulations of Fact, ¶¶ 58-61, 120; 13-cv-303, Doc. No. 1, ¶ 27; 13-cv-1459, Doc. No. 1, ¶ 26. ". . . [T]he duty of charity [is] a responsibility incumbent upon the whole Church and upon each Bishop in his Diocese . . . ." Plaintiffs' Exhibit 3, pg. 1. Bishops have a duty to prevent parishes and "diocesan structures" from taking actions at odds with the Church's teachings. Plaintiffs' Exhibit 3, Article 9, § 3 ("It is the duty of the diocesan Bishop and the respective parish priests to see that in this area the faithful are not led into error or misunderstanding; hence they are to prevent publicity being given through parish or diocesan structures to initiatives which, while presenting themselves as charitable, propose choices or methods at odds with the Church's teaching."). Bishops also are responsible for "ensur[ing] that in the activities and management of these activities, the norms of the Church's universal, and particular law are respected, as well as the intentions of the faithful who made donations or bequests for these specific purposes." Plaintiffs' Exhibit 3, Article 4, § 3.

#### 2. Catholic Schools

Education is an integral component of the Catholic faith. Hearing Testimony, Father Jabo, pg. 90, lines 24-25.

#### a. Diocese of Pittsburgh

The Diocese of Pittsburgh runs, organizes, and supervises approximately 11 high schools, 66 elementary schools, two non-residential schools for individuals with disabilities, and various preschool programs. Stipulations of Fact, ¶ 122. These schools educate approximately 22,000 students. Stipulations of Fact, ¶ 123; Doc. No. 1, ¶¶ 27-28. The Diocesan schools are open to and serve all children, without regard to the students' religion, race, or financial condition. Stipulations of Fact, ¶ 125. Some of the schools educate predominantly non-Catholic students. Stipulations of Fact, ¶ 129; Doc. No. 1, ¶ 30.

The contraceptive mandate, as applied via the "accommodation" and the "exemption," will result in elementary schools within the Diocese being treated differently – certain elementary schools within the Diocese will be exempt from compliance with the regulations, while others will not. Stipulations of Fact, ¶ 130.

#### b. Diocese of Erie

The Diocese of Erie operates approximately 30 elementary schools, 3 middle schools, and 6 secondary schools. These schools educate approximately 6,400 students. Stipulations of Fact, ¶ 62; Doc. No. 1, ¶ 28. Students are accepted regardless of religion. Stipulations of Fact, ¶ 63. Tuition assistance is offered to students based solely on financial need and for those who otherwise would have no alternative to the public school system. Stipulations of Fact, ¶¶ 63-64. These schools include Erie Catholic (an affiliated corporation), a preparatory high school, which was formed in 2010 by the merger of two Catholic schools and has approximately 870 students. Stipulations of Fact, ¶¶ 96, 98, 108; Doc. No. 1, ¶¶ 54, 60. Erie Catholic's vision is "steeped in Gospel values and the mission of the Catholic Church." Stipulations of Fact, ¶ 103. The

school's mission is to "form a Christ-centered, co-institutional, college preparatory Catholic school of the Diocese of Erie." Doc. No. 1, ¶ 57.

Erie Catholic implements the Church's teaching mission and has a strong religious component: daily mass is celebrated at the school; four years of theology are required for all students; students are required to perform qualified community service which may include "service to the school and parish community"; and religious retreats are organized. Stipulations of Fact, ¶¶ 104-107; Doc. No. 1, ¶¶ 58-59; Declaration of Father Scott Jabo (P-89), ¶ 4. The school is an affiliated corporation of the Diocese and endeavors to educate students in academic subjects and the Catholic faith as defined by the Diocese. Declaration of Father Scott Jabo (P-89), ¶ 13. Father Jabo, as President of Erie Catholic, is responsible for ensuring that the school and all of its functions are in line with Catholic Church teachings. Hearing Testimony, Father Jabo, pg. 91, lines 18-25, pg. 92, lines 1-4. The Diocese directly oversees the school's management and offers financial aid to its students through the Bishop assistance plan and the STAR Foundation. Stipulations of Fact, ¶¶ 97, 111; Doc. No. 1, ¶¶ 62, 65.

Erie Catholic is exempt from filing Form 990 ("Return of Organization Exempt from Income Tax")(26 C.F.R. § 1.6033-2(g)(vii). Stipulations of Fact, ¶ 112; Declaration of David Murphy (P-91), ¶ 13; 26 C.F.R. § 1.6033-2(g)(1)(vii). Erie Catholic is not exempt from the contraceptive mandate because it is not an "integrated auxiliary" under the definition in 26 C.F.R. § 1.6033-2(h). Stipulations of Fact, ¶ 113; Doc. No. 1, ¶ 64. If Erie Catholic does not comply with the contraceptive mandate, as applied via the "accommodation," it could face estimated annual fines of approximately $2.8 million against an annual budget of approximately $10 million. Hearing Testimony of Father Jabo, pg. 98, lines 19-20, 23.

### 3. Social Service Organizations

Providing social services to others is a central tenet of the Catholic faith.  Plaintiffs'

Exhibit 12, "Catholic Charities of Diocese of Pittsburgh Bylaws"; 13-cv-303, Doc. No. 1, ¶ 33;

Declaration of Susan Rauscher (P-86), ¶ 21.  These "good works" are integral to the practice of

the Catholic faith.  Hearing Testimony, Bishop Persico, pg. 83, lines 6-9 (" . . . it's faith and

good works.  You don't have two separate, [] they don't co-exist.  It's all part of the same.").

Social services must be provided in conformity with the Catholic faith.  Hearing Testimony,

Bishop Zubik, pg. 22, lines 22-23 ("The Catholic teaching and tradition and its teachings has to

be observed in all instances.").

Consistent with this tenet, the Dioceses of Pittsburgh and Erie provide social services to

the residents of their nineteen-county community.  These services are provided without regard to

national origin, race, color, sex, religion, age, or disability.  Stipulations of Fact, ¶ 131.  The

Dioceses also assist many other local organizations, including organizations that: provide support

to the homeless; provide scholarships to disadvantaged children of all faiths; and provide

counseling and support to struggling families.  Stipulations of Fact, ¶ 132; 13-cv-303, Doc. No.

1, ¶¶ 31-32; 13-cv-1459, Doc. No. 1, ¶¶ 32-33.   These social service programs receive support

from the Diocese.  13-cv-303, Doc. No. 1, ¶ 33.

### a. Pittsburgh

Plaintiff Catholic Charities is the primary social service agency of the Diocese under the

leadership of Bishop Zubik, who serves as the Chairman of the Membership Board.  Declaration

of Susan Rauscher (P-86), ¶ 4; Declaration of Father Ronald P. Lengwin (P-88), ¶ 5.  Per its

Bylaws, the Diocese of Pittsburgh "recognizes its obligation to bear witness to the charity of

Christ, both in work and deed," and "performs its mission of social welfare through Catholic

16

Charities . . . ."  Plaintiffs' Exhibit 12 "Catholic Charities Diocese of Pittsburgh Bylaws, December 5, 2012," pg. 1.

As Chairman of the Membership Board, Bishop Zubik oversees the management of Catholic Charities.  Charitable and educational agencies, such as Catholic Charities, must conform with the Bishop's authority.  Plaintiffs' Exhibit 3, pg. 4, Article 4, §§ 3-4 ("For agencies not approved at the national level . . . the competent authority is understood to be the diocesan Bishop where the agency has its principal office.)

Catholic Charities is required to completely adhere to the Catholic doctrine.  Plaintiffs' Exhibit 3, pg. 2  (" . . . there is a need to ensure that they are managed in conformity with the demands of the Church's teachings and the intentions of the faithful, and that they likewise respect the legitimate norms laid down by civil authorities.").  As such, Catholic Charities may not take actions that are inconsistent with the tenets of the Catholic Church.  Plaintiffs' Exhibit 3, pg. 3, Article 1, § 3 (". . . the collective charitable initiatives to which this *Motu Proprio* refers are required to follow Catholic principles in their activity and they may not accept commitments which could in any way affect the observance of those principles.") (emphasis original.)

Annually, Catholic Charities provides approximately 230,000 acts of service for people in need in Southwestern Pennsylvania.  Stipulations of Fact, ¶ 135.  The organization has offices in all six counties of the Diocese of Pittsburgh and employs approximately 115 individuals.  Stipulations of Fact, ¶¶ 136-137.

Like other charitable and educational organizations affiliated with the Catholic Church, the Diocese provides funding to Catholic Charities, its programs, and the Free Health Care Center.  Stipulations of Fact, ¶ 154; 13-cv-1459, Doc. No. 1, ¶ 68.  Catholic Charities serves the needy, underserved, and underprivileged through the efforts of its "Ambassadors of Hope"

volunteers.  Stipulations of Fact, ¶ 141.  Catholic Charities could not exist without its volunteers and donor funding.  Stipulations of Fact, ¶ 153.  Catholic Charities supports other charitable organizations including Team HOPE (assists the needy to gain independence), St. Joseph House of Hospitality (residential and transitional housing facility), and two senior centers.

Catholic Charities' programs and services include adoption, counseling, safety net and stability services, health care for the uninsured, housing and homeless assistance, pregnancy and parenting support, and refugee and senior services.  In 2012, through its various social service programs, Catholic Charities provided approximately 68,141 meals to the hungry, 14,430 hours of case management to struggling individuals and families, and participated in 16,542 patient visits.  Stipulations of Fact, ¶¶ 141, 148.

Catholic Charities offers free health services through the Free Health Care Center (a wholly-owned subsidiary of Catholic Charities).  The free health services provided at the Free Health Care Center in 2012 are valued at nearly $1.5 million.  Stipulations of Fact, ¶ 144-148. The Free Health Care Center is the only facility of its kind in the Pittsburgh region.  Stipulations of Fact, ¶ 145.  The Center is critical to the region and has provided free preventative and primary care to nearly 15,000 individuals during more than 35,000 patient visits.  Id. at ¶ 147.

Catholic Charities also supports a pregnancy and parenting support program.  In 2012, 2,545 parents utilized the services.  Stipulations of Fact, ¶ 149.  Catholic Charities also maintains crisis pregnancy assistance and post-abortion healing ministries and offers post-abortion healing retreats.  Stipulations of Fact, ¶¶ 138-41.

**b. Erie**

The Diocese of Erie, through its supported social services organizations, provides aid to approximately 56,000 people per year, including many who would otherwise not receive necessary food, shelter, and other services. Stipulations of Fact, ¶¶ 75-76; Doc. No. 1, ¶¶ 33-34. Residents of Northwestern Pennsylvania are served by the Diocese's prison, family, and disability ministries, as well as respect life organizations, and pregnancy and new mother services. Stipulations of Fact, ¶¶ 69-70. The Diocese also financially supports numerous secular and religious charities including: St. Elizabeth Center (food pantry and thrift and clothing store); the Good Samaritan Center (homeless shelter and emergency assistance provider); Better Homes for Erie (provider of affordable low-income housing); and Catholic Charities Counseling and Adoption Services (provider of professional, adoption, and pregnancy counseling and refugee resettlement services). Stipulations of Fact, ¶¶ 70-74.

Other Diocese affiliated organizations include Plaintiffs: St. Martin Center and Prince of Peace Center. Doc. No. 1, ¶¶ 41, 47. St. Martin Center is a nonprofit social service organization based in Erie that provides individuals and families with resources to become self-sufficient. Stipulations of Fact, ¶ 79; Doc. No. 1, ¶ 41. The Center is an affiliated corporation of the Diocese, which directly oversees its management. Doc. No. 1, ¶ 46. Services provided include social services, a food pantry, housing services, an early learning center, a job preparation program, and hospitality industry training. Stipulations of Fact, ¶¶ 88-93; Doc. No. 1, ¶ 46. The Center does not qualify as a "religious employer" as defined by the exemption to the contraceptive mandate. Doc. No. 1, ¶ 45.

Prince of Peace Center is a nonprofit social service organization which provides various social services to the needy of greater Mercer County who do not receive all of their necessities

19

from the Government.  Stipulations of Fact, ¶ 78; Doc. No. 1, ¶¶ 47, 50.  The Center is an

affiliated corporation of the Diocese, which directly oversees its management.  Doc. No. 1, ¶ 53.

Services provided include family support services, emergency assistance programs (funded by

private donations), a thrift store, workforce preparation, a soup kitchen (serves approximately

700 individuals a month with groceries to supplement food stamps and 5,700 people per year at

the soup kitchen), job preparation programs, computer classes, and various programs and charity

drives.  Stipulations of Fact ¶¶ 80-87; Doc. No. 1, ¶ 48.  The Center does not qualify as a

"religious employer" as defined by the exemption to the contraceptive mandate.  Doc. No. 1,

¶ 52.

The majority of the individuals served by St. Martin Center and Prince of Peace Center

live below the poverty line and would be without food, shelter, and necessary services if not for

the Centers.  Stipulations of Fact, ¶ 94.  The Diocese would not be able to provide all of the

social services offered, including at St. Martin Center and Prince of Peace Center, without

financial contributions from donors and volunteers.  Stipulations of Fact, ¶¶ 77, 95.

Bishop Persico serves as Chairman for the membership boards of the St. Martin Center

and Prince of Peace Center.  Declaration of Mary Maxwell (P-90), ¶ 3.  Both Centers are

"required to adhere to Catholic doctrine at all times and in all manners," particularly as defined

by the Diocese.  Id.  Bishop Persico is responsible for carrying out that doctrine and

implementing the Centers' missions.  Declaration of Father Scott Detisch, Ph.D. (P-92), ¶ 5.  As

such, he is ultimately responsible for ensuring that all of the Centers' policies comply with

Catholic doctrine.  Id. at ¶ 6.

Failure to adhere to the contraceptive mandate, as applied via the "accommodation,"

could subject St. Martin Center and Prince of Peace Center to "several million" dollars in

collective fines against budgets of four million dollars and $800,000.00, respectively.  Hearing

Testimony, Mary Maxwell, pg. 115, lines 9, 11-13, 16.


### E.  Plaintiffs' Employee Health Insurance Coverage

#### 1.  Religious Components of Employee Health Care

The sanctity of human life from conception to natural death and the dignity of all persons

are central tenets of the Catechism of the Catholic Church.  Hearing Testimony, Bishop Persico,

pg. 75, lines 16-19.  The Catholic Church believes that health care is a basic right because of the

sanctity and dignity of human life.  See Cardinal Dolan Deposition (13-cv-303, Doc. No. 52; 13-

cv-1459, Doc. No. 53), pg. 28, lines 19-23; Hearing Testimony, Bishop Zubik, pg. 38, lines 23-

24; Hearing Testimony, Bishop Persico, pg. 73, lines 23-25; Declaration of Father Scott Detisch,

Ph.D. (P-92), ¶ 25; Declaration of Father Ronald P. Lengwin (P-88), ¶ 34.

The Catholic Church also believes that contraception and abortion are prohibited, and

Catholics cannot facilitate/initiate, directly or indirectly, the provision of abortions.  Cardinal

Dolan Deposition (13-cv-303, Doc. No. 52; 13-cv-1459, Doc. No. 53), pg. 25, lines 15-19, 23-

25, pg, 26, lines 1-12; Hearing Testimony, Bishop Zubik, pg. 28, lines 16-22; Declaration of

Father Ronald P. Lengwin (P-88), ¶¶ 12-13; Plaintiffs' Exhibit 2 "Ethical and Religious

Directives for Catholic Health Care Services, United States Conference of Catholic Bishops

November 17, 2009," ¶¶ 45, 52 ("Abortion (that is, the directly intended termination of

pregnancy before viability or the directly intended destruction of a viable fetus) is never

permitted.  Every procedure whose sole immediate effect is the termination of pregnancy before

viability is an abortion, which, in its moral context, includes the interval between conception and

implementation of the embryo.  Catholic health care institutions are not to provide abortion

services, even based upon the principle of material cooperation.  In this context, Catholic health

care institutions need to be concerned about the danger of scandal[15] in any association with

abortion providers.").

This belief necessarily prohibits providing, subsidizing, initiating, or facilitating

insurance coverage for abortion-inducing drugs, sterilization services, contraceptives, and related

educational and counseling services.  Declaration of Father Ronald P. Lengwin (P-88),  ¶ 10;

Plaintiffs' Exhibit 2, pg. 28, ¶ 52 ("Catholic health institutions may not promote or condone

contraceptive practices but should provide, for married couples and the medical staff who

counsel them, instruction both about the Church's teaching on responsible parenthood and in the

methods of natural family planning.").

## 2. Diocese of Pittsburgh and the Catholic Benefits Trust (Self-Insured Health Plan) – Doc. No. 1, ¶¶ 34-40

The Diocese of Pittsburgh provides health insurance to its employees through a self-

insured health plan through the Catholic Benefits Trust ("Trust").  Declaration of David S.

Stewart (P-87), ¶ 4.  The Trust was formed in June 2013 by an agreement between the Diocese of

Pittsburgh, the Diocese of Altoona-Johnstown, and the Diocese of Greensburg (the "Trust

Agreement"), in an effort to pool resources with regard to health benefits.  Stipulations of Fact,

¶ 133.  The Trust was formed by the Diocese of Pittsburgh converting its Catholic Employers

Benefits Plan Delaware Trust to a Delaware statutory trust and expanding the Trust to include

the Dioceses of Altoona-Johnstown and Greensburg.  Doc. No. 1, ¶ 34.

The three Dioceses are the Beneficial Owners of the Trust, which is split into three series:

the Pittsburgh series, the Altoona-Johnstown series, and the Greensburg series.  Each Diocese is

---

[15] Per testimony, "scandal," within the Catholic faith, means cooperating with an objectionable practice that goes against the faith, or "teaching one thing and behaving in another manner."  Hearing Testimony, Bishop Zubik, pg. 35, lines 20-23; Hearing Testimony, Bishop Persico, pg. 81, lines 18-20.

the sole "Beneficial Owner" and sole beneficiary of its respective series.  Thus, Plaintiff Diocese

of Pittsburgh is the sole Beneficial Owner and sole beneficiary of the Pittsburgh series of the

Trust.  Declaration of David S. Stewart (P-87), ¶ 5.

The Diocese itself provides health insurance coverage to approximately 200 individuals

who are its direct employees and their beneficiaries.  Declaration of David S. Stewart (P-87), ¶ 6.

The offered plans are self-insured through the Catholic Benefits Trust and administered by

TPAs.  Id.  Consistent with the teachings of the Catholic Church, all of the Diocesan plans

offered through the Trust, including those for its nonprofit, religious affiliated/related

organizations, such as Catholic Charities, do not cover abortion-inducing drugs, contraceptives,

or sterilization, except when medically necessary.  Declaration of Susan Rauscher (P-86), ¶ 19;

Declaration of David S. Stewart (P-87), ¶ 9.  In the past, the Diocese has notified its TPAs that it

would not cover contraceptive products, services, and counseling.  Declaration of David S.

Stewart (P-87), ¶ 14.

The Catholic Benefits Trust also provides coverage to "Diocesan Entit[ies]," defined in

the Trust Agreement as "an Agency, Parish, School, seminary or other similar entity subject to

the supervision, or administrative and pastoral care, of a Diocese."  Stipulations of Fact, ¶ 134;

Doc. No. 1, ¶ 36.  Presently, approximately 230 Catholic organizations, including the Diocese of

Pittsburgh, Catholic Charities, all of the parishes and schools with the Diocese, and several other

entities affiliated with the Diocese of Pittsburgh, along with the Dioceses of Altoona-Johnstown

and Greensburg and affiliated entities within those Dioceses, participate in the Trust.  Within

these organizations, approximately 3,100 employees and 5,000 participants receive their health

insurance through the Trust.  This structure allows organizations to benefit from "economies of

scale," to be self-insured, and to spread their risks. As a result, each religious organization can offer its employees better benefits at lower costs. Doc. No. 1, ¶ 36.

The three Dioceses do not contract with a separate insurance company that pays for the employee health plans sponsored by the Trust. Instead, the Trust functions as the insurance company underwriting the covered employee's medical costs, with all funding coming from each respective Diocese and its covered affiliates. The health plans sponsored by the Trust are administered by TPAs, who are paid a flat fee for each covered individual for administering the plans but who do not pay for any services received by covered employees. The Trust sponsors one set of group health plans for the Diocese of Pittsburgh and the majority of Diocesan-affiliated entities within the Diocese of Pittsburgh (the "Diocesan Health Plan"). Doc. No. 1, ¶ 39.

The Diocesan health plans offered – except to Catholic Charities – are "grandfathered" and therefore are exempt from the requirements of the contraceptive mandate. Doc. No. 1, ¶ 166. The Diocese has included a statement describing its "grandfathered" status in plan materials, as required by 26 C.F.R. §54.9815-1251T(a)(2)(ii). Id.

The Trust sponsors separate group health plans for Plaintiff Catholic Charities of the Diocese of Pittsburgh. Catholic Charities provides health insurance coverage to approximately 80 full-time employees and their dependents (300 individuals). Declaration of Susan Rauscher (P-86), ¶ 7. The plan offered to employees of Catholic Charities is not a "grandfathered" health plan, and as such, it did not include a statement describing its "grandfathered" status in plan materials, as required by 26 C.F.R. § 54.9815-1251T(1)(ii) for "grandfathered" plans. Doc. No.

1, ¶ 44; Declaration of David S. Stewart (P-87), ¶ 10.[16]  The next Diocesan Health Plan year

begins on January 1, 2014.  Declaration of Susan Rauscher (P-86), ¶¶ 7-10; Declaration of David

S. Stewart (P-87), ¶ 12.  Many Diocesan-affiliated entities currently insured through the Trust

likely do not qualify for the religious employer exemption and would be subjected to the

accommodation after that date.  Doc. No. 1, ¶ 44.

### 3.    Trust Agreement – See Doc. No. 1, ¶¶ 47-50

The Trust Agreement provides that "each Director" of the Board of Directors of the Trust

shall be "appointed by the Bishop of each Diocese that is or becomes a Beneficial Owner" of the

Trust.  The Board of Directors is then responsible for "[t]he management of the Trust[.]"

While "all powers to manage the business and affairs of the Trust and each Series shall be

exclusively vested in the Board and the Board may exercise all powers of the Trust[,]" "a

majority of the Beneficial Owners may amend [the Trust] Agreement in writing at any time and

thereby broaden or limit the Board's power and authority[.]"  The Diocese, through the Bishop,

---

[16] The distinction between plans that are "grandfathered" and those that are not is important because as
defined in federal regulations, plans that are "grandfathered" do not have to provide coverage without cost
sharing of "preventive health services."  45 C.F.R. § 147.140; 26 C.F.R. § 54.9815-125T; and 29 C.F.R. §
2590.7151251.  A plan is "grandfathered" if: (1) at least one person was enrolled on March 23, 2010; (2)
the plan continuously covered at least one individual since that date; (3) the plan provides annual notice of
its grandfathered status; and (4) the plan has not been subject to significant changes as outlined in the
regulations.  See 42 U.S.C. § 18011; 26 C.F.R. §§54.9815-1251T(a), (g); 29 C.F.R. §§ 2590.715-1251(a),
(g); 45 C.F.R. §§147.140(a)(g).  A plan may maintain its grandfathered status so long as, if, compared to
its existence on March 23, 2010, it does not: eliminate all or substantially all benefits to diagnose or treat
a particular condition; increase a percentage cost-sharing requirement; significantly increase a fixed-
amount cost-sharing requirement; significantly reduce the employer's contribution; or impose or tighten
an annual limit on the dollar value of any benefits.  Additional Stipulated Facts, ¶ 3, citing 26 C.F.R. §
54.9815-1251T(a), (g)(1); 29 C.F.R. § 2590.715-1251(a), (g)(1); 45 C.F.R. § 147.140(a), (g)(1).

In July 2013, the Government announced that it will provide an additional year before the ACA
mandatory employer and insurer reporting requirements begin.  Plaintiffs' Exhibit 93, Doc. No. 63-1, pg,
2.  As of February 2012, 1,200 employers had been granted waivers for certain coverage requirements.
Id.

25

has ultimate decision-making authority and has the power to manage, oversee, and direct the Trust. Doc. No. 1, ¶ 46.

Additionally, the Diocese decides whether an entity may participate in the Trust. The Trust Agreement provides that "[e]ach Beneficial Owner may allow such Diocesan Entities to benefit in such Series in respect of which such Beneficial Owner is the holder of the sole interest in accordance with the terms and conditions established by such Beneficial Owner in consultation with its advisors." The Diocese, as sole beneficial owner, also is responsible for the liability and other costs of the Trusts – "[a] particular Series shall be charged with the liabilities of that Series, and all expenses, costs, charges and reserves attributable to any particular Series shall be borne by such Series." Doc. No. 1, ¶ 50.

### 4. Diocese of Erie

The Diocese of Erie operates a self-insured health plan ("the Diocesan health plan") by which it functions as the insurance company in underwriting the medical costs of its employees and the employees of its affiliated organizations. Doc. No. 1, ¶ 36. As such, the Diocese does not contract with a separate health insurance company. Id. The Diocesan health plan is administrated by a TPA. Id. The plan provides benefits for approximately 774 employees and 980 individuals, including those who are employed directly by the Diocese as well as by schools and charitable agencies of the Diocese (approximately 280 insured employees are employed by nonexempt entities). Declaration of David Murphy (P-91), ¶¶ 6, 27. Employees of St. Martin Center, Prince of Peace Center, and Erie Catholic (approximately 90 employees) are insured under the Diocesan health plan. Id. at ¶¶ 43, 51, 63; Declaration of Father Scott Jabo (P-89), ¶ 5.

Employees, regardless of the specific employer within the plan, are provided three options for health plans. Declaration of David Murphy (P-91), ¶ 18. Consistent with the tenets

of the Catholic faith, none of these plans cover abortion-inducing drugs, contraceptives, or

sterilization, except when "medically necessary." Declaration of David Murphy (P-91), ¶ 40.

The Diocese has previously notified its TPA that it would not cover contraceptive products,

services, and counseling, and has never designated the TPA to provide those products, services,

or counseling. Declaration of David Murphy (P-91), ¶ 15. Such actions never triggered the

provision of contraceptive products, services, or counseling. Id.

The next administrative year for the health plan (the date which all benefits for the July 1,

2014, plan year must be implemented) begins on January 1, 2014. Declaration of David Murphy

(P-91), ¶¶ 9, 25. The plan does not meet the ACA's definition of a "grandfathered" plan and

therefore is not exempt from provisions of the ACA. Declaration of David Murphy (P-91), ¶ 9.

As such, the Diocesan health plan must comply with the provisions of the ACA on or before

January 1, 2014 (after the safe harbor provision has elapsed and first date of next administrative

year for the plan). Id.

### F. Plaintiffs' Religious Beliefs as to the Contraceptive Mandate

As previously noted, a tenet of the Catholic faith is the belief that human life must be

preserved from conception through natural death. See generally Hearing Testimony, Bishop

Zubik, pg. 28, lines 16-20.

The ACA includes the provision that eight categories of preventative services for women

must generally be covered by group health plans without cost sharing. Additional Stipulated

Facts, ¶ 15, citing HRSA, *Women's Preventive Services Guidelines* (Aug. 1, 2011), available at

http://www.hrsa.gov/womensguidelines; 13-cv-303, Doc. No. 54-49; 13-cv-1459, Doc. No. 55-

49. Plaintiffs object to only one of the eight categories, "contraceptive methods and counseling,"

that covers FDA approved "contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." Additional Stipulated Facts, ¶¶ 16-17. Plaintiffs object to the "contraceptive methods and counseling" category because such products, services, and counseling violate their belief in the sanctity of human life. See generally Hearing Testimony, Bishop Zubik, pg. 28, lines 16-20.

Completing the self-certification form required by the contraceptive mandate's "accommodation" also violates that tenet. Hearing Testimony, Bishop Zubik, pg. 33, lines 19-21 (" . . . we are being asked to violate a tenet or belief that's important to us and a matter of conscience."). Completing the self-certification also would burden the signer's exercise of religion. Hearing Testimony, Mary Maxwell, pg. 113, lines 15-17.

Completion of the self-certification form would be akin to cooperating with/facilitating "an evil" and would place the Diocese "in a position of providing scandal" because "it makes it appear as though [the Diocese] is cooperating with an objectionable practice that goes against [Church] teaching." Hearing Testimony, Bishop Zubik, pg. 35, lines 17-18, 20-23, pg. 37, lines 7-9; Hearing Testimony, Bishop Persico, pg. 79, lines 24-25, pg. 80, lines 6-8; Hearing Testimony, Father Jabo, pg. 96, lines 4-5. Completing the self-certification form would violate personal religious beliefs and cause "eternal" "ramifications." Hearing Testimony, Father Jabo, pg. 97, lines 2-4; Hearing Testimony, Bishop Persico, pg. 81, line 25.

Bishop Zubik will not complete the self-certification form and would instruct the head of Catholic Charities not to complete the self-certification form. Hearing Testimony, Bishop Zubik, pg. 43, lines 2-10. Bishop Persico stated: "I would have a real moral issue in signing [the self-certification form] because I would be afraid of giving scandal to the faithful" and "I would have a very difficult time in [directing the heads of St. Martin Center, Prince of Peace Center, or Erie

28

Catholic to complete the self-certification form]. I don't see how I could." Hearing Testimony, Bishop Persico, pg. 80, lines 1-8, pg. 82, lines 14-16, pg. 91, lines 7-9.

### III.    Statutory and Regulatory History

The applicable statutory and regulatory history, as set forth by the parties in the Stipulations of Fact  (¶¶ 1-49) and Addition Stipulations of Fact (as cited), is:

#### A.  Introduction

In March 2010, Congress enacted the ACA.  Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and  Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010).

The ACA established new requirements for "group health plan[s]," broadly defined as "employee welfare benefit plan[s]" within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(1), that "provide[] medical care . . . to employees or their dependents."  42 U.S.C. § 300gg-91(a)(1).

Section 1001 of the ACA requires all group health plans and health insurance issuers that offer non-grandfathered, non-exempt group or individual health coverage to provide coverage for certain preventive services without cost-sharing, including, "[for] women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [("HRSA")]."  42 U.S.C. § 300gg-13(a)(4).

The ACA provides that certain of its provisions apply to "grandfathered health plans" and certain of its provisions, including 42 U.S.C. § 300gg-13, do not apply to "grandfathered health plans."  42 U.S.C. § 18011.  The contraceptive mandate does not apply to qualifying

"grandfathered" plans, and such plans are not required to comply with the preventive services coverage requirement of 42 U.S.C. § 300gg-13 .  Additional Stipulated Facts, ¶¶ 1-2.

### B. Regulatory Background

#### 1.   Rulemaking from July 2010 to March 2012

On July 19, 2010, Defendants issued interim final rules, incorporating the statutory requirement that group health plans provide coverage for women's "preventive care."  75 Fed. Reg. 41,726 (citing 42 U.S.C. § 300gg-13(a)(4)).  These initial rules did not define "preventive care," noting that "[t]he Department of HHS is developing these guidelines and expects to issue them no later than August 1, 2011."  Id. at 41,731.  At that time, there were no existing HRSA guidelines relating to preventive care and screening for women.

The Department of Health and Human Services ("HHS") tasked the Institute of Medicine ("IOM"), a non-governmental organization, with "review[ing] what preventive services are necessary for women's health and well-being and should be considered in the development of comprehensive guidelines for preventive services for women."  IOM Report at 2.  On July 19, 2011, the IOM Committee released a report entitled "Clinical Preventive Services for Women: Closing the Gaps 19-20, 109 (2011) ("IOM Report").  The IOM Report recommended that the HRSA guidelines include, among other things, "the full range of [FDA]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity" ("Preventive Services").  IOM Report at 10-12.  FDA-approved contraceptive methods include diaphragms, oral contraceptive pills, emergency contraceptives (such as Plan B and Ella), and intrauterine devices ("IUDs").  See id. at 105.  The IOM Report included a dissent from Committee member Anthony Lo Sasso.

On August 1, 2011, HHS issued a press release announcing that it would adopt the recommendations of the IOM Report.  U.S. Dept. of Health and Human Services, "Affordable Care Act Ensures Women Receive Preventive Services at No Additional Cost," *available at* http://www.hhs.gov/news/press/2011pres/08/20110801b.html.

Also, on August 1, 2011, HRSA adopted guidelines consistent with IOM's recommendations, encompassing all FDA-approved "contraceptive methods, sterilization procedures, and patient education and counseling," as prescribed by a health care provider, subject to an exemption relating to certain religious employers authorized by regulations issued that same day (the "2011 amended interim final regulations").  See HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines ("HRSA Guidelines").

In August 2011, the Government issued interim final rules implementing the statutory requirement that group health plans provide coverage for women's "preventive care and screenings . . . as provided for in comprehensive guidelines supported by [HRSA]."  76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011).

The August 2011 interim final rules also amended the July 19, 2010 interim rules to provide HRSA additional discretion to exempt "religious employers" from the contraceptive coverage requirement.  Id.  To qualify for the religious employer exemption contained in the 2011 amended interim final regulations, an employer had to meet the following criteria:

a.  The inculcation of religious values is the purpose of the organization;

b.  The organization primarily employs persons who share the religious tenets of the organization;

c.  The organization serves primarily persons who share the religious tenets of the organization; and

       d.   The organization is a nonprofit organization as described in section 6033(a)(1)

           and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as

           amended [*i.e.*, an organization exempted from filing IRS Form 990].

Id. at 46,623.  The Government sought "to provide for a religious accommodation that respects

the unique relationship between a house of worship and its employees in ministerial positions."

Id.

      In February 2012, the Government "finalize[d], without change," the "religious

employer" exemption as originally proposed in the August 2011 interim final rules.  77 Fed. Reg.

at 8,729 (Feb. 15, 2012).  In February 2012, the Government also created a "one-year safe harbor

from enforcement" for non-grandfathered group health plans sponsored by certain nonprofit

organizations with religious objections to contraceptive coverage.  See 77 Fed. Reg. 8725, 8726-

28 (Feb. 15, 2012).  The Government undertook a new rulemaking during the safe harbor period

to adopt new regulations applicable to non-grandfathered nonprofit religious organizations with

religious objections to covering Preventive Services.  Id. at 8728.

      On March 21, 2012, the Government issued an Advance Notice of Proposed Rulemaking

("ANPRM") that stated it was part of the Government's effort "to develop alternative ways of

providing contraceptive coverage without cost sharing in order to accommodate non-exempt,

nonprofit religious organizations with religious objections to such coverage."  77 Fed. Reg.

16,501, 16,503 (Mar. 21, 2012).

### 2.  Rulemaking from February to July 2013

      On February 1, 2013, the Government issued a Notice of Proposed Rulemaking

("NPRM"), setting forth a proposal that stated it was to "amend the criteria for the religious

employer exemption to ensure that an otherwise exempt employer plan is not disqualified

because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths," and to "establish accommodations for health coverage established or maintained by eligible organizations, or arranged by eligible organizations that are religious institutions of higher education, with religious objections to contraceptive coverage."  See 78 Fed. Reg. 8456 (Feb. 6, 2013).

Defendants received over 400,000 comments (many of them standardized form letters) in response to the proposals set forth in the NPRM.  78 Fed. Reg. 39,870, 39,872 (July 2, 2013).

On June 28, 2013, the Government issued final rules adopting and/or modifying proposals in the NPRM.  See 78 Fed. Reg. 39,870 ("Final Rule").  The regulations challenged here (the "2013 final rules") include the new regulations issued by the Government and applicable to non-grandfathered, nonprofit religious organizations with religious objections to covering Preventive Services.  See 78 Fed. Reg. 39,870; *see also* 77 Fed. Reg. 16,501 (ANPRM); 78 Fed. Reg. 8456 (NPRM).

### a.  The 2013 Final Rules' "Religious Employer" Exemption

The Final Rule states that it "simplify[ied] and clarify[ied] the definition of "religious employer."  78 Fed. Reg. at 39,871.  Under the new definition, an exempt "religious employer" is "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."  78 Fed. Reg. 39874 (codified at 45 CFR § 147.131(a)).  The groups that are "refer[red] to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code," are:

> (i) churches, their integrated auxiliaries, and conventions or associations of churches, and
>
> *         *         *
>
> (iii) the exclusively religious activities of any religious order.

26 U.S.C. § 6033(a)(3)(A)(i) or (iii).  Section 6033 of the Internal Revenue Code addresses

whether and when nonprofit entities that are exempt from paying taxes under the Code must file

"annual information [tax] return[s]."  26 C.F.R. § 1.6033-2(a).

The new definition of "religious employer" does "not expand the universe of religious

employers that qualify for the exemption beyond that which was intended in the 2012 final

regulations."  78 Fed. Reg. at 39,874 (citing 78 Fed. Reg. 8461).  Entities that are included in

Section 6033(a)(3)(A) are exempt from filing an annual Form 990 with the IRS.[17]

---

[17] The IRS has developed a non-exhaustive list of fourteen facts and circumstances that may be considered, in addition to "any other facts and circumstances that may bear upon the organization's claim for church status," in assessing whether an organization is a "church" under section 6033(a)(3)(A)(i) of the Internal Revenue Code.  *See Foundation of Human Understanding v. United States*, 88 Fed. Cl. 203, 220 (Fed. Cl. 2009); Internal Revenue Manual 7.26.2.2.4.   The list of fourteen facts and circumstances includes the following:

> (1) a distinct legal existence;
> (2) a recognized creed and form of worship;
> (3) a definite and distinct ecclesiastical government;
> (4) a formal code of doctrine and discipline;
> (5) a distinct religious history;
> (6) a membership not associated with any church or denomination;
> (7) an organization of ordained ministers;
> (8) ordained ministers selected after completing prescribed studies;
> (9) a literature of its own;
> (10) established places of worship;
> (11) regular congregations;
> (12) regular religious services;
> (13) Sunday schools for the religious instruction of the young; and
> (14) schools for the preparation of its ministers.

*Id.*

In 26 C.F.R. § 1.6033-2(h), the Treasury Regulations provide a 3-factor test to determine whether a group is an "integrated auxiliary" under section 6033(a)(3)(A)(i) of the Internal Revenue Code.  According to the Treasury Regulation, the term "integrated auxiliary of a church" means an "organization that is: (i) [d]escribed in both sections 501(c)(3) and 509(a)(1), (2), or (3);  (ii) [a]ffiliated with a church or a convention or association of churches; and (iii) [i]nternally supported."  26 C.F.R. § 1.6033-2(h)(1).

An organization is "internally supported" for purposes of subparagraph (h)(1)(iii), above, of this section, unless it both,

> (i) Offers admissions, goods, services or facilities for sale, other than on an incidental basis, to the general public (except goods, services, or facilities sold at a nominal charge or for an insubstantial portion of the cost); and

The 2013 final rules' amendments to the religious employer exemption apply to group health plans and group health insurance issuers for plan years beginning on or after August 1, 2013. See id. at 39,871.

### b. The 2013 Final Rules' "Accommodation"

The 2013 final rules establish regulations regarding the contraceptive coverage requirement for group health plans established or maintained by "eligible organizations." 78 Fed. Reg. at 39,875-80; 45 C.F.R. § 147.131(b).

An "eligible organization" is an organization that satisfies the following criteria:

> (1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
>
> (2) The organization is organized and operates as a nonprofit entity.
>
> (3) The organization holds itself out as a religious organization.
>
> (4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies.

---

(ii) Normally receives more than 50 percent of its support from a combination of governmental sources, public solicitation of contributions, and receipts from the sale of admissions, goods, performance of services, or furnishing of facilities in activities that are not unrelated trades or businesses.

An entity's eligibility for exemption as a religious employer is determined on an employer-by-employer basis. See 78 Fed. Reg. at 39,886.

An entity that offers a health plan to its employees that is administered by a qualified religious employer must independently qualify for the religious employer exemption to be exempt. 78 Fed. Reg. 39,886; see also 78 Fed. Reg. at 8456, 8463.

45 C.F.R. § 147.131(b); see also 78 Fed. Reg. at 39,874-75.  The 2013 final rules state that an eligible organization is not required "to contract, arrange, pay, or refer for contraceptive coverage" to which it has religious objections.  78 Fed. Reg. at 39,874.

To be relieved of the obligations that otherwise apply to non-grandfathered, non-exempt employers, the 2013 final rules require that an eligible organization complete a self-certification form, certifying that it is an eligible organization, sign the form, and provide a copy of that self-certification to its insurer or TPA.  Id. at 39,878-79.

For self-insured organizations, the self-certification "will afford the [TPA] notice of [its] obligations" under the 2013 final rules, "and will be treated as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA."  78 Fed. Reg. at 39,879.  Section 3(16) of ERISA provides the definition of "administrator" under ERISA.  29 U.S.C. § 1002(16).

Under the 2013 final rules, in the case of an eligible organization with a self-insured group health plan, the organization's TPA, upon receipt of the self-certification, will provide or arrange separate payments for contraceptive services for participants and beneficiaries in the plan without cost-sharing, premium, fee, or other charge to plan participants or beneficiaries, or to the eligible organization or its plan.  See id. at 39,879-80; 26 C.F.R. § 54.9816-2713A(b)(2), (c)(2).

Under the 2013 final rules, costs incurred by TPAs relating to the coverage of Preventive Services for employees of eligible organizations will be reimbursed through an adjustment to Federally-facilitated Exchange (FFE) user fees.  See 78 Fed. Reg. at 39,880.  The payments for Preventive Services required by the challenged regulations applicable to employer-sponsored health insurance plans are available to an employee only while the employee is on an organization's health plan.  29 C.F.R. § 2590.715-2713; 45 C.F.R. § 147.131(c)(2)(i)(B).

Self-insured religious employers and eligible organizations are prohibited from "directly or indirectly, seek[ing] to influence the[ir] third party administrator's decision" to provide or procure Preventive Services.  26 C.F.R. § 54.9815–2713.

The 2013 final rules' "accommodation" applies to group health plans and health insurance issuers for plan years beginning on or after January 1, 2014.  See id. at 39,872.

## IV.    Summation of Findings of Fact

Based upon testimony presented at the Injunction Hearing, credibility determinations of the witnesses by this Court, and the sum of evidence presented in various forms, the Court finds in summary that:

> (1) Plaintiffs hold sincerely to the religious beliefs of the Catholic faith that:
>
>> (a) human life is sacred from conception to natural death;
>>
>> (b) worship, faith, and good works are essential and integral to the practice of Catholicism ("faith without good works is dead"); and
>>
>> (c) the facilitation of evil is as morally odious as the proliferation of evil.
>
> (2) Plaintiffs will refuse to provide, directly or indirectly, employee health insurance coverage for contraceptive products, services, or counseling, because doing so would violate their sincerely-held religious beliefs.
>
> (3) The nonprofit, religious affiliated/related Plaintiffs (Catholic Charities, St. Martin Center, Prince of Peace Center, and Erie Catholic) will not complete the self-certification form.  These Plaintiffs will partake in this act of civil disobedience because to do otherwise – meaning signing the self-certification form – will initiate ("cause a process of action to begin") and facilitate coverage of contraceptive products, services,

and counseling by a TPA or health insurer.  The act of signing the self-certification form will violate these Plaintiffs' sincerely-held religious beliefs.  Hearing Transcript, November 13, 2013, pg. 54, lines 23-25, pg. 55, lines 1-9.  Further, the Bishops will direct these Plaintiffs not to complete the self-certification form.  Hearing Testimony, Bishop Zubik, pg. 43, lines 2-10; Hearing Testimony, Bishop Persico, pg. 80, lines 1-8, pg. 82, lines 14-16, pg. 91, lines 7-9.

(4) The nonprofit, religious affiliated/related Plaintiffs will be subject to substantial fines/penalties/"taxes" and other coercive governmental sanctions.

(5) The effect of the imposition of these fines/penalties/"taxes" will gravely impact Plaintiffs' spiritual, charitable, and educational activities, and the individuals who rely on the Catholic Church's nonprofit, religious affiliated/related organizations for the basic needs of food, shelter, and education, as well as other charitable programs. Cardinal Dolan Deposition, (13-cv-303, Doc. No. 52; 13-cv-1459, Doc. No. 53), pg. 29, lines 5-21.  The fines/penalties/"taxes" also will negatively affect Plaintiffs' financial situation as donors to these spiritual/charitable/educational organizations may not wish to donate funds when the funds could be diverted to the Government in the form of fines/penalties/"taxes."

## V.  Conclusions of Law

### A.  Overview

As far as this Court is aware, the facts presented by these two cases make them one of first-impression.  As of this writing, no appellate court has rendered a decision on the merits of a non-secular, nonprofit organization's rights under the RFRA, as impacted by the ACA's contraceptive mandate, and the "religious employer exemption" and "accommodation" which relate to that mandate.[18]

In reaching its decision in these two cases, this Court has found the recent decisions pertaining to secular, for-profit organizations to be instructive.  *See Korte v. Sebelius,* --- F.3d ---, 2013 WL 5960692 (7th Cir.  Nov. 8, 2013) (granting preliminary injunction to secular, for-profit corporations finding them to be "persons" who could assert claims under the RFRA alleging that the ACA's contraceptive mandate placed substantial burden on their exercise of religion);

---

[18]  In *Liberty University, Inc. v. Lew,* 733 F.3d 72 (4th Cir. 2013), the Court of Appeals upheld the constitutionality of two provisions of the ACA – the "individual mandate," which requires individuals to purchase a minimum level of health insurance coverage, and the "employer mandate," which requires certain employers to offer such coverage to their employees and their dependents.  Following a remand by the United States Supreme Court, and while on appeal to the Court of Appeals for the Fourth Circuit, Liberty University, for the first time, challenged as abortifacients all forms of FDA-approved contraception that "may act after fertilization," including emergency contraceptive pills and intra-uterine devices.  733 F3.d at 103.  Because this claim had never been raised before, the Court of Appeals refused to "consider an issue not passed upon below" and declined to rule on the merits of this claim.  *Id.*  Thus, assuming Liberty University is a non-secular, nonprofit educational institution, the appellate court did not reach the merits of its "contraceptive mandate" claim.

The Court further notes that there are other United States District Courts addressing whether the contraceptive mandate applies to non-secular, nonprofit organizations via the "accommodation."  *See, i.e., Geneva College v. Sebelius,* --- F.Supp.2d ----, 2013 WL 3071481 (W.D. Pa. June 18, 2013) (granting preliminary injunction preliminary injunction to religious college, protecting it from complying the ACA's contraceptive mandate), notice of appeal filed, United States Court of Appeals for the Third Circuit, Case Number 13-2814; and the recently re-opened *East Texas Baptist University v. Sebelius,* Civil Action No. H–12–3009 (S.D. Tex).

*Gilardi v. U.S. Dept. Health and Human Services*, --- F.3d ----, 2013 WL 5854246 (C.A. D.C.

Nov. 1, 2013) (holding secular, for-profit entity was not a "person" capable of religious exercise,

but individual owners were); *Conestoga Wood Specialties Corporation v. Secretary of U.S. Dept.*

*of Health and Human Services*, 724 F.3d 377 (3d Cir. July 26, 2013) (a secular, for-profit

corporation could not assert claim under Free Exercise Clause of First Amendment); and *Hobby*

*Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. June 27, 2013) (in moving for a

preliminary injunction, secular, for-profit corporations showed a substantial likelihood of success

on the merits as to the substantial-burden element of their claim under the RFRA).

The Court begins its analysis by considering the four criteria Plaintiffs must prove in

order to obtain a preliminary injunction.


### B. Preliminary Injunction Test

The primary purpose of a preliminary injunction is to maintain the *status quo* until a

decision on the merits of the case is rendered. *University of Texas v. Camenisch,* 451 U.S. 390,

395 (1981). "Given this limited purpose, and given the haste that is often necessary if those

positions are to be preserved, a preliminary injunction is customarily granted on the basis of

procedures that are less formal and evidence that is less complete than in a trial on the merits."

*Id*.

"Four factors determine whether a preliminary injunction is appropriate: '(1) whether the

movant has a reasonable probability of success on the merits; (2) whether the movant will be

irreparably harmed by denying the injunction; (3) whether there will be greater harm to the

nonmoving party if the injunction is granted; and (4) whether granting the injunction is in the

public interest.'" *B.H. ex rel. Hawk v. Easton Area School Dist.*, 725 F.3d 293, 301-2 (3d Cir.

2013) (quoting *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 252 (3d Cir. 2002) quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 170 (3d Cir. 2001)).

"A plaintiff seeking an injunction must meet all four criteria, as '[a] plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate.'" *Conestoga Wood Specialties Corp. v. Secretary of U.S. Dept. of Health and Human Svcs.,* 724 F.3d 377, 382 (3d Cir. 2013) (quoting *NutraSweet Co. v. Vit–Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)); accord, *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1438 (3d Cir. 1994) ( "The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief.").

As to the first criterion, the movant bears the burden of proving a reasonable probability of success on the merits. "[O]n an application for preliminary injunction, the plaintiff need only prove a *prima facie* case, not a certainty that he or she will win." *Highmark, Inc.*, 276 F.3d at 173, citing 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.3 (Civil 2d ed. 1995).

The second criterion requires the movant prove that "irreparable injury is *likely* in the absence of an injunction" – the mere "possibility" of such irreparable harm "is too lenient." *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 22 (2008). "While the burden rests upon the moving party to make these [first] two requisite showings, the district court 'should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.'" *Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir. 1994), quoting *Delaware River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974) (footnote omitted).

In order to satisfy the third criterion, this Court must find "that the party seeking the injunction would suffer more harm without the injunction than would the enjoined party if it were granted." *Pittsburgh Newspaper Printing Pressmen's Union No. 9 v. Pittsburgh Press Co.* 479 F.2d 607, 609 -610 (3d Cir. 1973). In *Winter*, the Supreme Court of the United States noted that although it did "not question the seriousness of [the movant's] interests, . . . the balance of the equities and consideration of the overall public interest in this case tip[ped] strongly in favor of the [non-moving party]." 555 U.S. at 26. Thus, this criterion requires this Court to employ a balancing test that compares the harms the movant and non-movant would suffer and then weighs them to discern which party would be more greatly harmed by the Court's grant or denial of the injunction.

The fourth and final criterion is closely tied to the third in that it requires this Court to determine if the public's interest will be furthered or harmed by the issuance of a preliminary injunction. *See Trefelner ex rel. Trefelner v. Burrell School Dist.,* 655 F.Supp.2d 581, 597-8 (W.D. Pa. 2009) ("With regard to the public interest prong, the court finds that granting the temporary restraining order is in the public interest. The focus of this prong is 'whether there are policy considerations that bear on whether the order should issue,'" citing 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE § 2948.4 (Civil 2d ed. 1995)). "'The grant or denial of a preliminary injunction is committed to the sound discretion of the district judge, who must balance all of these factors in making a decision.'" *Spartacus, Inc. v. Borough of McKees Rocks*, 694 F.2d 947, 949 (3d Cir. 1982), quoting *Penn Galvanizing Co. v. Lukens Steel Co*., 468 F.2d 1021, 1023 (3d Cir. 1972).

Turning to the instant matter, Plaintiffs in these cases have requested that this Court grant them a preliminary injunction, arguing that the ACA and the religious employer

"accommodation," which requires them to facilitate/initiate compliance with the contraceptive mandate, violates their rights under the RFRA and the Free Exercise Clause of the First Amendment.

### 1. Likelihood of Success on the Merits

#### a. Background

Plaintiffs' Motions for Expedited Preliminary Injunction ask this Court to enjoin the issuance, application, and enforcement of a federal regulation, specifically 45 C.F.R. § 147.130(a)(1)(iv), arguing that they are likely to succeed on their RFRA and First Amendment claims. 13-cv-1459, Doc. No. 4; 13-cv-303, Doc. No. 6.

As noted in Section "III. B. 2." above, 45 C.F.R. § 147.130(a)(1)(iv) is the regulation that allows HRSA to "establish exemptions" from group health plans maintained by "religious employers" with respect "to any requirement to cover contraceptive services[.]" *See* 45 C.F.R. § 147.130(a)(1)(iv)(A); *see also Gilardi, supra,* 2013 WL 5854246, *1 (C.A. D.C. Nov. 1, 2013).

After receiving hundreds of thousands of comments from the public, including religious individuals and entities, concerning the definition of "religious employer" for the benefit of receiving an "exemption" from the contraceptive mandate, the "final rule" promulgated by HRSA defined a "religious employer" as "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code . . . ." 45 C.F.R. § 147.131(a).

Again, as noted in Section "III. B. 2." above, the nonprofit entities included in the relevant portion of Section 6033 of the Internal Revenue Code are:

(i) churches, their integrated auxiliaries, and conventions or associations of churches,

               *      *      *

(iii) the exclusively religious activities of any religious order.

26 U.S.C.A. § 6033(a)(3)(A).

Given this description, Plaintiffs in the instant cases (the nonprofit, religious affiliated/related entities) fail to meet the definition of a "religious employer" entitled to the "exemption." As the United States Court of Appeals for the Seventh Circuit noted in *Korte*:

> The religious-employer exemption did not leave room for the conscientious religious objectors other than houses of worship, their integrated affiliate organizations, and religious orders acting as such. In other words the definition of 'religious employer' was so circumscribed that it left out religious colleges and universities; religious hospitals and clinics; religious charities and social-service organizations; other faith-based nonprofits; and for-profit, closely held businesses managed in accordance with a religious mission or creed.

*Korte*, 2013 WL 5960692, *3. Plaintiffs in the instant cases are akin to the *Korte* plaintiffs in that the instant Plaintiffs are entities to which the religious employer "exemption" does not apply. If HRSA had stopped here, non-secular, nonprofit entities such as Plaintiffs would have been required to directly provide for contraceptive products, services, and counseling pursuant to the contraceptive mandate.

However, in response to concerns that the application of the religious employer "exemption" was too narrow, and instead of broadening the "exemption," a second regulation was enacted that allowed for non-secular, nonprofit employers to receive an "accommodation," whereby these entities could self-certify that they were "eligible organizations" and thereby avoid <u>directly</u> providing contraceptive products, services, and counseling.

As noted above, this "accommodation" is limited to "eligible organizations" which:
(1) oppose providing coverage for some or all of any contraceptive services required to be

44

covered under the contraceptive mandate "on account of religious objections[;]" (2) are organized and operate as a nonprofit entity; (3) hold themselves out as a religious organization; and (4) "self-certify," in a form and manner specified by the Secretary, that it satisfies the criteria in (1) through (3) above.  See 45 C.F.R. § 147.131(b); see also 78 Fed. Reg. at 39,874-75.  "The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974."  Id.

Since the non-secular, nonprofit Plaintiffs in the instant cases meet the first three criteria of the "accommodation," they need to "self-certify," as required by the fourth criterion, to be deemed an "eligible organization" and thus, entitled to obtain the religious employer "accommodation."   It is the fourth criterion of the religious employer "accommodation" which Plaintiffs contend violates their rights under the RFRA and the First Amendment.[19]

In order to qualify for the religious employer "accommodation," and thus avoid <u>directly</u> providing or paying for contraceptive products, services, and counseling through their own health plans, Plaintiffs in these cases must self-certify that they: (1) oppose providing such contraceptive coverage on account of their religious objections; (2) are organized and operate as nonprofit entities; and (3) hold themselves out as a religious organization.  This Court found as fact that Plaintiffs' self-certification forms must be executed by the Bishop of Pittsburgh (with respect to the Pittsburgh Plaintiffs in 13-cv-1459) and by the Bishop for the Diocese of Erie (with respect to the Erie Plaintiffs in 13-cv-303), or at their directive.

---

[19] Notably, subpart "(c)" of same regulation provides that entities who meet all four criteria, thereby entitles them to an "accommodation," and will not have to pay for the contraceptive products, services, and counseling.  A third party will.  See 45 C.F.R. § 147.131(c).

### b. Substantial Burden[20] under RFRA

### i. The RFRA

Plaintiffs assert that by requiring self-certification and thereby facilitating or initiating the process of providing contraceptive products, services, and counseling, via a third party, the "accommodation," violates their rights under the RFRA.

The RFRA provides, in pertinent part, as follows:

a) In general

       Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

       Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

       (1) is in furtherance of a compelling governmental interest; and

       (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C.A. § 2000bb-1.

As noted by the Government, under the "substantial burden test," this Court must look to what is meant by "substantial burden" under the RFRA. As the Court of Appeals for the Seventh Circuit recently noted in *Korte*, "[a]t a minimum, a substantial burden exists when the government compels a religious person to 'perform acts undeniably at odds with fundamental tenets of [his] religious beliefs.'" 2013 WL 5960692 at *22, citing *Wisconsin v. Yoder,* 406 U.S. 205, 218 (1972). *Korte* further instructs that "a burden on religious exercise also arises when the

---

[20] The Government declined to stipulate to the "substantial burden" portion of this test. 13-cv-303, Doc. No. 30, 4; 13-cv-1459, Doc. No. 25, 4.

government 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Id.*, citing *Thomas v. Review Bd. of Indiana Employment Sec. Division*, 450 U.S. 707, 718 (1981). "An inconsequential or *de minimis* burden on religious practice does not rise to this level, nor does a burden on activity unimportant to the adherent's religious scheme." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (citing *Thomas*, 450 U.S. at 718 (1981)).

The Government argues that the "accommodation" merely requires the Pittsburgh and Erie Bishops (or their designees) to sign the self-certification form on behalf of their respective nonprofit, religious affiliated/related entities, and does not rise to the level of a "substantial burden," as that term has been defined in connection with the RFRA. The Government argues that any impact on Plaintiffs' sincerely-held religious beliefs created by Plaintiffs' self-certification is too attenuated to rise to the level of creating a substantial burden on Plaintiffs.

The Government acknowledges that the act of self-certification will require the Plaintiff-entities to sign the self-certification and supply a third party with the names of the Plaintiffs' respective employees so that the third-party may provide (and/or pay for) contraceptive products, services, and counseling. The Government also concedes that Plaintiffs have sincerely-held religious beliefs with respect to: (1) the sanctity of human life from conception to natural death; (2) unity of worship, faith, and good works ("faith without good works is dead"); and (3) the facilitation of evil is as morally odious as the proliferation of evil.

Given these concessions, the Court disagrees with the Government that Plaintiffs' ability or inability to "merely sign a piece of paper," and thus comport with the "accommodation," is all that is at issue here. Again, as stated by the Court of Appeals in *Korte*:

> . . . the test for substantial burden does not ask whether the claimant has
> correctly interpreted his religious obligations. See *Lee*, 455 U.S. at 257;
> *Thomas*, 450 U.S. at 715–16. Indeed, that inquiry is prohibited. "[I]n this
> sensitive area, it is not within the judicial function and judicial competence
> to inquire whether the [adherent has] . . . correctly perceived the
> commands of [his] . . . faith. Courts are not arbiters of scriptural
> interpretation." *Thomas*, 450 U.S. at 716. It is enough that the claimant
> has an "honest conviction" that what the government is requiring,
> prohibiting, or pressuring him to do conflicts with his religion.

*Korte* at *22.

Here, the issue is whether Plaintiffs, being non-secular in nature, are likely to succeed on the merits of proving that their right to freely exercise their religion has been substantially burdened by the "accommodation" which requires the Bishops of two separate Dioceses (or their designees) to sign a form which thereby facilitates/initiates the provision of contraceptive products, services, and counseling.

### ii. The "Accommodation" Creates a New Substantial Burden

The Government contends that the affirmative acts of: (1) signing the self-certification form stating Plaintiffs' religious objections; (2) compiling a list of Plaintiffs' employees; and (3) providing those items to the health insurer or TPA, does not place a substantial burden on Plaintiffs. The Government further argues that these same acts have been undertaken by Plaintiffs in the past. In response, Plaintiffs concede that they have provided similar information in the past to their TPA, and that the physical acts themselves are not onerous. However, in the past, such actions barred the provision of contraceptive products, services, or counseling. Now, this type of information previously submitted to an insurer or TPA will be used to facilitate/initiate the provision of contraceptive products, services, or counseling – in direct contravention to their religious tenets.

Plaintiffs liken this result by analogy to a neighbor who asks to borrow a knife to cut something on the barbecue grill, and the request is easily granted. The next day, the same neighbor requests a knife to kill someone, and the request is refused. It is the reason the neighbor requests the knife which makes it impossible for the lender to provide it on the second day.

The same is true here. In all prior instances where the Government, an insurer, or a TPA has requested employee names or other information from Plaintiffs, the reason the information was sought was of no moment to Plaintiffs. Now, under the "accommodation," the reason the documentation is required is so that contraceptive products, services, and counseling can be provided in direct contravention of Plaintiffs' sincerely-held religious beliefs. The Government is asking Plaintiffs for documentation for what Plaintiffs sincerely believe is an immoral purpose, and thus, they cannot provide it.

In sum, although the "accommodation" legally enables Plaintiffs to avoid directly paying for the portion of the health plan that provides contraceptive products, services, and counseling, the "accommodation" requires them to shift the responsibility of purchasing insurance and providing contraceptive products, services, and counseling, onto a secular source. The Court concludes that Plaintiffs have a sincerely-held belief that "shifting responsibility" does not absolve or exonerate them from the moral turpitude created by the "accommodation"; to the contrary, it still substantially burdens their sincerely-held religious beliefs.

### iii. The "Accommodation" and the "Exemption" Divide the Catholic Church which Creates a Substantial Burden

The Government, by enacting the religious employer "exemption," allowed certain religious employers (*i.e.,* the Dioceses and "houses of worship") to freely exercise the religious

49

belief that "contraception violates the sanctity of human life," by completely exempting them from the contraceptive mandate.  Thus, the "exempt" religious employers do not have to directly provide contraceptive products, services, and counseling through their own health plans, nor do they have to provide a list of their employees to a third party and thereby indirectly provide contraceptive products, services, and counseling through that same third party.  However, the religious employer "accommodation" separates the "good works (faith in action) employers" from the "houses of worship employers" within the Catholic Church by refusing to allow the "good works employers" the same burden-free exercise of their religion.

Under the "accommodation," Plaintiffs here (*i.e.,* the "good works (faith in action) employers") will be forced to facilitate/initiate the provision of contraceptive products, services, and counseling, through a third party, despite the fact that the sincerity of their religious beliefs – "contraception violates the sanctity of human life" and "facilitation of evil is as morally odious as the proliferation of evil" – are not in question.

Simply put, the Court is constrained to understand why all religious employers who share the same religious tenets – (1) the sanctity of human life from conception to natural death; (2) unity of worship, faith, and good works ("faith without good works is dead"); and (3) the facilitation of evil is as morally odious as the proliferation of evil – are not exempt; or conversely, why all religious employers do not fall within the confines of the "accommodation." The Court made the factual determination that Plaintiffs sincerely believe that the "good works, or faith-in-action" arms of the Catholic Church implement a core and germane guiding principle in the exercise of their religious beliefs.  Why should religious employers who provide the charitable and educational services of the Catholic Church be required to facilitate/initiate the

provision of contraceptive products, services, and counseling, through their health insurers or TPAs, when religious employers who operate the houses of worship do not?

To this question, the Government does not provide a direct answer. Rather, the Government takes the position that Plaintiffs cannot use the RFRA as a sword to prevent the Government from creating "alternate mechanisms" to essentially protect the rights of employees and to make sure that they are receiving the mandated health services. However, the Government, through its "exemption" regulation, allows the religious employers who operate the houses of worship to do just that, while denying the same benefit to the religious employers who operate on behalf of, and at the direction of, the Catholic Church.

What this Court finds equally problematic with the Government's position is that the Bishops of these two Dioceses may freely exercise those same three religious tenets referred to above, as long as they espouse them within the confines of a "house of worship." When they provide health insurance for the employees who work for the houses of worship, they are not in any moral danger of directly or indirectly providing contraceptive products, services, and counseling. However, these same two individuals, as the spiritual leaders for the Plaintiffs at issue in these cases, must personally take at least three affirmative actions (sign a self-certification form, compile a list of employees, and provide these to an insurer or TPA) in order to escape directly providing contraceptive products, services, and counseling to the employees of the charitable and educational agencies, while knowingly facilitating/initiating the process for the provision of contraceptive services, products, and counseling through a third party. The Bishops, given their three sincerely-held religious beliefs, while wearing their "house-of-worship" hats, are not in any moral peril; yet, when they wear their "head-of-the-'good works'-agencies" hats,

they must take affirmative actions which facilitate/initiate the provision of contraceptive products, services, and counseling in violation of their religious tenets.

Thus, the practical application of the two distinct regulations (one an "exemption" and one an "accommodation") allows the <u>same</u> members of the <u>same</u> religion to completely adhere to their religious beliefs at times (when the "exemption" applies), while other times, forces them to violate those beliefs (when the "accommodation" applies). Stated another way, even though Plaintiffs here share identical, religious beliefs, and even though they share the same persons as the religious heads of their organizations, the heads of Plaintiffs' service organizations may not fully exercise their right to those specific beliefs, when acting as the heads of the charitable and educational arms of the Church. The Court finds this enigmatic.

Furthermore, the Court is constrained to understand why religious employers such as Catholic Charities and Prince of Peace Center– which were borne from the same religious faith, and premised upon the same religious tenets and principles, and operate as extensions and embodiments of the Church, but are not subsidiaries of a parent corporation – would not be treated the same as the Church itself with respect to the free exercise of that religion. If the contraceptive mandate creates such a substantial burden on the Dioceses' exercise of religion so as to require the religious employer "exemption," the contraceptive mandate obviously creates the same substantial burden on the nonprofit, religious affiliated/related organizations like Plaintiffs (*i.e.*, Catholic Charities, Prince of Peace Center, *et al.*), which implement the "good works" of the Dioceses.

The Court concludes that the religious employer "exemption" enables some religious employers to completely eliminate the provision of contraceptive products, services, and counseling through the Dioceses' health plans and third parties; while the religious employer

52

"accommodation" requires other religious employers (often times the same member with the same sincerely-held beliefs) to take affirmative actions to facilitate/initiate the provision of contraceptive products, services, and counseling – albeit from a third-party.

The application of these two regulations – one an exemption and one an accommodation – has the effect of dividing the Catholic Church into two separate entities.  Now, one regulation (the "exemption") applies to the worship arm of the Catholic Church and thus applies to all of those employees who work inside a church's walls.  While the other regulation (the "accommodation") applies to the "good works" arms of the Catholic Church, and thus applies to those who stand on the church steps and pass out food and clothes to the needy.  The Court concludes that by dividing the Catholic Church in such a manner with the enactment of these two regulations, the Government has created a substantial burden on Plaintiffs' right to freely exercise their religious beliefs.

### iv. Conclusion re: Substantial Burden

For the reasons set forth above, the Court concludes that the religious employer "accommodation" places a substantial burden on Plaintiffs' right to freely exercise their religion – specifically their right to <u>not</u> facilitate or initiate the provision of contraceptive products, services, or counseling.  Thus, Plaintiffs have met their burden of proving that complying with the "accommodation" provision of the contraceptive mandate is a substantial burden on their free exercise of religion.

### c.  Compelling Governmental Interest under the RFRA

Given that the Court has concluded (for purposes of these Motions for Expedited Preliminary Injunction) that the "accommodation" places a substantial burden on Plaintiffs' free exercise of religion under the RFRA, the Court will now consider whether the RFRA's exception

has been met.  Accordingly, the Court must determine whether the contraceptive mandate, as

applied to Plaintiffs via the "accommodation": (1) furthers a compelling governmental interest,

and (2) is the least restrictive means of furthering that compelling governmental interest.  42

U.S.C.A. § 2000bb-1.

As to the compelling interest test, the Court of Appeals in *Korte* stated:

> The compelling-interest test generally requires a "high degree of
> necessity." *Brown v. Entm't Merchs. Ass'n*, —— U.S. ——, ——, 131
> S.Ct. 2729, 2741, 180 L.Ed.2d 708 (2011). The government must "identify
> an 'actual problem' in need of solving, and the curtailment of [the right]
> must be actually necessary to the solution." *Id*. at 2738 (citations omitted).
> In the free-exercise context, "only those interests of the highest order and
> those not otherwise served can overbalance legitimate claims to the free
> exercise of religion." *Yoder*, 406 U.S. at 215. "[I]n this highly sensitive
> constitutional area, only the gravest abuses, endangering paramount
> interests, give occasion for permissible limitation . . . ." *Sherbert*, 374 U.S.
> at 406 (internal quotation marks and alteration omitted). The regulated
> conduct must "pose[ ] some substantial threat to public safety, peace[,] or
> order." *Id*. at 403. Finally, "a law cannot be regarded as protecting an
> interest of the highest order . . . when it leaves appreciable damage to that
> supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (internal
> quotation marks omitted).

*Korte,* 2013 WL 5960692, *25.

The "compelling governmental interests" identified by the Government in this case are

two-fold: (1) "the promotion of public health," and (2) "assuring that women have equal access

to health care services."  13-cv-1459, Doc. No. 23, 20-21; 13-cv-303, Doc. No. 28, 20.

While the Court agrees that these two interests are certainly important governmental

interests, the Court concludes that these two interests, as so broadly stated,[21] are not "of the

---

[21]  This Court further notes that, the Court of Appeals in *Korte* took great offense to the Government's
identification of its two "compelling" interests stating:

> The government identifies two public interests—"public health" and "gender equality"—
> and argues that the contraception mandate furthers these interests by reducing unintended
> pregnancies, achieving greater parity in health-care costs, and promoting the autonomy of

highest order" such that "those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Yoder,* 406 U.S. at 215.

In reaching this conclusion, the Court first notes that the existence of a religious employer "exemption" is an acknowledgment of the lack of a compelling governmental interest as to religious employers who hire employees for their "houses of worship." Simply put, as stated more fully above, the religious employers who qualify for the "exemption" do not have to directly provide, nor indirectly facilitate/initiate, the provision of any contraceptive products, services, and counseling. At a minimum, the existence of the "exemption" is an indication that the Government found its compelling interests to (1) promote public health, and (2) assure that women would have equal access to health care services, could not "overbalance the legitimate claims to the free exercise of religion" asserted by <u>some</u> religious employers – *i.e.*, the houses of worship. *Yoder*, 406 U.S. at 215; *see also Geneva College,* 2013 WL 3071481 at *10.

Thus, the Government's argument that its two stated compelling interests will not overbalance the exact same legitimate claims to the free exercise of religion (at times being

---

women both economically and in their reproductive capacities. This argument seriously misunderstands strict scrutiny. By stating the public interests so generally, the government guarantees that the mandate will flunk the test. Strict scrutiny requires a substantial congruity—a close "fit"—between the governmental interest and the means chosen to further that interest. Stating the governmental interests at such a high level of generality makes it impossible to show that the mandate is the least restrictive means of furthering them. There are many ways to promote public health and gender equality, almost all of them less burdensome on religious liberty. Other Courts have deemed these to be too broad to be held to be compelling.

2013 WL 5960692 at *25.

*See also Gonzales v. O Centro Espirita,* 546 U.S. 418, 420 (2006) in which the Supreme Court of the United States held that Courts must look beyond "broadly formulated interests" justifying the application of Government mandates and scrutinize the asserted harm of granting specific exemptions to particular religious claimants. Invocation of general characteristics "cannot carry the day." *Id.*

raised by the same individuals – *i.e.,* Bishop Zubik in the Pittsburgh case 13-cv-1459) when asserted on behalf of a different religious affiliated/related employer fails. If the Court were to conclude that the Government's stated interests were sufficiently "compelling" to outweigh the legitimate claims raised by the nonprofit, religious affiliated/related Plaintiffs, the net effect (as noted above) would be to allow the Government to cleave the Catholic Church into two parts: worship, and service and "good works," thereby entangling the Government in deciding what comprises "religion." Accordingly, for purposes of reaching a decision on Plaintiffs' Motions for Expedited Preliminary Injunction, the Court refuses to conclude that the Government has compelling interests which overbalance the legitimate claims to the free exercise of religion raised by the nonprofit, religious affiliated/related Plaintiffs.

The Court also notes that the "exemption" itself (which dictates that certain religious employers can legally decline to directly and indirectly facilitate the provision of contraceptive products, services, and counseling) was not predicated upon a "public health" basis to meet the two purported compelling interests. Instead, a religious employer's qualifications for the "exemption" is predicated upon the unrelated question of whether that religious employer files the IRS Form 990. 45 C.F.R. § 147.131(a) (August 1, 2013).

If there is no compelling governmental interest to apply the contraceptive mandate to the religious employers who operate the "houses of worship," then there can be no compelling governmental interest to apply (even in an indirect fashion) the contraceptive mandate to the religious employers of the nonprofit, religious affiliated/related entities, like Plaintiffs in these cases.

Despite the fact that the Government contends this analysis is "perverse" (see 13-cv-1459, Doc. No. 29, 24), the only argument it offers to support its position is that "[h]ouses of

worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers, including organizations eligible for the accommodation [*i.e.,* Plaintiffs in the instant cases], to employ people of the same faith who share the same objection, and who would therefore be less likely to use contraceptive services even if such services were covered under their plan."  The Court finds this statement speculative, and unsubstantiated by the record and, therefore, unpersuasive.

Next, the portions of the Administrative Record offered into evidence by the Government suggest that "women who receive their health coverage through employers like plaintiffs would face negative health and other outcomes . . . ."  77 Fed. Reg. at 8728; 78 Fed. Reg., at 39, 887 (emphasis added).   Despite this assertion, the Government has failed to offer any testimony or other evidence during the Injunction Hearing to support the Government's claim that employees of these Plaintiffs have, in fact, suffered in the past, or will in the future, any "negative health or other outcomes," without the enforcement of the contraceptive mandate.   In fact, the evidence was to the contrary.

Finally, as stated above, whether intended or not, the application of two distinct regulations (one providing a complete "exemption," the other merely providing an "accommodation") to religious employers who hold the same basic religious tenets unnecessarily – and in direct contravention to the RFRA and the Free Exercise Clause of the First Amendment – entangles the Government into determining what constitutes "religion."  By having these two, separate regulations "on the books," the Government has essentially detached worship and faith from "good works" and has determined that a religious employer's complete freedom to exercise religion ends at the church doors.   Once outside the church doors, that employer's religious beliefs must take a back seat to the stated compelling governmental interests.   The Government

thus seeks to restrict the Right to the Free Exercise of Religion set forth in the First Amendment to a Right of Worship only.

For all of the reasons set forth above, the Court concludes that the Government has failed, factually and legally, to establish that its two stated governmental interests are "of the highest order" such that "those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Yoder*, 406 U.S. at 215.

### d. Least Restrictive Means under the RFRA

Given that Plaintiffs have met their burden of showing that the "accommodation" creates a substantial burden on their free exercise of religion, and given that the Government has failed to meet its burden of proving that it had a compelling interest to apply the contraceptive mandate, via the "accommodation," to Plaintiffs, the Court need not consider whether the "accommodation" was the least restrictive means of meeting the stated compelling interests. Nevertheless, the Court also concludes that the Government failed to adduce evidence that definitively establishes that it used the least restrictive means to meet the stated compelling government interests.

First, the Government proffers that the "accommodation" was not only the "least restrictive means," but the "only possible means" of furthering the two compelling governmental interests to: (1) promote public health, and (2) assure that women would have equal access to health services. The Government's position is simply that this "accommodation" (*i.e.,* the acts of signing a self-certification form and gathering/delivering employee list(s) to their health insurer or TPA) was the "least" and the "only possible means," of furthering the two stated compelling governmental interests.

If the Government is correct that the entire fundamental statutory scheme set forth in the ACA will fail, without the participation in the contraceptive mandate by nonprofit, religious affiliated/related Plaintiffs and others like them (*i.e.*, food pantries, homeless shelters, etc.), which operate under the authority of an already exempt religious body (*i.e.,* Plaintiff Erie Diocese), then the foundation of the "statutory scheme" is certainly troubled.

Under the RFRA, the "accommodation" must be the "least restrictive means" to further the two stated compelling governmental interests. The Government neither at the Injunction Hearing, nor in the Administrative Record, offered any evidence concerning: (1) the identity of all other possible "least restrictive means" considered by the Government; (2) the analysis of each of the "means" to determine which was the "least" restrictive; (3) the identity of the person(s) involved in the identification and evaluation of the alternative "means"; or (4) "evidence-based" analysis as to why the Government believes that the "accommodation" is the "least restrictive means."

Instead, the Government argues that all the "accommodation" requires is a signature on a piece of paper. Once the signed document is received by the insurer or TPA, the contraceptive products, services, and counseling will then be made part of the nonprofit, religious affiliated/related Plaintiffs' health care plan at no cost to the Plaintiffs – except, of course, for the incalculable cost of the loss of their rights to freely exercise their religion.

As noted throughout this Opinion, this Court has found that the Government conceded that Plaintiffs' beliefs are sincerely-held. Despite these concessions, the Government trivializes these sincerely-held beliefs of Plaintiffs throughout its Brief in Opposition, to wit, the "accommodation": (1) "requires virtually nothing of Plaintiffs" (13-cv-1459, Doc. No. 23, 9-10; 13-cv-303, Doc. No. 28, 9-10, 20); (2) "certainly does not require Plaintiffs to modify their

behavior in any meaningful way" (id.); (3) is "no more than a *de minimis* burden" (id.); (4) requires Plaintiffs to "do next to nothing" (id.); and (5) Plaintiffs "need only fulfill the self-certification requirement and provide the completed self-certification to their issuers and TPAs" (13-cv-1459, Doc. No. 23, 21).  Further, there is nothing in the record to establish, or even hint, that a broader "religious employer" exemption, to include Plaintiffs (*i.e.,* Catholic Charities, Prince of Peace Center, *et al.*), would have any impact at all on "the entire statutory scheme."

During the Injunction Hearing, the Court specifically asked the Government about its stated compelling interests and the means it took to advance them.  The Government directed the Court's attention to a precise section of the Administrative Record which reads, in pertinent part:

> Fifth, some commentators asserted that the contraceptive coverage requirement [the contraceptive mandate] is not the least restrictive means of advancing those compelling interests, and proposed various alternatives to these regulations. All of these proposals were considered, and it was determined that they were not feasible and/or would not advance the government's compelling interests as effectively as the mechanisms established in these final regulations and the preventative services coverage more generally.

78 Fed.Reg. 39888 (July 2, 2013).

As to this "argument," the Court first notes that it is not the commentators' responsibility to draft the regulations employing the least restrictive means – that obligation rests with the Government.  Second, the regulation itself clearly announces that the alternatives to the current regulations – including the contraceptive mandate – would not advance the Government's interests "as <u>effectively</u> as" the contraceptive mandate and the "accommodation."  Greater efficacy does not equate to the least restrictive means.

Thus, the Court concludes that the Government failed to present any credible evidence tending to prove that it utilized the least restrictive means of advancing those interests.

60

### e. Conclusion – Likelihood of Success

After hearing the testimony of Cardinal Dolan, Bishop Zubik, Bishop Persico, and all of the other witnesses for Plaintiffs, the Court made the factual determination that Plaintiffs possess a sincerely-held belief that the burden imposed by the execution of the self-certification form is not *de minimis.* Plaintiffs sincerely believe that by signing the self-certification form, required by the "accommodation," they will facilitate/initiate the provision of contraceptive products, services, and counseling. Plaintiffs also sincerely believe that this facilitation/initiation is no different than if Plaintiffs directly provided those same products, services, and counseling. The Court concludes that the "accommodation," in effect, causes these Plaintiffs to comply with the contraceptive mandate which violates their sincerely-held religious beliefs – that "the sanctity of human life which begins at conception," and "facilitation of evil is the same as proliferation of evil" – and thus, places a substantial burden on Plaintiffs' ability to exercise their religion. The Court also concludes that the Government has, thus far, in this litigation, failed to show these regulations meet a compelling governmental interest and are sufficiently narrowly-tailored to meet those interests, and/or to demonstrate that the "accommodation" is the least restrictive means to meet those stated interests.

Based on the foregoing analysis, the Court finds that Plaintiffs are likely to succeed on the merits, and thus, they have met the first element of the preliminary injunction test.

### 2. Irreparable Harm to Plaintiffs

In the context of a preliminary injunction, irreparable harm is harm that cannot be adequately compensated at a later date in the ordinary course of litigation. *Acierno v. New Castle Cnty.* 40 F.3d 645, 653 (3d Cir. 1994) (In general, to show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy

following a trial.)  The Supreme Court of the United States has held "[t]he loss of First

Amendment freedoms," which implicates the Free Exercise Clause as protected by the RFRA,

"for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v.*

*Burns*, 427 U.S. 347, 373 (1976).

Recently, in a First Amendment-free speech case, the United States Court of Appeals for

the Third Circuit held that a ban preventing students in a school from exercising their right to

free speech, "unquestionably constitute[d] irreparable injury," where "[a]n after-the-fact money

judgment would hardly make up for their lost opportunity" to exercise their right to free speech.

*B.H. ex rel. Hawk v. Easton Area School Dist.*, 725 F.3d 293, 323 (3d Cir. 2013).

Turning to the instant matter, Plaintiffs need to decide by December 31, 2013, whether or

not to sign the self-certification form thereby by violating their sincerely-held religious beliefs.

Plaintiffs will not drop health coverage as of January 1, 2014, for their employees – because they

believe that health care is a basic human right.  See Cardinal Dolan Deposition (13-cv-303, Doc.

No. 52; 13-cv-1459, Doc. No. 53), pg. 28, lines 19-23; Hearing Testimony, Bishop Zubik, pg.

38, lines 23-24; Hearing Testimony, Bishop Persico, pg. 73, lines 23-25; Declaration of Father

Scott Detisch, Ph.D. (P-92), ¶ 25; Declaration of Father Ronald P. Lengwin (P-88), ¶ 34.

Plaintiffs cannot sign the self-certification form knowing that their signatures will

facilitate/initiate the provision of the contraceptive products, services, and counseling which

violate their sincerely-held beliefs.

Plaintiffs also have provided credible testimony and evidence which support their

contentions that they will provide health coverage, but will conscientiously object to the

contraceptive mandate and the "accommodation" by refusing to sign the self-certification form,

thereby potentially suffering financial penalties which would negatively impact those entities

that provide services to individuals who depend upon Plaintiffs for food, shelter, educational, and other basic services.  Hearing Testimony, Susan Rauscher, pg. 61, lines 17-18, pg. 62, lines 21-25; Hearing Testimony Father Jabo, pg. 99, lines 8-10; Hearing Testimony of Mary Maxwell, pg. 115, lines 23-25; Declaration of Mary Maxwell (P-90), ¶ 20; Declaration of Father Scott Detisch, Ph.D. (P-92), ¶ 32.  In addition, Plaintiffs' failure to sign the self-certification form by December 31, 2013, places them in a situation where they may be faced with enforcement proceedings such as liens on their property, and possible execution on those liens.

Given the evidence presented by Plaintiffs, the Court concludes that the harm to Plaintiffs, and the ripple effect of that harm impacting members of the public who depend upon Plaintiffs for food, shelter, educational, and other basic services, is such that Plaintiffs could never be adequately compensated at a later date in the ordinary course of this litigation. Accordingly, the Court concludes Plaintiffs stand to suffer irreparable harm if the injunction were not granted.

### 3.  Greater Harm to the Government

Conversely, the Court concludes that there will be no irreparable harm to the Government if the preliminary injunction is granted.[22]  In reaching this conclusion, the Court notes that despite the Government's two stated  interests: (1) "the promotion of public health," and (2) "assuring that women have equal access to health care services"), any employers with fifty (50) or less employees do not have to provide their employees with any health care coverage at all. 26 U.S.C. § 4980H(c)(2)(A).  In addition, religious employers who can meet the criteria for an "exemption" have to provide health coverage to their employees, but do not have to offer

---

[22] Plaintiffs seek narrowly-tailored injunctive relief – only as to one of the eight categories of preventive services for women required by the ACA and its implementing regulations.  Additional Stipulations of Fact, ¶¶ 15-17.

contraceptive products, services, and counseling. They do not have to "sign a form" thereby facilitating/initiating the provision of contraceptive products, services, and counseling through a third party. Finally, there are "innumerable" employers who have "grandfathered" health coverage plans which may or may not provide for all of the components required under the ACA, including the contraceptive products, services, and counseling required by the contraceptive mandate.

The Court concludes that the combined nationwide total of all of those employers who fall within an exclusion, an exemption, or whose plans are "grandfathered" (approximately 100 million individuals are on "grandfathered" health plans) creates such an "underinclusiveness" which demonstrates that the Government will not be harmed in any significant way by the exclusion of these few Plaintiffs. *Gilardi*, 2013 WL 5854246, at * 13; *Geneva College*, 2013 WL 3071481, at * 10; Additional Stipulated Facts, ¶¶ 4, 6. This conclusion again weighs in favor of the Court granting a preliminary injunction, keeping the parties at *status quo* while the significant issues involved in these cases are resolved in a thoughtful and orderly manner.

### 4. Public Interest

Lastly, granting the preliminary injunction furthers the public interest. As noted above, the Court concludes that it is in the public interest to have the issues presented herein, considered in a thoughtful and orderly manner. These issues include whether the Government will be permitted to sever the Catholic Church into two parts (*i.e.*, worship and faith, and "good works") – in other words, whether the Government will be successful in restricting the Right to the Free Exercise of Religion as set forth in the First Amendment to a Right to Worship only. This reflective consideration as to nonprofit, religious affiliated/related entities, including Plaintiffs, is all the more in the public interest, because the Free Exercise of Religion is a fundamental right.

The public interest also is best served if Plaintiffs (non-profit, affiliated/related organizations) can continue to provide needed educational and social services, without the threat of substantial fines for non-compliance with the contraceptive mandate as imposed upon them via the "accommodation." As previously noted, such fines would impede the provision of those services to thousands of individuals who have no other means of obtaining necessary food, shelter, and other basic assistance. Hearing Testimony of Mary Maxwell (re: St. Martin Center and Prince of Peace Center), pg. 115, lines 23-25 (fines "would be devastating for all of our clients, the poor - - these are single women, children.")

> [I]t would be drastic if- if these fines had to be dealt with.
> . . . [P]eople would lose jobs. Our community in Erie counts on
> the St. Martin Center. It – it would be devastating for all
> concerned, for our church. It just – it – it isn't something that we
> could cope with.

Id. at pg. 116, lines 5-10. A preliminary injunction, preserving the *status quo*, prevents any reduction in those services and thus is in the best interests of the public.

### VI.     Conclusion

Based upon the foregoing Findings of Fact, Conclusions of Law, and cited legal authority, the Court concludes that Plaintiffs have met their burden of proving all four criteria of the preliminary injunction test, and thus, for the reasons set forth herein, Plaintiffs' Motions for Expedited Preliminary Injunction will be GRANTED.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Court Judge

cc:     All Registered ECF Counsel and Parties

65