## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 13-1441 (ABJ) |
| KATHLEEN SEBELIUS, Secretary, U.S. Department of Health and Human Services, *et al.*, | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION

This case concerns the requirements imposed on certain employers under the Affordable Care Act to offer healthcare plans to their employees that provide cost-free coverage for contraceptive services. Plaintiffs the Roman Catholic Archbishop of Washington ("the Archdiocese"), the Consortium of Catholic Academies of the Archdiocese of Washington, Inc., Archbishop Carroll High School, Inc., Don Bosco Cristo Rey High School of the Archdiocese of Washington, Inc., Mary of Nazareth Roman Catholic Elementary School, Inc., Catholic Charities of the Archdiocese of Washington, Inc., Victory Housing, Inc., the Catholic Information Center, Inc., Catholic University of America, and Thomas Aquinas College have filed this case against defendants Kathleen Sebelius, the Secretary of Health and Human Services; Thomas Perez, the Secretary of Labor; Jacob Lew, the Secretary of the Treasury; the U.S. Department of Health and Human Services; the U.S. Department of Labor; and the U.S. Department of the Treasury. In their complaint, plaintiffs allege that the contraceptive mandate violates the Religious Freedom Restoration Act ("RFRA") as applied to them, as well as the Free Exercise Clause, the

Free Speech Clause, and the Establishment Clause of the First Amendment to the U.S. Constitution.  Compl. ¶¶ 237–312 [Dkt. # 1].  They also assert that defendants violated the Administrative Procedure Act and advanced an erroneous interpretation of the religious employer exemption to the mandate when they adopted the contraceptive mandate in its final form.  *Id.* ¶¶ 313–39.

Plaintiffs filed a motion for preliminary injunction in light of the impending January 1, 2014 contraceptive mandate enforcement date.  Pls.' Mot. for Prelim. Inj. [Dkt. # 6].  Pursuant to Federal Rule of Civil Procedure 65(a)(2), this Court consolidated the motion with the merits on September 26, 2013.  Defendants filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and to dismiss plaintiffs' Establishment Clause count under Federal Rule of Civil Procedure 12(b)(1).  Defs.' Mot. to Dismiss or, in the alt., for Summ. J. ("Defs.' Mot.") [Dkt. # 26]; Defs.' Mem. in Supp. of Mot. to Dismiss or, in the alt., for Summ. J. ("Defs.' Mem.") [Dkt. # 26-1].  They also moved, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56.  Defs.' Mot. at 1; Defs.' Mem. at 9.  Plaintiffs then filed a cross-motion for summary judgment.  Pls.' Opp. & Cross-Mot. for Summ. J. ("Pls.' Opp. & Cross-Mot.") [Dkt. # 27-1].  The case has been fully briefed, and the Court held oral argument on November 22, 2013.

For the reasons stated below, the Court will grant defendants' motion for summary judgment with respect to Catholic University's RFRA claim in Count I, and all of the plaintiffs' Free Exercise claims in Count II, compelled speech claims in Count III, denominational preference claims in Count V, internal church governance claims in Count VI, and APA contrary

to law claims in Count VII.[1]   The Court will also grant defendants' motion to dismiss the RFRA claims in Count I that are advanced by those plaintiffs who are covered under the Archdiocese's healthcare plan, and all of the plaintiffs' Establishment Clause challenges to the IRS factors in Count V and APA erroneous interpretation claims in Count VIII for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).   Finally, the Court will grant Thomas Aquinas College's cross-motion for summary judgment on its RFRA claim in Count I, and all of the plaintiffs' cross-motions for summary judgment on their Free Speech claims asserted in Count IV.

Plaintiffs allege that the contraceptive mandate burdens their religious exercise because it requires them "to provide, pay for, and/or facilitate access to abortion-inducing products, contraception, sterilization procedures, and related counseling, in a manner that is directly contrary to their religious beliefs."  Compl. ¶ 241.  This is practically identical to the claim that the Archdiocese and four of the other plaintiffs advanced in the suit they filed in this Court in May of 2012.  *See Roman Catholic Archbishop of Washington v. Sebelius*, No. 12-0815, Compl. ¶ 181 [Dkt. # 1] ("The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate practices and speech that are contrary to their religious beliefs.").  Plaintiffs' religious beliefs remain the same, but in the interim, the law has changed.  Defendants have created an accommodation for the specific purpose of alleviating the burden that the mandate imposes on religious organizations that are not entirely exempt.  And in the case of all but one of the plaintiffs – the self-insured Thomas Aquinas College – the Court finds that the law no longer

---

1      Although defendants' motion is styled as a motion to dismiss, or in the alternative, for summary judgment, the Court will decide those claims for which it has jurisdiction under the summary judgment standard because plaintiffs have alleged enough facts to satisfy *Iqbal*'s and *Twombly*'s pleading requirements.  *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

requires plaintiffs to provide, pay for, or facilitate access to contraception. Thus, it does not require plaintiffs to "modify [their] behavior and to violate [their] beliefs," as the Supreme Court defined an unacceptable burden more than thirty years ago in *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707, 718 (1981), or to "meaningfully approve and endorse the inclusion of contraceptive coverage" in their plans, as the D.C. Circuit described the burden in the context of the mandate without the accommodation just last month. *Gilardi v. U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208, 1217 (2013).

Religious organizations like Catholic University – that offer health insurance to their employees through an insured group plan – may avail themselves of the accommodation simply by memorializing their objection to the mandate in writing. The insurer is obligated under the rules to exclude the coverage from the University's plan and to provide and pay for the coverage itself, and therefore, as the Court explains in detail below, Catholic University has no grounds for a RFRA claim. Plaintiffs contend that the act of self-certifying – an act that consists of nothing more than plaintiffs' reiteration of their already public objection to participation in the requirements of the mandate – is a substantial burden on the exercise of their religion in and of itself. But that argument so blurs the demarcation between what RFRA prohibits – that is, governmental pressure to modify one's own behavior in a way that would violate one's own beliefs – and what would be an impermissible effort to require others to conduct their affairs in conformance with plaintiffs' beliefs, that it obscures the distinction entirely. RFRA was enacted to shield religious adherents from governmental interference with their own religious exercise and to protect them from being required to perform odious acts themselves. Plaintiffs articulate this distinction clearly: "Plaintiffs simply invoke RFRA to vindicate the principle that the Government may not force them, *in their own conduct*, to take actions that violate their religious

conscience." Pls.' Mem. in Supp. of Mot. for Prelim. Inj. ("Pls.' Mot.") at 20 [Dkt # 6-1]. Since the rules that apply in the insured group plan context do not involve that compulsion, they survive the RFRA challenge. RFRA is not a mechanism to advance a generalized objection to a governmental policy choice, even if it is one sincerely based upon religion.

But Thomas Aquinas College is covered by the set of regulations directed towards religious organizations that are self-insured, and unlike all of the other plaintiffs with self-insured plans, Thomas Aquinas College does not offer its employees coverage through a plan offered by the church, which cannot be compelled to comply with the mandate. In the case of a self-insured entity like Thomas Aquinas, the newly enacted regulations fall short of the mark. Since the accommodation imposes a duty upon the religious organization to contract with a willing third-party administrator that will arrange for the payments for contraceptives, they compel the organization to take affirmative steps – to *do* something – that is in conflict with the tenets of its faith. And therefore, defendants are enjoined from enforcing the mandate against Thomas Aquinas College.

RFRA involves the application of a more lenient standard than the one that applies under the First Amendment, though, and all of the plaintiffs have failed to establish any violation of the Free Exercise Clause. The contraceptive coverage law is neutral and generally applicable to all employers, and it does not target religion. Nothing about the regulatory scheme violates the Establishment Clause either. The fact that the Archdiocese, a church, is completely exempt, while the educational and charitable organizations must seek relief through the accommodation does not constitute unlawful discrimination among denominations, and it does not entangle the government in religious affairs.

With one important exception, the law also passes muster under the Free Speech Clause of the First Amendment.  The fact that counseling is included within the set of services to be offered, and the requirement that a religious organization certify its objection to providing contraceptive services to be eligible for the accommodation do not violate the Constitution.  But defendants cannot lawfully prohibit a self-insured religious organization from seeking to influence – directly or indirectly – a third-party administrator's decision on whether to remain in a contractual relationship with a plan.  That is a content-based restriction on expression that is not justified by the government's proffered interest.

Finally, the Court finds that defendants did not violate the Administrative Procedure Act, that the accommodation and the exemption do not lead to unlawful interference with internal church governance, and that there is no plaintiff that can allege an injury arising out of the challenged interpretation of how the accommodation is to be applied.

## BACKGROUND

## I.      Statutory and Regulatory Background

### A.      The Affordable Care Act

In March 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010), which together make up the Affordable Care Act ("ACA").  78 Fed. Reg. 39870-01, 39870 (July 2, 2013).  The ACA made changes to the existing Public Health Service Act and incorporated those changes into the Employee Retirement Income Security Act ("ERISA") and the Internal Revenue Code.  *Id.*

Two changes made by the ACA are pertinent to this case.  The first change is the requirement that employers with more than fifty full-time employees must provide their

employees with a health insurance plan that complies with the ACA's minimum essential coverage requirements.   26 U.S.C. § 4980H (2012); *see also* 42 U.S.C. § 300gg-13 (2012). Failure to comply with this provision – often referred to as the "employer mandate" – results in substantial penalties.  *See* 26 U.S.C. § 4980H.

The second pertinent change relates to the "essential minimum coverage" that must be offered by an employer's plan.   The ACA provides that all insurance plans must cover "preventive care," and specifically, that they "shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for . . . (1) evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force," and "(4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration," an agency within the U.S. Department of Health and Human Services ("HHS").  42 U.S.C. § 300gg-13(a)(1), (4).

B.      **The Contraceptive Mandate**

Pursuant to its delegated authority under ACA section 300gg-13(a)(4), HHS requested that the Institute of Medicine ("IOM") – an organization established by the National Academy of Sciences and funded by Congress – provide recommendations to HHS regarding "what preventive services are necessary for women's health and well-being and should be considered in the development of comprehensive guidelines for preventive services of women."  Inst. of Med., Clinical Preventive Services for Women:  Closing the Gaps ("IOM Report") iv, 2, AR 289, 300. After convening a sixteen-member committee, IOM proposed numerous recommendations regarding what preventive services should be covered and how HHS could continue to keep the list up-to-date.  *See generally id.*  The recommendation most relevant to this case was IOM's

suggestion that the definition of "preventive health services" include "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity" (collectively, "contraceptive services"), which includes diaphragms, oral contraceptive pills, emergency contraceptives, and intrauterine devices. *Id.* at 10, 105, AR 308, 403. After reviewing IOM's recommendations, defendants ultimately adopted the suggestion that the preventive services for which coverage would be required be defined to include all Food and Drug and Administration ("FDA") approved contraceptive services. 78 Fed. Reg. at 39870. That regulation is commonly referred to as "the contraceptive mandate."

In promulgating the initial contraceptive mandate, defendants recognized the potential religious implications and authorized the creation of a religious employer exemption to the contraceptive mandate's requirements. 45 C.F.R. § 147.131(a) (2013); *see also* 78 Fed. Reg. at 39871, 39896. An organization that satisfies the definition of a religious employer derived from the Internal Revenue Code is wholly exempt from the requirement to cover contraceptive services.[2] 45 C.F.R. § 147.131(a); 78 Fed. Reg. at 39871, 39896. All other employers, including religious organizations that did not meet the definition of a religious employer, were required to

---

2    The religious employer exemption originally defined "religious employer" as one that:

    (1)    has the inculcation of religious values as its purpose;
    (2)    primarily employs persons who share its religious tenets;
    (3)    primarily serves persons who share its religious tenets; and
    (4)    is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the [Internal Revenue] Code.

78 Fed. Reg. at 39871. The definition has since been altered to state that "a 'religious employer' is an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.131(a); *see also* 78 Fed. Reg. at 39896.

comply with the requirements of the contraceptive mandate if they provided a health insurance plan to their employees, regardless of whether they provided the plan voluntarily or because they were subject to the employer mandate.

Religious organizations that did not qualify for the exemption voiced their strong objection to the coverage requirements.  In response to their concerns, HHS, the Department of Labor, and the Department of the Treasury (collectively, "the Departments") "issued guidance establishing a temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments for group health plans established or maintained by certain nonprofit organizations with religious objections to contraceptive coverage."  78 Fed. Reg. at 39871.  During that safe harbor, the Departments published an advance notice of proposed rulemaking that solicited comments on how to achieve the goal of ensuring "more women broad access to recommended preventive services, including contraceptive services, without cost sharing, while simultaneously protecting certain additional nonprofit religious organizations with religious objections to contraceptive coverage."  *Id.*  At the end of the comment period, the Departments published proposed regulations at 78 Fed. Reg. 8456 that created what has come to be known as "the accommodation."  78 Fed. Reg. 8456, 8462 (Feb. 6, 2013); *see also* 29 C.F.R. § 2590.715–2713A (2013).  On July 2, 2013, the Departments adopted the final version of that accommodation, which is available to all "eligible organizations."  *See* 78 Fed. Reg. at 39870-01, 39874; s*ee also* 29 C.F.R. § 2590.715–2713A.

An organization is considered an "eligible organization" for purposes of the accommodation if it satisfies all of the following requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 2590.715-2713(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (a)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies.

29 C.F.R. § 2590.715-2713A(a)(1)–(4).

The accommodation then specifies two sets of means by which the employees of an eligible organization will obtain coverage for contraceptive services based upon whether the organization offers health insurance to its employees through a self-insured health plan or a group insured health plan. *See id.* § 2590.715–2713A(b)–(c).

In the group insured context, an eligible organization satisfies its obligations under the contraceptive mandate by providing its insurance issuer ("insurer") with a self-certification form. *Id.* § 2590.715–2713A(c)(1).   At that point, the statutory duty to provide the organization's employees with cost-free contraceptive services coverage automatically shifts to the insurer.  *Id.* § 2590.715–2713A(c)(2); s*ee also* 78 Fed. Reg. at 39876.  The insurer cannot decline to provide that coverage on the self-certifying organization's behalf, and the insurer must expressly exclude contraceptive services coverage from the self-certifying organization's plan.   29 C.F.R. § 2590.715–2713A(c)(2)(i); s*ee also* 78 Fed. Reg. at 39876.   Furthermore, the insurer is expressly prohibited from passing on the costs of covering contraceptive services to either the

self-certifying organization or that organization's employees.   29 C.F.R. § 2590.715–2713A(c)(2)(ii); s*ee also* 78 Fed. Reg. at 39876.

If an eligible organization is self-insured, the organization that objects to providing contraceptive coverage on religious grounds must provide its "third party administrator that will process claims for any contraceptive services required to be covered . . . with a copy of the self-certification described in paragraph (a)(4) of this section."   29 C.F.R. § 2590.715–2713A(b)(1)(ii).  If the third-party administrator agrees to remain in its contractual relationship with the organization or its plan, the self-certifying organization has met its obligation under the contraceptive mandate.  *Id.* § 2590.715–2713A(b)(1); s*ee also* 78 Fed. Reg. at 39879.  It is the third-party administrator that must then provide or arrange payments for contraceptive services without "imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization."  29 C.F.R. § 2590.715–2713A(b)(2)(i)–(ii).[3]

The third-party administrator becomes a "plan administrator" under ERISA for purposes of providing the contraceptive coverage, *see id.* § 2510.3–16(b), and it provides the coverage through the eligible organization's self-insured plan.  *See id.* § 2590.715–2713A(b).

But a third-party administrator is permitted to decline to assume responsibility for providing contraceptive services coverage on behalf of a self-certifying organization by cancelling its contract with the eligible organization and declining to serve as that organization's

---

3     The "costs of providing or arranging such payments . . . may be reimbursed through an adjustment to the Federally-facilitated Exchange user fee."  29 C.F.R. § 2590.715-2713A(b)(4).

third-party administrator.  *Id.* § 2590.715–2713A(b)(2); s*ee also* 78 Fed. Reg. at 39879.[4]  If the contract is cancelled, the self-certifying organization must either provide the self-certification form to its newly hired third-party administrator, *see* 29 C.F.R. § 2590.715–2713A(b), or notify the government that it will no longer use a third-party administrator and await further instruction on how it may comply with the contraceptive mandate's requirements. 78 Fed. Reg. at 39880–81.[5]

Regardless of whether a self-certifying organization utilizes an insurer or a third-party administrator, the accommodation requires that notice of the availability of separate payments for contraceptive services be provided to plan participants and beneficiaries contemporaneous with, "but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in [the organization's] group health coverage."  29 C.F.R. § 2590.715-2713A(d). The accommodation relieves a self-certifying religious organization of any responsibility to provide or pay for contraceptive services coverage itself.

## II.     Procedural and Factual Background

Plaintiffs in this case consist of the Archdiocese, several charitable organizations that are affiliated with the Catholic Church – Catholic Academies, Archbishop Carroll, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and the Catholic Information Center – and two Catholic institutions of higher education:  Catholic University of America and Thomas Aquinas

---

4      While the preamble to the regulations expresses defendants' intention to implement the regulations on an employer-by-employer, and not a plan-by-plan basis, the regulations themselves do not clearly address how this will operate in practice in the situation where an employer offers its employees coverage under the auspices of a self-insured plan established by another entity that has identified and entered into a contract with the third-party administrator.

5      At this time, defendants have not specified the procedures that will govern a self-insured eligible organization that does not use a third-party administrator because defendants have not received any information to indicate that any such organization exists.  *See* 78 Fed. Reg. at 39880–81.

College.  Compl. ¶¶ 2, 16–25, 59, 66, 74, 83, 90, 98, 107.  They challenge the contraceptive mandate under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, several provisions of the First Amendment to the U.S. Constitution, and the Administrative Procedure Act, 5 U.S.C. § 501 *et seq.*, and they argue that the accommodation does not remedy those violations.  Compl. ¶¶ 237–339.  Pending before this Court are defendants' motion to dismiss, or in the alternative, for summary judgment and plaintiffs' cross-motion for summary judgment. For purposes of deciding this case, the Court will adopt the following undisputed material facts.

The Archdiocese employs approximately 1,825 full-time employees, Supplemental Aff. of the Archdiocese ("Supp. Aff. Archdiocese"), Ex. A to Pls.' Reply ¶ 4 [Dkt. # 33-1], and operates a self-insured health plan that is "recognized under the Employee Retirement Income Security Act as a 'church plan.'"  Pls.' Statement of Material Facts ("Pls.' SOF"), Ex. 2 to Pls.' Opp. & Cross-Mot. ¶ 2 [Dkt. # 27-2].  The plan is currently administered by a third-party administrator, National Capital Administrative Services, Inc.  *Id.*  Although separately incorporated, Catholic Academies, Archbishop Carroll, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and the Catholic Information Center are affiliated with the Archdiocese, and they offer their employees health insurance coverage through the Archdiocese's self-insured health plan.  *Id.* ¶ 5.

Catholic Academies, Archbishop Carroll, Mary of Nazareth, Catholic Charities, and Victory Housing all employ over fifty full-time employees.  Supplemental Aff. of CCA ("Supp. Aff. CCA"), Ex. B to Pls.' Reply ¶ 4 [Dkt. # 33-2]; Supplemental Aff. of ACHS ("Supp. Aff. ACHS"), Ex. C to Pls.' Reply ¶ 4 [Dkt. # 33-3]; Supplemental Aff. of Mary of Nazareth ("Supp. Aff. Mary of Nazareth"), Ex. E to Pls.' Reply ¶ 4 [Dkt. # 33-5]; Supplemental Aff. of Catholic Charities ("Supp. Aff. Catholic Charities"), Ex. F to Pls.' Reply ¶ 4 [Dkt. # 33-6]; Supplemental

Aff. of Victory Housing ("Supp. Aff. Victory Housing"), Ex. G to Pls.' Reply ¶ 4 [Dkt. # 33-7]. Don Bosco and the Catholic Information Center employ less than fifty full-time employees. Supplemental Aff. of Don Bosco ("Supp. Aff. Don Bosco"), Ex. D to Pls.' Reply ¶ 4 [Dkt. # 33-4]; Supplemental Aff. of the CIC ("Supp. Aff. CIC"), Ex. H to Pls.' Reply ¶ 4 [Dkt. # 33-8].

The remaining two plaintiffs – Catholic University and Thomas Aquinas – also employ over fifty full-time employees.  Supplemental Aff. of CUA ("Supp. Aff. CUA"), Ex. I to Pls.' Reply ¶ 5 [Dkt. # 33-9]; Supplemental Aff. of TAC ("Supp. Aff. TAC"), Ex. J to Pls.' Reply ¶ 5 [Dkt. # 33-10].  Catholic University participates in a group insured plan by offering its students a health insurance plan through AETNA and its employees a health insurance plan through United Healthcare.  Pls.' SOF ¶¶ 29, 31.  Thomas Aquinas is self-insured; it offers its employees a health insurance plan through the RETA trust, a self-insurance trust set up by the Catholic bishops of California, and the trust is administered by a third-party administrator, Benefit Allocation Systems.  *Id.* ¶ 36.  The College's self-insured plan is not a church plan under ERISA. Supp. Aff. TAC ¶ 6.

None of the plaintiffs' health insurance plans qualify for the grandfathered plan exception to the ACA.  Pls.' SOF ¶¶ 3, 33, 38.  The Archdiocese has identified itself to be covered by the religious employer exemption, Aff. of Archdiocese, Ex. A to Pls.' Mot. ¶ 18 [Dkt. # 6-2], but the remaining plaintiffs have stated that they do not qualify for that exemption.  Pls.' SOF ¶¶ 9, 12, 15, 18, 21, 24, 27, 34, 39.  They are, however, eligible for the accommodation to the contraceptive mandate.  Compl. ¶ 10.

"Plaintiffs are all religious entities that are part of, and/or adhere to the teachings and philosophies of, the Roman Catholic Church."  Pls.' SOF ¶ 40.  Consequently, they all subscribe to the Roman Catholic belief that it is immoral to engage in conduct that artificially interferes

14

with conception or terminates an existing pregnancy, which includes, but is not limited to, abortion, sterilization, emergency contraception, and other contraceptive products. *Id.* ¶¶ 41, 45–46. It is a tenet of plaintiffs' faith that they not only refrain from using contraception themselves, but that they may not morally assist another in accessing those services. *Id.* ¶ 48. As a result, plaintiffs have "historically excluded coverage for abortion, contraceptives (except when used for non-contraceptive purposes), sterilization, and related education and counseling" from their health insurance plans, *id.* ¶ 6; *see also* Aff. of CUA, Ex. I to Pls.' Mot. ¶ 15 [Dkt. # 6-10]; Aff. of TAC, Ex. J to Pls.' Mot. ¶ 13 [Dkt. # 6-11], and they contend that compliance with the contraceptive mandate, even as it has been modified, would violate their religious belief.

## STANDARD OF REVIEW

### I.     Federal Rule of Civil Procedure 12(b)(1)

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002). Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

"To state a case or controversy under Article III, a plaintiff must establish standing." *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011); *see also Lujan*, 504 U.S. at 560. Standing is a necessary predicate to any exercise of federal jurisdiction, and if it is lacking, then the dispute is not a proper case or controversy under Article III, and federal courts have no subject-matter jurisdiction to decide the case. *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012). To establish constitutional standing, a plaintiff must demonstrate: (1) that he has suffered an "injury in fact"; (2) that the injury is "fairly traceable" to the challenged action of the defendant; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (internal quotation marks omitted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000). Failure to demonstrate even one of the three requirements will defeat subject-matter jurisdiction. *See Lujan*, 504 U.S. at 561.

When considering a motion to dismiss for lack of jurisdiction for standing, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## II.    Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

To defeat summary judgment, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  The existence of a nongenuine, nonmaterial factual dispute is insufficient to preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, and a fact is only "material" if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *see also Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

## I.  Plaintiffs' Religious Freedom Restoration Act claims.

The central claim in this case is Count I:  plaintiffs' claim that the contraceptive mandate violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, because it "requires Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing products, contraception, sterilization procedures, and related counseling, in a manner that is directly contrary to their religious beliefs."  Compl. ¶ 241.  It is undisputed that the Church itself – the

Archdiocese – is completely exempt from the requirement, and therefore, it is not joined in Count I. It is also part of the background of this case that defendants delayed implementation of the mandate for a year and engaged in a rulemaking process in an effort to address the objections raised by other religious organizations and to alleviate the burden that they identified. Thus, the question presented in this case is whether the accommodation promulgated in July 2013 achieves that aim or whether the mandate, as it has now been modified, imposes a substantial burden on plaintiffs' free exercise of religion.

RFRA provides that the government shall not "substantially burden a person's exercise of religion" unless it can demonstrate that application of the burden to the person: "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b).[6] The prohibition applies even if the burden results from a rule of general applicability. *Id.* § 2000bb-1(a). To successfully mount a RFRA challenge and subject government action to strict scrutiny, a plaintiff must meet the initial burden of establishing that the government has substantially burdened his religious exercise. *Henderson v. Stanton*, 76 F. Supp. 2d 10, 14 (D.D.C. 1999). Only if that predicate has been established will the onus then shift to the government to show that the law or regulation is the least restrictive means to further a compelling interest. 42 U.S.C. §§ 2000bb-1(b), 2000bb-2(3).

Plaintiffs have averred that it is a central tenet of their faith that life begins at the moment of conception, and that their religion therefore requires that "they may not provide, pay for, and/or facilitate access to" contraceptive services. Pls.' Mot. at 19; *see also* Pls.' SOF ¶¶ 42–43;

---

6 Although the Supreme Court found RFRA unconstitutional as applied to the states, *City of Boerne v. Flores*, 521 U.S. 507, 533–34 (1997), the statute still applies to the federal government, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 166 (D.C. Cir. 2003); *Henderson v. Kennedy*, 265 F.3d 1072, 1073 (D.C. Cir. 2001).

Aff. of CCA, Ex. B to Pls.' Mot. ¶¶ 7–8 [Dkt. # 6-3]; Aff. of ACHS, Ex. C to Pls.' Mot. ¶¶ 7–8 [Dkt. # 6-4]; Aff. of Don Bosco, Ex. D to Pls.' Mot. ¶¶ 7–8 [Dkt. # 6-5]; Aff. of Mary of Nazareth, Ex. E to Pls.' Mot. ¶¶ 7–8 [Dkt. # 6-6]; Aff. of Catholic Charities, Ex. F to Pls.' Mot. ¶¶ 7–8 [Dkt. # 6-7]; Aff. of Victory Housing, Ex. G to Pls.' Mot. ¶¶ 7–8 [Dkt. # 6-8]; Aff. of CIC, Ex. H to Pls.' Mot. ¶¶ 7–8 [Dkt. # 6-9]; Aff. of CUA ¶¶ 13–14; Aff. of TAC ¶¶ 11–12.  The government does not contest the sincerity of these beliefs.  *See* Defs.' Combined Mem. in Opp. to Pls.' Cross-Mot. for Summ. J. & Reply in Supp. of Defs.' Mot. to Dismiss, or in the alt., for Summ. J. ("Defs.' Opp. & Reply") at 4, 7–20 [Dkt. # 31]; *see also* Defs.' Resp. to Pls.' SOF ¶ 43 [Dkt. # 31-1].  The Court finds that plaintiffs' religion forbids them from facilitating access to contraceptive services, and that finding of fact serves as the basis for the RFRA analysis.

Plaintiffs contend that the contraceptive mandate imposes a burden on their sincere religious belief because it requires that plaintiffs provide a health insurance plan that includes coverage for contraceptive services and counseling and thereby renders them unable to offer a health insurance plan consistent with their religious beliefs.  Pls.' Mot. at 21–24.  They argue that the accommodation does not alleviate that burden because, as they put it, they must file a self-certification form that "inexorably leads to provision of the very coverage to which they object," and offer a health insurance plan through which their "employees would receive access to the mandated payments [for contraceptive services] *only* by virtue of their participation in [that] health plan."  *Id.* at 20.  Also, they complain that, in some circumstances, they must "locate and identify a third party willing to provide the very services they deem objectionable, and . . . enter into a contract with that party that will result in the provision or procurement of those services 'for free.'"  *Id.*  All of these burdens, plaintiffs state, are substantial, because failure to comply with the requirement of the contraceptive mandate – either by providing the coverage or by self-

19

certifying under the accommodation – results in significant monetary penalties.  *Id.* at 22–24; *see also* 26 U.S.C. § 4980H.

Defendants maintain that the accommodation has eliminated the objectionable impact of the mandate and that any remaining burden on plaintiffs' religious exercise is at most de minimis or too attenuated to be substantial and to trigger strict scrutiny under RFRA.  Defs.' Mem. at 11–20.  They also argue that all the plaintiffs except Catholic University and Thomas Aquinas lack standing to bring a RFRA challenge.  Defs.' Opp. & Reply at 5–7.  But if the Court determines that any one plaintiff is substantially burdened by the contraceptive mandate and that it must therefore go on to apply strict scrutiny to the regulatory scheme, defendants concede that the D.C. Circuit's recent holding that the contraceptive mandate does not satisfy strict scrutiny controls this case and is binding on this Court.[7]  *See Gilardi v. U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208, 1219–24 (D.C. Cir. 2013); Defs.' Opp. & Reply at 17; Mot. Hr'g Tr. 34.  As a result, the RFRA analysis here is limited to the question of whether the contraceptive mandate places a substantial burden on plaintiffs' asserted religious exercise.

Congress enacted RFRA in response to the decision in *Employment Division, Department of Human Services of Oregon v. Smith*, 494 U.S. 872 (1990), in which the Supreme Court narrowed what had been its previous delineation of the scope of the protection afforded to religion by the Free Exercise Clause.  *See Holy Land Found.*, 333 F.3d at 166.  In *Smith*, the Court permitted a law that was neutral towards religion to stand, notwithstanding its impact on a particular plaintiff's religious exercise.  494 U.S. at 890.  Thereafter, as Congress expressly stated in the findings and declaration of purpose section of the statute, RFRA was enacted "to

---

[7]     Defendants did, however, note objection to the Circuit's decision in *Gilardi*, thereby preserving the issue for appeal.  *See* Defs.' Opp. & Reply at 17; Mot. Hr'g Tr. 34.

restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963), and

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free

exercise of religion is substantially burdened."  42 U.S.C. § 2000bb(b)(1); *see also Holy Land*

*Found.*, 333 F.3d at 166–67.  Thus, if the question to resolve is whether plaintiffs have met their

burden to establish that the challenged regulations impose a substantial burden on their religious

exercise, *Sherbert* and *Yoder* must be the starting point of the analysis.  *See Tyndale House*

*Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 120 (D.D.C. 2012) ("Accordingly, courts look

to pre-*Smith* free exercise jurisprudence in assessing RFRA claims."); *see also Vill. of*

*Bensenville v. FAA*, 457 F.3d 52, 62 (D.C. Cir. 2006).

In *Sherbert*, a member of the Seventh-Day Adventist Church was fired by her employer

for her refusal to work on Saturday, the day on which she observed the Sabbath.  374 U.S. at

399.  She was subsequently found to be ineligible for state unemployment benefits on the

grounds that she had failed, without good cause, to accept employment that had been offered.  *Id.*

at 400–01.  To resolve her constitutional challenge to the state's decision, the Supreme Court

first addressed the question of whether the disqualification imposed a burden on the employee's

free exercise of her religion.  *Id.* at 403.  The Court likened the situation to a fine imposed on the

employee for her Saturday worship and stated:

> [I]f the purpose or effect of a law is to impede the observance of one or all
> religions or is to discriminate invidiously between religions, that law is
> constitutionally invalid even though the burden may be characterized as
> being only indirect.  Here not only is it apparent that appellant's declared
> ineligibility for benefits derives solely from the practice of her religion,
> but the pressure upon her to forego that practice is unmistakable.  The
> ruling forces her to choose between following the precepts of her religion
> and forfeiting benefits, on the one hand, and abandoning one of the
> precepts of her religion in order to accept work, on the other hand.

*Id.* at 404 (citations omitted).

*Yoder* involved members of the Old Order Amish religion and a member of the Conservative Amish Mennonite Church who declined to send their children to public school after eighth grade and were convicted of violating the state's compulsory attendance laws.  406 U.S. at 207–08.  In that case, the Court observed that:

> [T]he unchallenged testimony of acknowledged experts in education and religious history, almost 300 years of consistent practice, and strong evidence of a sustained faith pervading and regulating respondents' entire mode of life support the claim that enforcement of the State's requirement of compulsory formal education after the eighth grade would gravely endanger if not destroy the free exercise of respondents' religious beliefs.

*Id.* at 219.  The state did not challenge those findings, but it advanced the position that the state's interest in universal compulsory education was so great that the laws should be enforced notwithstanding the undisputed religious consequences.  *Id.*  Thus, the bulk of the opinion is only relevant to the second prong of the RFRA analysis, but the Court did state, in language that appears in plaintiffs' pleadings:  "The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs."  *Id.* at 218.

The Supreme Court took up the denial of unemployment benefits again in *Thomas.*  450 U.S. at 707.  Thomas terminated his employment at a foundry and machinery company when he was transferred from a department that fabricated steel for a range of industrial uses to a department that produced turrets for military tanks.  *Id.* at 710.  At that time, there were no longer any units at the company that were not involved in the manufacture of armaments, and Thomas, a Jehovah's Witness, maintained that participation in the production of weapons for war violated his religious beliefs.  *Id.* at 710–11.  When the employer declined to lay him off, he quit

and was subsequently denied unemployment benefits by the state on the grounds that his departure was not based on good cause. *Id.* at 710–12.

As in *Sherbert*, the state argued that its public welfare legislation did not directly command the employee to violate his conscience, but the Court noted that "the employee was put to a choice between fidelity to religious belief or cessation of work" and therefore "the coercive impact on Thomas is indistinguishable from *Sherbert*." *Id.* at 717. The Court then restated the principle that had been set out in *Sherbert*:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Id.* at 717–18.

In sum, all of the key Supreme Court cases involve individuals who were compelled, under the threat of either punishment or the denial of a benefit, to *act*: to personally do the very thing that violated their religious beliefs. That means that the issue in this case is whether plaintiffs are being required to "modify their behavior" or perform acts that contravene the tenets of their faith.

Plaintiffs laid out their position in their motion for preliminary injunction:

> Under the original version of the Mandate, a non-exempt religious organization's decision to offer a group health plan resulted in the provision of coverage for [contraceptive services]. Under the Final Rule, a non-exempt religious organization's decision to offer a group health plan *still* results in the provision of coverage . . . . In both scenarios, Plaintiffs' actions trigger the provision of "free" contraceptive coverage to their employees in a manner contrary to their beliefs. The provision of the objectionable products and services are directly tied to Plaintiffs' insurance policies . . . .

Pls.' Mot. at 10.  But plaintiffs have not cited the Court to any binding Supreme Court or Circuit precedent that would call for the invalidation of a law based upon its consequences, that is, when plaintiffs are not being required to pay for or "provide" the services themselves, but rather, the result of compliance with the regulatory steps would be "*the provision of*" the objectionable services by a third party to another third party.

Indeed, the precedent in this Circuit points to the opposite conclusion.

In *Kaemmerling v. Lappin*, the D.C. Circuit explained that a plaintiff cannot satisfy his burden under RFRA if the government regulation requires a third party, and not the plaintiff, to act in a way that violates the plaintiff's religious beliefs.  553 F.3d 669, 679 (D.C. Cir. 2008).  In that case, the plaintiff challenged the DNA Act, which directs the Federal Bureau of Prisons ("BOP") to collect tissue or fluid samples from individuals in custody who have been convicted of certain offenses.  *Id.* at 673.  The BOP then delivers the samples to the FBI for the extraction and analysis of the DNA they contain and the creation of a unique profile for each offender, which is stored in an FBI database.  *Id.*  Kaemmerling, an Evangelical Christian, moved to enjoin the application of the Act to him because he objected to the distillation and retention of his DNA – "a foundational aspect . . . of God's creative work" – on religious grounds.  *Id.* at 674, 678.  The court emphasized that the plaintiff did not object to the government's collection of any of the bodily specimens that contained his DNA – not to the gathering of his hair or skin particles or even the drawing of his blood; rather, plaintiff was only opposed to the government's extraction of the DNA from the sample once it was obtained.  *Id.* at 679.  Under those circumstances, the court found that the complaint failed to allege a substantial burden that would be cognizable under RFRA:

24

> Kaemmerling's objection to the DNA Act centers on the government's act of extracting and analyzing his DNA . . . without suggesting that the Act imposes any restriction on what Kaemmerling can believe or do.  Like the parents in *Bowen*, Kaemmerling's opposition to government collection and storage of his DNA profile does not contend that any act of the government pressures him to change his behavior and violate his religion, but only seeks to require the government to conduct its affairs in conformance with his religion.

*Id.* at 680; *see also Bowen v. Roy*, 476 U.S. 693, 699–700 (1986) (explaining that free exercise of religion does not require "the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family").

The D.C. Circuit emphasized this principle at several points in the *Kaemmerling* opinion:

> The government's extraction . . . of Kaemmerling's DNA information does not call for Kaemmerling to modify his religious behavior in any way – *it involves no action or forbearance on his part*, nor does it otherwise interfere with any religious act in which he engages.  Although the government's activities with his fluid or tissue sample after the BOP takes it may offend Kaemmerling's religious beliefs, they cannot be said to hamper his religious exercise because they do not "pressure [*him*] to modify his behavior and to violate his beliefs."

*Id.* at 679 (second alteration in original) (emphases added), quoting *Thomas*, 450 U.S. at 718.

And the court made it clear that its application of RFRA derived directly from the Supreme Court precedent that Congress had incorporated into the statute:

> Religious exercise necessarily involves an action or practice, as in *Sherbert*, where the denial of unemployment benefits impeded the observance of the plaintiff's religion by pressuring her to work on Saturday . . . , or in *Yoder*, where the compulsory education law compelled the Amish to perform acts undeniably at odds with fundamental tenets of their religious beliefs.  Kaemmerling, in contrast . . . suggests no way in which these governmental acts pressure him to modify his own behavior in any way that would violate his beliefs.

*Id.* at 679 (alteration, citations, and internal quotation marks omitted).[8]

It is against this legal backdrop that the Court must analyze plaintiffs' RFRA claim. Have defendants put pressure on plaintiffs to modify their behavior and violate their beliefs?  Or does the accommodation alleviate the pressure on them as it was intended to do?  Plaintiffs cannot rest their claims on the fact that their employees will still receive access to contraceptives under the accommodation; they must point to conduct that they are obliged to undertake that, in and of itself, violates their religious beliefs.

The Court acknowledges and respects the sincerity of plaintiffs' expression of their religious beliefs, and it emphasizes that its ruling is not predicated in any way upon a failure to accept plaintiffs' articulation of what their faith commands.  The Court has no intention of substituting its judgment for that of the affiants on the existence or nature or importance of this aspect of their religion, and nothing in this opinion should be read as an indication of any divergence of opinion on those topics.  *See Gilardi*, 733 F.3d at 1216 ("We begin with the peculiar step of explaining what is *not* at issue.  This case is not about the sincerity of the

---

8       The D.C. Circuit has also found a burden to be inconsequential or de minimis on other grounds, such as where the government regulation merely prohibits one of a multitude of methods of exercising religion.  *Mahoney v. Doe*, 642 F.3d 1112 (D.C. Cir. 2011); *Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001); *see also Mead v. Holder*, 766 F. Supp. 2d 16 (D.C. Cir. 2011).   In *Henderson* and *Mahoney*, the plaintiffs challenged regulations that prevented individuals from selling t-shirts on the National Mall and regulations that prohibited "chalking" the sidewalk in front of the White House, respectively.   642 F.3d at 1115; 253 F.3d at 13–14.  Both sets of plaintiffs argued that these regulations – otherwise neutral to religion – violated RFRA because they prevented plaintiffs from following the religious requirement that they spread the gospel.  *Mahoney*, 642 F.3d at 1120; *Henderson*, 253 F.3d at 15.  The D.C. Circuit ruled that neither regulation imposed a substantial burden because the regulations were, at most, "a restriction on one of a multitude of means" by which plaintiffs could exercise their religion and other alternative means were still available.  *Henderson*, 253 F.3d at 17; *see also Mahoney*, 642 F.3d at 1121.  But the court also specifically noted that neither case posed a situation where "the regulation force[d] the plaintiffs] to engage in conduct that their religion forbid" or prevented "them from engaging in conduct their religion require[d]."  *Henderson*, 253 F.3d at 16; *see also Mahoney*, 642 F.3d at 1121.

[plaintiffs]' religious beliefs, nor does it concern the theology behind Catholic precepts on contraception.  The former is unchallenged, while the latter is unchallengeable.").

The Court also recognizes that it is not within its province to assess the centrality of the particular religious tenet involved to plaintiffs' faith or to calibrate where the challenged conduct might fall on a spectrum of objectionable practices:  whether it would offend plaintiffs' religious sensibilities or "gravely endanger if not destroy" the exercise of their religious beliefs as in *Yoder*.  *See Kaemmerling*, 553 F.3d at 678 ("Because the burdened practice need not be compelled by the adherent's religion to merit statutory protection, we focus not on the centrality of the particular activity to the adherent's religion but rather on whether the adherent's sincere religious exercise is substantially burdened.").

In sum, the Court is not qualified or authorized to state what Catholicism does or does not prohibit, and it accepts plaintiffs' expressions of their principles on its face.  At the same time, there is nothing about RFRA or First Amendment jurisprudence that requires the Court to accept plaintiffs' characterization of the regulatory scheme on its face.  Put differently, although the Court is bound to accept the statements in plaintiffs' affidavits that their religious teachings go beyond a ban on the personal use of contraceptives and that "facilitating access" to contraceptive services and products is also inconsistent with Catholicism, the Court may determine whether compliance with the contraceptive mandate and accommodation actually constitutes compelled "facilitation."  Interpreting a regulatory scheme is a secular task that is well within the Court's domain.  The D.C. Circuit specifically recognized this point in *Kaemmerling*, when it noted that there is a critical distinction between a plaintiff's unassailable factual recitation of what his religion entails and the court's ultimate finding on whether his religious exercise has been substantially burdened:  "Accepting as true the factual allegations that Kaemmerling's beliefs are

sincere and of a religious nature – but not the legal conclusion, cast as a factual allegation, that his religious exercise is substantially burdened – we conclude that Kaemmerling does not allege facts sufficient to state a substantial burden . . . ." 553 F.3d at 679.

Plaintiffs' pleadings contain many legal conclusions advanced as facts, and therefore, to resolve the RFRA claims, it is necessary to hone in more closely on the details of the regulations themselves rather than the parties' characterizations of them. Because those regulations affect different plaintiffs differently based upon the type of insurance plan they offer, it is also necessary to take up certain plaintiffs' claims separately. Catholic University covers its employees under a group health plan, which falls under section 2590.715–2713A(c), and Catholic Academies, Archbishop Carroll, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, Catholic Information Center, and Thomas Aquinas cover their employees through self-insured plans, which are addressed in section 2590.715–2713A(b). Seven of those plaintiffs offer insurance through the exempt Archdiocese's self-insured health plan, and only one plaintiff, Thomas Aquinas, offers its employees a health plan through a self-insured entity that is not exempt from the mandate itself. The different situations produce different outcomes.

A.      **The contraceptive mandate does not impose a substantial burden on Catholic University of America's religious exercise.**

Of the ten plaintiffs in this case, Catholic University is the only plaintiff that offers its students and employees the option to participate in a group health plan through insurers, specifically AETNA and United Healthcare. Pls.' SOF ¶¶ 29–32. The regulations contain a specific set of rules that deal with organizations insured under a group plan, and in light of the accommodation available in that instance, the contraceptive mandate as modified does not impose a substantial burden on the University's religious belief. *See Priests for Life v. U.S. Dep't of Health & Human Servs.*, No. 13-1261 (D.D.C. Dec. 19, 2013).

Catholic University has established that its sincerely held religious belief prohibits it from providing or facilitating access to contraceptive services coverage.  Aff. of CUA ¶¶ 14–15.  The affidavit of Frank Persico explains that Catholicism "teaches that life begins at the moment of conception, that sexual union should be reserved to committed marital relationships in which the husband and wife are open to the transmission of life, and, therefore, that artificial interference with life and conception are immoral."  *Id.* ¶ 13.  As a result, "[o]ffering a health insurance policy that provides coverage for or facilitates access to abortion-inducing products, contraceptives, sterilization, and related education and counseling is thus inconsistent with the core moral and religious beliefs of the University."  *Id.* ¶ 14.  In their joint pleadings, plaintiffs have explained that, although Catholicism does not require them to prevent their employees or students from gaining access to contraceptive services coverage, it does require that they not participate in the provision of that coverage.  *See* Pls.' Reply in Supp. of its Cross-Mot. for Summ. J. ("Pls.' Reply") at 4 [Dkt. # 33] ("If the Government believes all women must be provided with free abortion-inducing products, sterilization, and contraceptives, Plaintiffs ask only that the Government not force them to participate in that effort.").  The Court finds that, since the accommodation effectively severs an organization that offers its employees or students an insured group health plan from participation in the provision of the contraceptive coverage, it relieves Catholic University of any burden cognizable under RFRA.  *See Priests for Life*, No. 13-1261.

Under the terms of the new regulations, a religious organization is eligible for the accommodation once it certifies that:  it is a nonprofit entity, it holds itself out as a religious organization, and it opposes providing coverage for some or all of the contraceptive services required to be covered under the mandate.  29 C.F.R. § 2590.715–2713A(a).  A group health

plan established or maintained by an eligible religious organization complies with the requirement to provide contraceptive coverage "if the eligible organization or group health plan furnishes a copy of the self-certification . . . to each issuer that would otherwise provide such coverage in connection with the group health plan." *Id.* § 2590.715–2713A(c)(1).  At that point, "[a] group health insurance issuer that receives a copy of the self-certification . . . with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage . . . must –

    (A) Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and

    (B) Provide separate payments for any contraceptive services required to be covered . . . for plan participants and beneficiaries."

*Id.* § 2590.715–2713A(c)(2)(i).

What does this mean? Catholic University must identify itself as an organization with religious objections by completing a form that states, as it has repeatedly averred in this litigation, that it objects to the provision of contraceptive services on religious grounds.  Then, either the University or its health plan must furnish its insurance issuers – Aetna and United Healthcare – with a copy of the self-certification.  That is the extent of what is required from the religious organization.  The insurance issuers are obligated under the ACA to provide contraceptive coverage under section 2590.715–2713A(c)(2), and once they receive the self-certification, they must expressly exclude the contraceptive coverage from the healthcare coverage that is being provided in connection with Catholic University's plan and pay for the

coverage themselves.[9]  *Id.*  So, the health insurance plan that the ACA employer mandate requires the University to provide will *not* cover contraceptive services.  The University has stated in its affidavit that offering a health insurance policy that provides coverage for contraceptive services would be inconsistent with its religious beliefs, but it is no longer required to do so.  Under the terms of the accommodation, Catholic University's group health plan that does not include contraceptive services coverage will be in full compliance with the ACA once the University self-certifies that it objects to the provision of that coverage.[10]

Plaintiffs, including Catholic University, maintain that the obligation to self-certify to avail themselves of the accommodation is a burden on religion in and of itself because the act of completing the form "facilitates" or "authorizes" the provision of contraceptive coverage to their students or employees.  Pls.' Mot. at 20 ("In other words, the government has effectively made 'no' mean 'yes,' transforming the very act of objecting to the mandated coverage into the authorization to provide such coverage.").  But this conclusory characterization of the regulatory scheme is not immune from probing by the Court merely because it has been incorporated into each of the plaintiffs' sworn affidavits.  *See, e.g.*, Aff. of CUA ¶ 17 ("[P]erversely, it is CUA's self-certification of its religious objection that authorizes provision of the mandated coverage.").

---

9       The statement in Catholic University's affidavit that, under the accommodation, the University "bears the burden of locating and identifying an insurance company willing to provide the very services it deems objectionable," Aff. of CUA ¶ 17, is not consistent with the regulations, and therefore, it is not a circumstance that can be found to be a burden on the school's religious exercise.  Also, because the accommodation explicitly requires the insurer to engage in separate accounting to ensure that none of Catholic University's premiums are used to pay for contraceptive services, 29 C.F.R. § 2590.715–2713A(c)(2)(ii), the Court is not persuaded by the University's argument that the "cost-neutrality" of providing contraceptive services somehow results in its premiums being used to pay for contraceptive services.  *See* Pls.' Mot. at 21 n.15.

10      For the same reasons, the contraceptive mandate does not place Catholic University in a position where it will give rise to "scandal by acting in a way inconsistent with Church teachings."  Aff. of CUA ¶ 19.

That is not a matter of religious doctrine, and when plaintiffs insist on referring to the self-certification as a "permission slip" in their papers, *see, e.g.*, Pls.' Reply at 3, they make it plain that this aspect of their case turns largely upon semantics and not theology.[11]

For one thing, the "authority" to provide contraceptive services to the women who work or study at the institution is not Catholic University's to bestow. Access to contraceptives is guaranteed by the Constitution. *Griswold v. Connecticut*, 381 U.S. 479 (1965). As plaintiffs acknowledged in their pleadings, they have "no legal right to prevent individuals from procuring the objectionable products and services from the Government or anywhere else." Pls.' Mot. at 20. And cost-free access to contraceptive services – to women who are covered by a health plan anywhere – has already been guaranteed by the ACA and the implementing regulations. 42 U.S.C. § 300gg-13; 29 C.F.R. § 2590.715–2713. In the insured group plan context, the "authority" for the insurers to provide that coverage – or more aptly described, their "obligation" to do so – is imposed by the regulatory scheme, and it exists whether Catholic University takes any steps to ensure compliance with the mandate or not. *See* 29 C.F.R. § 2590.715–2713A(c) (listing the obligation of an insurer of a self-certifying organization to provide contraceptive services coverage in mandatory terms). Through its self-certification, the religious organization

---

11      Indeed, in *Priests for Life v. U.S. Dep't of Health & Human Services*, the Catholic plaintiffs *conceded* that the self-certification was not a burden of their exercise of religion, in and of itself. No. 13-1261, slip op. at 26–27.

declares its intention to step out of the process.  That cannot be accurately characterized as an act that "facilitates" the employees' access to the services.[12]

Similarly, the University cannot support the legal finding that its religious exercise is burdened with its assertion that contraceptive services "coverage will be made available to CUA's employees only for so long as they remain on the University's plan."  Aff. of CUA ¶ 17.  The use of the passive voice – "coverage will be made available" – conveys an objection to the consequences of the self-certification, not to the action of certifying itself.  Moreover, that factual assertion is belied by the fact that the insurance mandate will follow the school's employees wherever they go, and that all insurance plans are required to provide preventive services – as HRSA has defined them – under the ACA.

Plaintiffs' fundamental complaint is that "[s]hould they choose to certify their objection to the mandated coverage, that action inexorably leads to provision of the very coverage to which they object."  Pls.' Mot. at 20.  But the law requiring Kaemmerling to submit to the taking of blood or tissue samples also led "inexorably" to a result to which he objected, and the D.C. Circuit determined that was not enough to satisfy RFRA.  Plaintiffs seek to distinguish *Kaemmerling* by highlighting the Circuit Court's observation that Kaemmerling did not object to submitting to the actual collection of the samples.  They say, in essence, maybe Kaemmerling did not object to the first step that led to the objectionable consequences, but we do.  But, in fact,

---

12     Catholic University also argues that it is burdened because, under the contraceptive mandate, it "will be forced to further facilitate access to the mandated coverage by . . . identifying its benefits-eligible employees for the insurance company."  Aff. of CUA ¶ 17.  In other words, the University states that it still must facilitate access to contraceptive services coverage even if those services are completely separated from its plan because it must provide the insurer with the names of those individuals who are eligible for contraceptive services payments.  But the University does not point to any regulation that imposes this duty, and the insurance issuer will have independent records of which employees enrolled for healthcare coverage.

Kaemmerling filed his complaint and motion for preliminary injunction to stop the first step from happening:   to enjoin the Bureau of Prisons from collecting the sample.   *See* Compl. *Kaemmerling v. Lappin*, No. 06-1389 [Dkt. # 1].   He did not simply sue to bar the FBI from extracting and preserving his DNA.   Like Kaemmerling, the reason that plaintiffs object to the self-certification is that they object to what happens after someone else receives it.   The Court is aware that plaintiffs predicate that objection on moral grounds.   But if RFRA is applied to reach a religious objection to "bearing witness" to an immoral act by others, in the absence of any requirement that the objector modify his own behavior, then the law is no longer a shield, but it is a sword, and it becomes a tool to deny the equally compelling rights of thousands of other people.   Nothing in RFRA jurisprudence to date takes the law that far.

Like the statute that was challenged in *Kaemmerling*, the regulations here do not "impose any restrictions on what [Catholic University] can believe or do," and it does not impose pressure on the University "to modify [its] behavior and to violate [its] beliefs."   553 F.3d at 679–80. Through the self-certification, the eligible organization raises its hand and says "I object" to participating in the provision of contraceptive services itself, and through the accommodation, the government accedes to its request and assigns the obligation to someone else.   RFRA does not reach the results.

This conclusion is entirely consistent with the D.C. Circuit's recent ruling in *Gilardi*.   In that case, the Court found that the Catholic owners of a for-profit corporation "are burdened when they are pressured to choose between violating their religious beliefs in managing their selected plan or paying onerous penalties."   733 F.3d at 1217; *see also Tyndale House*, 904 F. Supp. 2d at 122.   But the Gilardis are secular employers who do not qualify for the accommodation and are therefore required to provide and pay for the contraceptive coverage

themselves.  And a close reading of the *Gilardi* opinion reveals that the case is distinguishable on those grounds.[13]

In order to determine whether the accommodation alleviates the burden that was recognized in *Gilardi*, one must first distill from the opinion what the court found that burden to be.  The court began by reciting the rule that *Kaemmerling* derived from the Supreme Court's opinion in *Thomas*:  "[a] 'substantial burden' is 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"  *Id.* at 1216, quoting *Kaemmerling*, 553 F.3d at 678.  The court then responded to an argument that the government is not advancing in this case:  that the alleged burden was too remote or attenuated to trigger RFRA because it would only arise at the point when an employee purchased contraceptives or used contraceptive services.  *Id.* at 1217.  The court took issue with that position:

> The burden on religious exercise does not occur at the point of contraceptive purchase; instead, it occurs when a company's owners fill the basket of goods and services that constitute a healthcare plan.  In other words, the Gilardis are burdened when they are pressured to choose between violating their religious beliefs in managing their selected plan or paying onerous penalties.

---

13      In *Tyndale House*, the plaintiffs were secular employers that did not qualify for the accommodation and were therefore required to provide and pay for contraceptive services.  In concluding that the contraceptive mandate burdened the plaintiffs' religious exercise, the court emphasized the direct responsibility imposed on the employer to provide the objectionable coverage and the specific financial obligation imposed on the plaintiffs to pay for the contraceptives.  The court found it significant that Tyndale acted as its own insurer and that "Tyndale itself directly pays for the health care services used by its plan participants."  904 F. Supp. 2d at 123.

For similar reasons, plaintiffs' many citations to *Hobby Lobby*, which is not controlling on this Court in any event, do not help resolve this case.  Hobby Lobby is a self-insured, for-profit employer that does not qualify for the accommodation, and the plaintiffs there objected to "participating in, providing access to, paying for, training others to engage in, or otherwise supporting" the use of certain emergency and intrauterine contraceptives they consider to be a form of abortion.  *See* 723 F.3d 1114, 1121 (10th Cir. 2013) (en banc), *cert. granted* No. 13-354, 2013 WL 5297798 (Nov. 26, 2013).

*Id.*  This passage suggests that the Circuit Court would find a substantial burden if the regulations, as revised, imposed obligations on Catholic University to take affirmative steps to include the objectionable products and services as part of its plans.  That is not the case for an employer that offers a group insured plan in any event.[14]  But the court's statement more directly addresses the question of when the burden attaches, not what it consists of.  It was later in the opinion that the court more specifically described the burden that had been imposed upon the Gilardis that warranted relief under RFRA:

> The contraceptive mandate demands that owners like the Gilardis meaningfully approve and endorse the inclusion of contraceptive coverage in their companies' employer-provided plans, over whatever objections they may have.  Such an endorsement – procured exclusively by regulatory ukase – is a "compel[led] affirmation of a repugnant belief."  That, standing alone, is a cognizable burden on free exercise.

*Id.* at 1217–18.  Finally, the court found that the burden was substantial because the government commands employer compliance with financial penalties, thereby giving the Gilardis a "Hobson's choice:"  comply with the mandate and participate in what they believe to be a grave moral wrong, or abide by the tenets of their faith and pay devastating penalties.  *Id.* at 1218.

Here, plaintiffs seize upon the Hobson's choice language and the Circuit Court's observation that if the risk of a $14 million fine "is not 'substantial pressure on an adherent to modify his behavior and to violate his beliefs,' we fail to see how the standard could be met."  *Id.*  But the question to be resolved here is not whether an acknowledged burden has been rendered

---

14    The accommodation requires insurance issuers to "[e]xpressly exclude contraceptive coverage" from the group health plan.  29 C.F.R. § 2590.715–2713A(c)(2)(i)(A). So even if the D.C. Circuit meant to define the RFRA burden with its shopping cart metaphor, the accommodation differentiates Catholic University from the Gilardis because the University is not required to "fill the basket of goods and services that constitute a healthcare plan" with contraceptive services coverage.  *See Gilardi*, 733 F.3d at 1217.

substantial by the threat of financial consequences for noncompliance but whether the compelled conduct imposes a meaningful burden on plaintiff's religious exercise at all.

Unlike the Gilardis, the plaintiff nonprofit religious organizations in this case become eligible for the accommodation as soon as they state that they oppose providing coverage on the basis of their religious beliefs. 29 C.F.R. § 2590.715–2713A(a). This is exactly the opposite of the "compelled affirmation of a repugnant belief" that was at the heart of *Gilardi*, and it is a distinction that cannot be ignored. Furthermore, the accommodation explicitly provides that, "[w]ith respect to payments for contraceptive services, the [insurer] may not impose . . . any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization." *Id.* § 2590.715–2713A(c)(2)(ii). This relief, which was not available to the Gilardis, cuts off any obligation of the self-certifying organization to pay for the contraceptive services of its employees or students. *Id.* So the case is not governed by *Gilardi*, and it is distinguishable from the decision in this District in *Tyndale House*.[15]

Plaintiffs seem to recognize what the law prohibits, and they put it succinctly in their own pleading: "Plaintiffs' only request has been that they not *themselves* be made the vehicle by which the mandated coverage is delivered." Pls.' Reply at 4. Under the terms of the accommodation, Catholic University has in fact been relieved of any obligation to *itself* be the vehicle by which the coverage is delivered. The Court finds that the University has not met its burden under RFRA to establish a substantial burden on its exercise of religion and thereby

---

15     The Court's conclusion can also be squared with *Geneva College v. Sebelius*, 941 F. Supp. 2d 672 (W.D. Pa. 2013), which addressed the contraceptive mandate before the accommodation was promulgated and relied heavily on the fact that the plaintiffs in that case had to arrange and pay for a health insurance plan that included the contraceptive services coverage.

trigger the application of strict scrutiny.[16]   Defendants are therefore entitled to summary

judgment on Catholic University's RFRA claim.[17]

> **B.      The accommodation falls short of relieving the burden on Thomas Aquinas College's religious exercise.**

Thomas Aquinas College is a Catholic institution that adheres to the same religious

beliefs as Catholic University:  that interfering with conception is immoral, and that it is equally

wrong to take actions that would facilitate the use of contraceptives by others.  Aff. of TAC

¶¶ 12–14.  Unlike Catholic University, the College provides benefits on a self-insured basis, and

it offers its employees health insurance through the RETA Trust, "which is a self-insurance trust

set up by the Catholic bishops of California for the purpose of providing medical coverage

consistent with Catholic moral teaching."[18]   *Id.* ¶ 8. The self-insurance trust is administered by a

third-party administrator, Benefit Allocation System, *id.*, and the parties have informed the Court

---

16      Additionally, for the reasons stated below in footnote 24, the contraceptive mandate does not impose a burden on Catholic University's religious exercise even though it requires that the University's student health insurance plan include coverage for contraceptive services.  Not only does the accommodation effectively eliminate any potential facilitation on Catholic University's part, but the fact that the ACA does not mandate the University to provide a student health insurance plan removes the government compulsion necessary to find a RFRA burden.  *See infra* note 24.

17      The Court is not basing its holding on the government's argument that the fact that the plaintiffs provide their employees with a salary that might ultimately be used to purchase contraceptive services means that the mandate does not impose its own religious burden.  If plaintiffs voice religious objections to providing, paying for, and facilitating contraceptive themselves, but they do not object to paying a salary that could potentially be used for the purchase of contraceptives by the employees, it is not for the Court "to say that the line [plaintiffs] drew was an unreasonable one.  Courts should not undertake to dissect religious beliefs . . . ." *Thomas*, 450 U.S. at 715.

18      Thomas Aquinas College's RFRA claim refers only to its employee healthcare plan.  It has not asked the Court to address whether the contraceptive mandate imposes a RFRA burden on the school by requiring that any student health insurance plan include contraceptive services coverage.

that, notwithstanding the bishops' involvement, the plan does not constitute a church-sponsored

plan under ERISA.  Supp. Aff. of TAC ¶ 6.

Under the regulations, a self-insured organization that wishes to avail itself of the

accommodation must also certify its eligibility as a religious, nonprofit entity that opposes

providing coverage for contraceptive services under 29 C.F.R. § 2590.715–2713A(a)(4).  Under

section 2590.715-2713A(b), a health plan established or maintained by an eligible organization

that provides benefits on a self-insured basis then complies with the mandate to provide

contraceptive coverage if:

> (i)      The eligible organization or its plan contracts with one or more third party
>          administrators.
>
> (ii)     The eligible organization provides each third party administrator . . . with
>          a copy of the self-certification . . . , which shall include notice that –
>
>> (A) The eligible organization will not act as the plan administrator or
>>     claims administrator with respect to claims for contraceptive services,
>>     or contribute to the funding of contraceptive services; and
>>
>> (B) Obligations of the third party administrator are set forth in [the
>>     applicable regulations].
>
> (iii)    The eligible organization must not, directly or indirectly, seek to interfere
>          with a third party administrator's arrangements to provide or arrange
>          separate payments for contraceptive services . . . and must not, directly or
>          indirectly, seek to influence the third party administrator's decision to
>          make any such arrangements.

29 C.F.R. § 2590.715-2713A(b)(1).  If a third-party administrator receives a copy of the self-

certification and agrees to enter into or remain in a contractual relationship with the eligible

organization or its plan to provide administrative services, then *it* is bound to provide or arrange

for separate payments for the contraceptive services.  *Id.* § 2590.715-2713A(b)(2).  The third-

party administrator may provide for the payments itself, or it may arrange for an insurance issuer

or another entity to do so, but in no event may any cost-sharing, premium, or fee be imposed,

directly or indirectly, on the religious organization or its plan.  *Id.* § 2590.715-2713A(b)(2)(i)–(ii).

So while this section of the regulations is also designed to accomplish the goal of relieving the religious organization of the burden of providing contraceptive coverage, by transferring that obligation to a substitute and shielding the organization from absorbing the cost in any way, there are several differences between what happens in the case of a self-insured entity and in the insured group health plan scenario.  First, neither the ACA nor the accommodation itself imposes a mandatory obligation on the third-party administrator to accept responsibility to provide contraceptive services coverage on behalf of the self-certifying organization.  One of the steps required for plan compliance is that the organization or its plan contract with a third-party administrator, and under the terms of the accommodation, the third-party administrator's obligation to provide contraceptive coverage arises only if it receives a copy of the self-certification "and *agrees* to *enter into* or *remain in* a contractual relationship with the eligible organization or its plan to provide administrative services for the plan."  *See id.* § 2590.715–2713A(b)(2) (emphases added).  As a result, if a third-party administrator declines to assume the responsibility to provide coverage for contraceptive services on behalf of the self-certifying religious organization, the third-party administrator can no longer serve in that capacity for the organization's plan, and the organization must either shop around to find a new third-party administrator that will assume responsibility for the coverage or proceed without a

third-party administrator and await instructions from the government on how it can otherwise satisfy its obligations.  *See id.*; *see also* 78 Fed. Reg. at 39880–81.[19]

Second, the accommodation operates differently in the self-insured context than in the insurer context because, should the third-party administrator agree to assume responsibility for the contraceptive services coverage, the regulations provide that the self-certification form itself "shall be an instrument under which the plan is operated [and] shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered."   29 C.F.R. § 2510.3–16(b); *see also id.* § 2590.715–2713A(b)(1)(ii)(B).   In other words, it is "plan administrators" who have the obligation under ERISA to carry out the contraceptive mandate, and unlike health insurance issuers in the insured plan context, the third-party administrator would not have this obligation unless it was conferred on it by law in some way.  A religious organization's self-certification provides that the organization will not be acting as the plan administrator for purposes of compliance with the contraceptive mandate, and it directs the third-party administrator to the rules that will govern its responsibilities.  *Id.* § 2590.715–2713A(b)(ii).[20]

 Finally, in the insurance context, the regulations expressly require insurers to carve out contraceptive services coverage from the self-insured organization's plan. The third-party

---

19      The regulations do not spell this out explicitly, but both parties agree that this is what they will entail.  The Court has questions about how this set of provisions will operate in practice in a situation such as the one presented by Thomas Aquinas College, where the third-party administrator may be in a contractual relationship with the plan but not with the eligible organization, and the plan and plan administrator may have religious objections of their own, but the Court has come to its conclusion based on the fact that this obligation to secure a compliant third-party administrator is by all accounts a critical feature of the accommodation for self-insured plans.

20      In this case, the College does not serve as the ERISA plan administrator in any event. *See* Pl. TAC's Dec. 17, 2013 Resp. to Order of the Ct. [Dkt. # 42].

administrator will be separately arranging for and paying for the coverage, but under the auspices of the plan.  As counsel for the government stated at the hearing, "[i]n the self-insured case, technically, the contraceptive coverage is part of the plan, [even though] the responsibility to make the payments . . . is entirely the [third-party administrator's]."  Mot. Hr'g Tr. 18.

In evaluating Thomas Aquinas College's RFRA claim, then, the question becomes whether any of these differences are meaningful for purposes of the burden analysis.

In the Court's view, the obligation to take affirmative steps to identify and contract with a willing third-party administrator if the existing third-party administrator declines forces the religious organization to *do* something to accomplish an end that is inimical to its beliefs. This involves the organization in facilitating access to contraceptive services, which the College has averred it cannot do, and it entails the critical element of modifying one's behavior.  Therefore, the College has met its burden to identify a burden on religious exercise imposed by the regulations governing self-insured plans.

The Court is less persuaded that the mere fact that the arrangements and payments for the contraceptive coverage arise under the auspices of the organization's healthcare plan is enough to constitute a burden, even if the exclusion of the coverage from an insured group plan makes the government's case stronger in that situation.  A court could conclude that, since one of the founders and a Vice President of the College has averred that "[p]roviding health insurance coverage that includes coverage for [contraceptive services] is . . . inconsistent with the core moral and religious beliefs of the College," Aff. of TAC ¶ 12, and a court is bound by law to accept a litigant's sincere statement of his religious beliefs, the Court must base a finding that there is a burden on those grounds.  But the fact that the payments are to be made as part of the plan, as opposed to a separate plan, is a technicality driven by the intricacies of ERISA and the

insurance industry and the recognition that the third-party administrator can only advance "payments" and not issue a "policy." Nothing about those details changes the fact that any actions the third-party administrator takes with respect to contraceptive coverage must be completely independent from the eligible organization.  The payments are totally separate from and cannot be imposed upon the religious organization, and the third-party administrator can even arrange for an entirely separate insurance issuer to provide the payments.  So the argument that the problem arises because the coverage is still being offered under the auspices of the religious organization's plan is difficult to distinguish from the argument the Court has already rejected:  that the organization is burdened based upon objectionable consequences, and the Court will not predicate its decision in the College's favor on those grounds.

With respect to the self-certification, an argument can be made there is something qualitatively different about the act of self-certifying in the context of a self-insured entity that is different from the group plan scenario.  That cuts both ways.  On the one hand, the self-insured organization's certification contains additional language that explicitly cuts itself out of the process:  it provides that the organization will not be the plan administrator for purposes of the delivery of the coverage.  29 C.F.R. § 2590.715-2713A(b)(1)(ii)(A).

But on the other hand, the regulations provide that an eligible organization's self-certification "shall be an instrument under which the plan is operated" and "shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered."  *Id.* § 2510.3–16.  Defendants explain the practical significance of that regulatory provision:

> [W]hen a [third-party administrator] receives a copy of the self-certification from an eligible employer that sponsors a self-insured group health plan, that [third-party administrator] becomes an ERISA Section 3(16) plan administrator and claims administrator for the purpose of providing the separate payments for contraceptive services. Thus, the contraceptive coverage requirements can be enforced against such [third-party administrators] through defendant Department of Labor's ERISA enforcement authority.

Defs.' Opp. & Reply at 6 (citations omitted). One could argue, then, that when Thomas Aquinas College files its self-certification, it will be taking more of an affirmative step to help secure women's access to contraceptive services than Catholic University will be, and therefore, the Court should find that it is acting in a manner that is inconsistent with its religious beliefs.

The Court sees the differences in the nature of the self-certification to be, again, primarily a problem of consequences. What the religious organization is being asked to *do* is the same: to express its religious objection. That action eliminates any obligation to provide or pay for contraceptive services, and then it is the regulations that operate to assign the obligation to someone else and to give the self-certification its legal import. In other words, defendants have done it, not the College. While the contraceptive coverage may still be under the broad roof of one health plan that is being offered, the government has assigned a new plan administrator the job of offering entirely separate shelter for that purpose under its own umbrella. So unless the religious organization has been forced to run around with the umbrella and find the person to hold it, hasn't the accommodation succeeded in granting plaintiffs' "*only* request . . . that they not *themselves* be made the vehicle by which the mandated coverage is delivered?" *See* Pls.' Reply at 4 (first emphasis added).

It is helpful to remember that, despite plaintiffs' reliance on *Gilardi*, the *Gilardi* court was not concerned with results. It did not hold that the Gilardi's rights were violated because their employees would receive access to contraception by virtue of their participation in the

Gilardis' plan or even because contraceptive services would be included in the plan.   That question was not presented.   What animated the court was its observation that the mandate – without the accommodation – "demands that owners like the Gilardis *meaningfully approve and endorse* the inclusion of contraceptive coverage in their companies' employer-provided plans." *Gilardi*, 733 F.3d at 1217–18 (emphasis added).   If the third-party administrator accepts the obligation, and there is no obligation placed upon the religious organization to secure another, these circumstances have also been eliminated by the accommodation in the self-insured context.   Once again, there is no compelled affirmation of a repugnant belief.

But the operative word in that sentence is "if."   If the third-party administrator declines to serve, a series of duties and obligations will fall to the religious organization.   If the third-party administrator stays in the contractual relationship but fails to carry out its obligations, then the College's self-certification may be the tool which gives the government its ERISA enforcement authority.   Looking at section 2590.715-2713A(b) as a whole, the Court finds that Thomas Aquinas has met its burden to show that the mandate, even as revised by the accommodation, imposes a burden on its religious exercise.   Since that burden comes upon pain of substantial financial penalties, *see* 26 U.S.C. § 4980H, the Court must find it to be substantial.   *Gilardi*, 733 F.3d at 1218.

Once the Court determines that the regulations impose a substantial burden on plaintiff's religious exercise, it must go on to decide whether the application of the burden is in furtherance of a compelling interest and whether it is the least restrictive means of furthering that interest. Defendants have conceded that the *Gilardi* decision requires the Court to find that contraceptive

mandate does not survive strict scrutiny,[21] thus the Court concludes that Thomas Aquinas College is entitled to summary judgment on its RFRA claim.

### C.      The remaining plaintiffs do not have standing to raise a RFRA claim.

The rest of the plaintiffs – Catholic Academies, Archbishop Carroll, Don Bosco, Mary of Nazareth, Catholic Charities, Victory Housing, and the Catholic Information Center (collectively,  the "church plan plaintiffs") – provide their employees with health insurance through the Archdiocese's self-insured health plan.  Pls.' SOF ¶ 5.  The government contends that, therefore, they do not have standing to bring a RFRA challenge to the contraceptive mandate, and it has raised a significant jurisdictional concern.  While this Court, like the court in the Eastern District of New York, is troubled by defendants' delay in appreciating the implications of their own regulations, *see Roman Catholic Archdiocese of N.Y. v. Sebelius*, No. 12-2542, 2013 U.S. Dist. LEXIS 176432 (E.D.N.Y. Dec. 13, 2013), that circumstance does not alter the fact that they are correct.

The government's authority to enforce a third-party administrator's obligation to provide contraceptive services coverage on behalf of a self-certifying organization under the accommodation is derived from ERISA.  It is ERISA that accords the government authority to penalize any third-party administrator that undertakes to pay for the coverage by remaining in its contractual relationship with the self-certifying organization but then fails to make the necessary

---

21      *Gilardi* addressed the burden imposed by the mandate itself on an employer that could not avail itself of the accommodation, and the Court found that the interests identified by the government were not sufficiently compelling, but even if they were, the mandate was not narrowly tailored to achieve those goals.  733 F.3d at 1219–24.  For all of the reasons set out in this section of the opinion, the Court is not certain that the application of strict scrutiny would lead to the same conclusion in the context of weighing the acts required of a religious organization under the accommodation against the government's interests, and it believes that the less restrictive means test would not be governed by the analysis in *Gilardi* since that Court was not assessing the provisions in the accommodation.

payments or arrangements.  *See* 29 C.F.R. § 2510.3–16(b); Mot. Hr'g Tr. 31.  Thus, ERISA is

essential to the accommodation's regulatory scheme.  It is well-settled, though, that church plans

– such as the plan maintained by the Archdiocese – are explicitly exempt from the requirements

of ERISA.  29 U.S.C. § 1003(b)(2) (2012).  The government therefore has no authority to

enforce the third-party administrator obligations under the accommodation against the

administrator of a church plan.  Defs.' Opp. & Reply at 5–7.

Based on this regulatory framework, defendants argue that the church plan plaintiffs do

not have standing.  The church plan plaintiffs are self-insured under the Archdiocese's plan, that

plan constitutes a church plan under ERISA, and the government lacks authority to require the

Archdiocese's third-party administrator to provide contraceptive services coverage on behalf of

the church plan plaintiffs, even if they furnish their self-certifications.  As a result, defendants

argue, the church plan plaintiffs have not alleged an actionable injury:  they may object to

facilitating access to contraceptive services, but the facts indicate that they will not actually be

facilitating access to contraceptive services by offering a health insurance plan or by self-

certifying under the accommodation because, once they self-certify, there is no imminent risk

that their third-party administrator will provide the objectionable coverage, and the government

cannot force it to do so.  *Id.*  The Court agrees.

To satisfy the injury-in-fact requirement of standing, a plaintiff must suffer an invasion of

a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent.

*Lujan*, 504 U.S. at 560.  An injury that is merely conjectural or hypothetical does not suffice.  *Id.*

Here, the church plan plaintiffs allege the same burden under RFRA as Catholic University and

Thomas Aquinas College:  that requiring them to facilitate access to contraceptive services

violates their sincerely held religious belief.  In other words, as they cast their RFRA claim,

plaintiffs' claimed injury arises when the provision of contraceptive coverage has been facilitated

by their actions and their beliefs have thereby been violated.  Although the church plan plaintiffs

are self-insured, and they are under the same obligation as Thomas Aquinas to self-certify and to

transmit the form to the third-party administrator, that conduct does not give rise to a concrete,

actual or imminent, cognizable injury in fact when it is performed by the church plan plaintiffs

because there is no reason to believe that anything will happen after that.

For example, the church plan plaintiffs have not shown that they are injured by the

requirement in the ACA that they provide a health insurance plan that includes access to

contraceptive services because there is no indication in the record that the coverage under their

plan – the Archdiocese plan – is going to change.  *See* Pls.' Submission in Resp. to Order at 12–

13 [Dkt. # 39].[22]  In response to specific questions from the Court on this topic, the government

has unequivocally stated that the church plan plaintiffs will be in full compliance with the

mandate if they provide the self-certification to the third-party administrator of their plan under

---

[22]     Plaintiffs argue that the accommodation itself is mandatory on its face and that, for
purposes of standing, the Court should assume that its third-party administrator will comply
"with its legal obligations as stated in the federal regulations" regardless of whether ERISA
applies.  Pls.' Submission in Resp. to Order at 12.  Although there are some contexts in which
the "possibility that third parties may violate the law is too speculative to defeat standing," *Tel.
& Data Sys., Inc. v. FCC*, 19 F.3d 42, 48 (D.C. Cir. 1994), this is not one of those situations.
The government has conceded that, under the accommodation, a church plan third-party
administrator has *no* legal obligation to provide contraceptive services and may remain in its
contractual relationship with the church plan plaintiffs even if it declines to provide that
coverage.  Given the representations contained in the Archdiocese's affidavit concerning the
manner in which it intends to operate its plan, it is reasonable to infer that the Archdiocese's
third-party administrator will decline to assume additional responsibilities to provide coverage or
to actually provide that coverage when it has been told by the enforcing agency that it has no
legal duty to do so.

section 2590.715–2713A(b)(1)(ii) and abide by the provisions of section 2590.715–2713A(b)(1)(iii).[23] Defs.' Resp. to Ct. Order at 1–3 [Dkt. # 40].

> QUESTION BY THE COURT: If the church plan "plaintiffs submit the self-certification to the third-party administrator of the church plan pursuant to section [2590.715–2713A(b)(1)(ii)], would those plaintiffs then be in full compliance with the regulatory regime provided that they do not violate section [2590.715–2713A(b)(1)(iii)]?"

> DEFENDANTS: "Assuming that they do not violate section [2590.715–2713A(b)(1)(iii)], and that they maintain the self-certification form and make it available for examination upon request, then the self-certifying non-Archdiocese plaintiffs who cover their employees under the church plan . . . would be in full compliance with the regulatory regime."

*Id.* at 1 (citation omitted).

Moreover, the self-certification alone is not enough to enable the church plan plaintiffs' employees to obtain payments for the contraceptive services: the third-party administrator must assume that responsibility. In the context of the Archdiocese plan, there is no reason to believe that is an actual, imminent possibility. *See* Aff. of Archdiocese ¶ 15 ("Consistent with Catholic teaching, the Archdiocese has historically excluded coverage for abortion [and] contraceptives (except when used for non-contraceptive purposes) . . . ."). And the government has made it clear that plaintiffs will *not* be obliged to shop for another one. *See* Defs.' Resp. to Ct. Order at 3

---

[23]    29 C.F.R. § 2590.715–2713A(b)(1) provides that a group health plan "established or maintained by" an eligible organization that provides benefits on a self-insured basis complies with the contraceptive mandate if the eligible religious organization "or its plan" contracts with a third-party administrator, and the eligible organization provides the self-certification to the third-party administrator. The church plan plaintiffs question whether they are obligated to do anything under this provision because they have not "established or maintained" the plan – it is the Archdiocese's plan. Joint Submission in Resp. to Order at 1–2, 5 [Dkt. # 36]. Based on the authority cited by plaintiffs on this point, the Court concludes that the church plan plaintiffs have "established or maintained" the Archdiocese plan for purposes of this section. *See Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1265 (11th Cir. 2004); *Peckham v. Gem State Mut. of Utah*, 964 F.2d 1043, 1049 (10th Cir. 1992). If the Court and the government are incorrect about that and the church plan plaintiffs have not "established or maintained" the plan that they expressly aver they offer to their employees, then they clearly would not have standing to bring an action challenging this provision.

("If the non-Archdiocese plaintiffs submit the self-certification to the [third-party administrator ("TPA")] of the Archdiocese's self-insured church plan, and the TPA does not agree to provide or arrange for payment for contraceptive services, then the non-Archdiocese plaintiffs are *not* required to identify another TPA to perform that function.").   Instead, in the context of the church plan, ERISA enforcement is lacking, and the government can neither require the third-party administrator of a church plan to end its contractual relationship for failing to assume responsibility for contraceptive services coverage nor penalize the third-party administrator that assumes the responsibility if it fails to actually provide that coverage.

Finally, there is no concern in this context that, by requiring the church plan plaintiffs to file a self-certification form, the government is compelling those plaintiffs to transform their contractual relationship with their third-party administrator or to provide the instrument that will serve as the legal authority to enforce the third-party administrator's obligations under the accommodation.   A church plan is not subject to ERISA, 29 U.S.C. § 1003(b)(2); therefore, a third-party administrator of a church plan cannot be transformed into an ERISA plan administrator just because the self-certification is filed.   The church plan plaintiffs have not alleged an injury in fact that will flow from filing the self-certification form because that form has no effect other than to relieve their burden to provide contraceptive services coverage. Therefore, the church plan plaintiffs lack standing to bring the RFRA claim in Count I.

But even if one were to conclude that the church plan plaintiffs have standing to press their RFRA claim because they are still obligated to complete the self-certification form, they have not met their burden to establish that there is a RFRA burden on their religious exercise. Since the regulatory obligation to provide a health insurance plan and to self-certify a religious objection does not compel the church plan plaintiffs to provide contraceptive coverage or to

facilitate the delivery of that coverage contrary to their principles, the Court concludes that neither the contraceptive mandate nor the accommodation places a burden on the church plan plaintiffs' religious exercise.[24]

The Court will grant defendants' motion to dismiss the church plan plaintiffs' RFRA claims for lack of standing.

## II.   Defendants are entitled to summary judgment on the Free Exercise Clause claim in Count II.[25]

The Free Exercise Clause of the U.S. Constitution provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend. I.  The Supreme Court has made clear that this constitutional right "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes

---

24      There are additional grounds why, even if the Court found that the church plan plaintiffs sufficiently alleged an injury to satisfy standing, Catholic Information Center and Don Bosco do not have a successful RFRA claim.  Unlike the other plaintiffs, Catholic Information Center and Don Bosco have less than fifty employees and are not subject to the employer mandate.  Supp. Aff. CIC ¶ 4; Supp. Aff. Don Bosco ¶ 4.  So, they provide health insurance to their employees on a voluntary basis.  Although employers who provide health insurance voluntarily must still comply with the contraceptive mandate and face penalties for failure to do so, *see* 42 U.S.C. § 300gg-13(a); Mot. Hr'g Tr. 36, plaintiffs simply are not in the same position as those subject to the employer mandate because they can choose to not provide health insurance in order to exercise their religious belief of not facilitating access to contraceptive services.  Any potential penalty resulting from that decision – such as difficulty recruiting employees without offering a health insurance plan – is the product of the conditions of the marketplace and is not imposed by the government.  It therefore cannot be said that Catholic Information Center and Don Bosco suffer a cognizable RFRA burden because they are not in a position where the *government* is placing pressure on them to violate their religious beliefs in order to avoid a *government* imposed penalty.

25      In this section, "plaintiffs" refers only to Catholic University and Thomas Aquinas because the remaining plaintiffs do not have standing to argue that the contraceptive mandate violates the Free Exercise Clause.  *See supra* section I.C.

(or prescribes) conduct that his religion prescribes (or proscribes)."[26]  *Smith*, 494 U.S. at 879 (internal quotation marks omitted); *see also Minersville Sch. Dist. v. Gobitis*, 310 U.S. 586, 594–95 (1940) ("The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities.").  The Court must apply strict scrutiny only when a law is either not neutral or not generally applicable.  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993).  When assessing whether a law is neutral and generally applicable, the two inquiries tend to overlap and "failure to satisfy one requirement is a likely indication that the other has not been satisfied."  *Id.* at 531.

Here, plaintiffs argue that the contraceptive mandate violates the Free Exercise Clause because it is neither neutral towards religion nor generally applicable because it is subject to numerous exceptions.  Compl. ¶¶ 252–68; *see also* Pls.' Mot. at 29–32.  The Court disagrees.

### A.    The contraceptive mandate is neutral.

A law is not neutral if it targets religious beliefs because of their religious nature or "if the object of a law is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533.  A discriminatory object may be present on the face of the challenged provision when the text "refers to a religious practice without a secular meaning discernable from the language or context."  *Id.*  For example, *Lukumi* involved a city ordinance that prohibited animal sacrifice and the Supreme Court noted that the use of words such as "sacrifice" or "ritual" – which are religious in origin – might suggest that the city's ordinance is discriminatory on its face.  *Id.* at 533–34.  A discriminatory object may also exist where the

---

26    It was this articulation of the Constitution's religious protection that prompted Congress to bring religion back into the equation with RFRA.  *See Holy Land Found.*, 333 F.3d at 166–67. RFRA is statutory, however, and therefore has no bearing on the claims asserted under the Free Exercise Clause.

challenged provision, in operation, targets religious practice in general, or certain religions' practices specifically, for unfavorable treatment. *Id.* at 534 (noting that the Free Exercise Clause also "'forbids subtle departures from neutrality' and 'covert suppression of particular religious beliefs'").

Here, plaintiffs do not argue that the text of the contraceptive mandate is facially discriminatory, and the Court finds nothing in the language of the contraceptive mandate that would suggest that it is not neutral towards religion. *See id.* at 531. Instead, plaintiffs assert that the law is not neutral because "the Mandate was part of a conscious political strategy to marginalize and delegitimize Plaintiffs' religious views on contraception by holding them up for ridicule on the national stage." Pls.' Mot. at 31. None of plaintiffs' arguments relate to the actual effects of the contraceptive mandate or suggest that, as applied, the contraceptive mandate only burdens – and thus targets – religion. Because a lack of neutrality towards religion must be evident in the practical effects of the challenged provision – not just in what a party claims was in the minds of those who influenced or promulgated it – and because the contraceptive mandate does not operate to single out religion in general, or any religions specifically, for unfavorable treatment, it is neutral for purposes of the First Amendment.

Indeed, the availability of a religious employer exemption that completely exempts the Catholic Church from the requirements of the contraceptive mandate cuts against the conclusion that the contraceptive mandate was specifically designed to oppress those of the Catholic faith as plaintiffs suggest. *See id.* The Church employs over 2,100 individuals in the District of Columbia alone. *See* Aff. of Archdiocese ¶ 8.

Moreover, the contraceptive mandate applies equally to religious and nonreligious employers. It does not operate, as the Supreme Court put it in *Lukumi*, so "that almost the only

conduct subject to [the ordinances was] the religious exercise" of a specific church.  508 U.S. at

535.  All employers that offer a healthcare plan – whether they do so voluntarily or by virtue of

the ACA, and whether they are religious or nonreligious – must include cost-free coverage of a

range of preventive services, including contraceptive services, in their plans.[27]  This makes the

law neutral.  *See Am. Family Ass'n v. FCC*, 365 F.3d 1156, 1171 (D.C. Cir. 2004) (noting that

the point system FCC used to award noncommercial education broadcast licenses was neutral

because "the rule on its face appear[ed] also to disadvantage nonreligious centralized

broadcasting networks" and therefore did not place a burden "on religious organizations 'but

almost no others'").

The fact that many nonreligious employers may have provided coverage for

contraceptive services prior to the contraceptive mandate does not change the analysis.  The

contraceptive mandate imposes a new burden on employers who already provide contraceptive

services coverage – they must now provide contraceptive services coverage *for free* – and it

eliminates the right of those employers to change their mind.  Because the practical effect of the

contraceptive mandate is to treat religious and nonreligious employers the same, that weighs in

favor of finding the provision to be neutral towards religion.

---

27    That some employers may be exempt from this requirement because they qualify for the
"grandfathered-plan exemption" does not change the conclusion that the contraceptive mandate
imposes an equal burden on religious and nonreligious employers.   Not only is the
grandfathered-plan exemption of temporary duration and therefore only allows qualifying plans
to avoid compliance with the contraceptive mandate for a limited time, the grandfathered-plan
exemption is available to both religious and nonreligious employers equally.   It therefore does
not operate to impermissibly target religion for unfavorable treatment.  *See Am. Family Ass'n*,
365 F.3d at 1171 (noting that any discrimination against decentralized organizations in the
FCC's point system was felt by both religious and nonreligious employers and any "differential
impact . . . on . . . religion [was] neither . . .  severe and targeted nor so unrelated to the FCC's
legitimate regulatory interests as to be a religious gerrymander").

The finding of neutrality is also supported by the fact that the mandate's requirements are closely related to its stated goals.[28]  *See Lukumi*, 508 U.S. at 538.  The final rules state that the purpose of the contraceptive mandate is to facilitate access to cost-free contraceptive services, which defendants have determined will help to improve the health of women and newborn children, decrease healthcare coverage cost disparities among women and men, and foster great equality for women in the workplace.  78 Fed. Reg. at 39872–73, 39887.  Whether or not one agrees that access to cost-free contraceptive services will actually produce those desired outcomes, the contraceptive mandate's requirements are aimed at promoting those asserted interests and are not so unrelated as to arouse suspicion.  *Cf. Lukumi*, 508 U.S. at 538–39 (expressing concern that ordinances banning animal sacrifice prohibited more religious conduct than was necessary to prevent improper disposal of animal remains or to prevent animal cruelty).  Thus, the contraceptive mandate is neutral in its practical effect, and it is related to its specified, neutral regulatory interests.

Plaintiffs point to statements by defendant Sebelius and by a key supporter of California's contraception statute, and they allege that there was a pro-choice bias on the part of the IOM committee.  *See* Pls.' Mot. at 31–32.  But those circumstances do not necessarily reflect

---

28    Although the D.C. Circuit found that the government's interests in public health and equal access to healthcare for women are not compelling interests and that the contraceptive mandate is not narrowly tailored to achieve those interests, *Gilardi*, 733 F.3d at 1219–24, those interests may still serve as evidence of neutrality in this case because the Court is concerned not with whether the contraceptive mandate survives strict scrutiny, but with whether the stated goals are so unrelated to the regulatory mechanism as to raise suspicions that an otherwise neutral regulation has more sinister purposes.  For the reasons provided in this section, the Court is convinced the contraceptive mandate has no ill intent toward religion or the Catholic Church.

hostility towards Catholicism.[29]   And even though – if it can be shown to exist – the subjective

intent of the drafters may create an inference that the object of a law is not neutral towards

religion, *Lukumi*, 508 U.S. at 533, that inference is weakened when the law does not operate in a

nonneutral way.[30]   *See id.* at 558 (Scalia, J., concurring) ("The First Amendment does not refer

to the purposes for which legislators enact laws, but to the effects of the laws enacted . . . .");

*United States v. O'Brien*, 391 U.S. 367, 383 (1968) ("It is a familiar principle of constitutional

law that this Court will not strike down an otherwise constitutional statute on the basis of an

alleged illicit legislative motive."); *see also id.* at 384 ("What motivates one legislator to make a

speech about a statute is not necessarily what motivates scores of others to enact it, and the

stakes are sufficiently high for us to eschew guesswork."); *City of Renton v. Playtime Theatres,*

---

29      The statutory scheme itself suggests that Congress may have contemplated that HRSA's guidelines would include contraceptive services coverage.  HRSA's statutory authority is derived from 42 U.S.C. § 300gg-13(a), which calls for coverage for preventive services, but then specifically directs HRSA to enumerate recommended preventive services for women.   42 U.S.C. § 300gg-13(a)(4).  Paragraph (1) of that section requires coverage of "evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force."  *Id.* § 300gg-13(a)(1).  Because many women-only preventive services, such as breast cancer screening, breastfeeding counseling, and cervical cancer screening, already fall within paragraph (1), *see* USPSTF A and B Recommendations, U.S. Preventive Services Task Force, http://www.uspreventiveservicestaskforce.org/ uspstf/uspsabrecs.htm (last visited December 3, 2013), one could conclude that Congress had other women-only preventive services – such as contraceptive services – in mind.  This further reduces the likelihood that the regulation was specifically designed to target adherents of the Catholic faith.

30      Defendant Sebelius's use of sarcasm on the one occasion cited was, at most, insensitive, and the statement of the California legislator who played no role in the adoption of the rule does not bear on this case at all.

*Inc.*, 475 U.S. 41, 47 (1986) (applying the same principle in the regulatory context).  The Court therefore finds that the contraceptive mandate is neutral towards religion.[31]

**B.**      **The contraceptive mandate is generally applicable.**

Plaintiffs argue that the contraceptive mandate is not generally applicable because there are exemptions to its requirements, Pls.' Mot. at 30, and they quote the sentence in *Lukumi*, which states:   "[I]n circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious hardship without compelling reason."  508 U.S. at 537, quoting *Smith*, 494 U.S. at 884 (internal quotation marks omitted).  But the requirement of general applicability is not the same thing as requiring a regulation to be universally applicable.  *See Gillette v. United States.*, 401 U.S. 437 (1971).

First of all, the quoted language is taken from the Supreme Court's neutrality discussion in *Lukumi*.  Although inquiries into a regulation's neutrality and general applicability tend to overlap, *Lukumi*, 508 U.S. at 531, the observation appears to recognize that the application of statutory or regulatory discretion to exempt all secular objectors, leaving the rule to be enforced against a religious group only, would undermine its neutrality.  *Id.* at 537 (explaining that the government exercised its discretion to determine which animal killings were necessary and therefore exempt in a way that "devalue[d] religious reasons for killing by judging them to be of lesser import than nonreligious reasons").

---

31      Despite plaintiffs' arguments to the contrary, the contraceptive mandate does not single out Catholicism for unfavorable treatment while leaving all other religions unaffected.  It is undisputed that the exemption is available to the Catholic Church, and that the availability of the exemption for the religious-affiliated organizations turns on the nature of those organizations and not the church with which they are affiliated.

But here, none of the exemptions to the contraceptive mandate are individualized, and none of the exemptions require the government to exercise its discretion in a way that would allow it to "devalue[] religious reasons for [not providing contraceptive services coverage] by judging them to be of lesser import than nonreligious reasons." *See id.* All of the exemptions are available regardless of an employer's religious leanings, and an employer's ability to qualify for an exemption is not based on any subjective determination by the government. *See Am. Family Ass'n*, 365 F.3d at 1171 ("Even setting aside that nonreligious organizations also face burdens from the rule, the burden the point system foists on religious organizations is relatively modest" because "[t]here is nothing inherently related to religion in the point system's criteria"). Indeed, the availability of both the religious employer exemption and the accommodation for nonprofit religious organizations demonstrates that the government is not devaluing religious concerns, but rather, it is making efforts to accommodate them.[32]

The Court in *Lukumi* acknowledged that it did "not define with precision the standard used to evaluate whether a prohibition is of general application," but it indicated that the inquiry

---

[32]     The Third Circuit's decision in *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999) – even if it were binding on this Court – does not compel a contrary conclusion.  In that case, the court addressed whether a police department's decision to deny a religious exemption to its no beard policy violated the Free Exercise Clause and determined that the policy was subject to heightened scrutiny because it was not generally applicable.  *Id.* at 365.  But, the court did not simply look at the police department's beard policy, spot a secular exemption, and automatically decide that heightened scrutiny applied.  Instead, the existence of a nonreligious exemption for medical reasons gave the court pause because the nonreligious exemption would undermine the stated goal of having uniform police uniforms to the same extent as if the department allowed a religious exemption to that policy.  *Id.* at 366.  Consequently, providing an exemption for medical reasons but not for religious reasons aroused suspicion that the government was making "a value judgment in favor of secular motivations, but not religious motivations."  *Id.*  However, the court was not troubled by the existence of an exemption for undercover police officers because undercover officers are not held out as police to the public, which means that their appearance did not undermine uniformity in police appearance.  *Id.*  Here, the only permanent exemption to the contraceptive mandate is an exemption that respects religion.

should focus on whether the challenged provision is so underinclusive that it raises suspicions as to whether it was actually designed to promote the proffered government interests.  508 U.S. at 543.

Here, the cited exceptions do not give rise to that sort of underinclusiveness.  The grandfathered-plan exemption and the small employer exemption are not specific exemptions to the contraceptive mandate; instead, they are general exemptions to mandate that employers comply with all of the ACA's new essential minimum coverage requirements.  These exemptions to the employer mandate do not tend to show that the government has created so many specific exemptions to the contraceptive rules to counteract their efficacy in promoting public health and women's equality.[33]  Similarly, the one-year safe harbor delaying enforcement of the contraceptive mandate is irrelevant when considering whether the contraceptive mandate is underinclusive.  The safe harbor was temporary and it will expire next month, thereby eliminating any potential underinclusiveness caused by that "exemption."

The only specific exemption to the contraceptive mandate – and therefore the only potential source of underinclusiveness – is the religious employer exemption established by 45 C.F.R. § 147.131(a).  The existence of a religious employer exemption, however, does not give rise to the kind of underinclusiveness that concerned the Supreme Court.  *See Lukumi*, 508 U.S. at 543 (finding underinclusiveness where the ordinances "fail[ed] to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than Santeria sacrifice does").  It is true that the definition of religious employer includes some religious organizations and not others, but the purpose of the narrow definition was to narrow the group of employees

---

33    Moreover, to the extent that these exemptions are relevant to the general applicability inquiry, they do not cut against a finding of general applicability because the grandfathered plan exemption is of limited duration and the small employers exemption does not exempt a small employer who voluntarily chooses to provide health insurance from the contraceptive mandate.

who would be carved out of the law.  *See* 78 Fed. Reg. at 39874 (explaining that defendants adopted a narrow definition of religious employer because it allowed them to respect religious objections to contraceptive services "in a way that [did] not undermine the governmental interests furthered by the contraceptive coverage requirement" because "[h]ouses of worship and their integrated auxiliaries . . . are more likely than other employers to employ people of the same faith who share the same objection [to contraceptive services], and who would therefore be less likely than other people to use contraceptive services").   In other words, the religious employer exemption was drafted narrowly in order to *prevent* the contraceptive mandate from being underinclusive.

The Court finds, then, that the contraceptive mandate is generally applicable because none of its exemptions create the type of individualized value assessment or underinclusiveness that warrants a contrary finding.  Since the contraceptive mandate is both neutral and generally applicable, strict scrutiny is not triggered, and defendants are entitled to summary judgment on Count II, plaintiffs' Free Exercise Clause claim.[34]

---

34     In their motion for preliminary injunction, plaintiffs cite *Smith* and briefly discuss the language in that case that has been used to create a sort of hybrid theory of constitutional rights that would trigger the application of heightened scrutiny.  Pls.' Mot. at 32.  It is not clear, however, from plaintiffs' motion – or its subsequent motions that do not mention the hybrid theory – whether plaintiffs intend to assert a separate claim under the hybrid rights theory.  To the extent that this was their intention, the Court finds that a hybrid rights claim must also fail. In the D.C. Circuit, the hybrid rights theory may only trigger strict scrutiny where at least one of the two asserted constitutional claims is viable.  *Henderson*, 253 F.3d at 19 (noting that at least one claim must be viable because the laws of mathematics teach us that "zero plus zero equals zero").  As explained throughout this opinion, plaintiffs' only viable constitutional claim is a narrow count that does not go to the contraceptive mandate, but only challenges the ban on attempts to influence a third-party administrator.  *See infra* section IV.  As this claim is extremely narrow and does not overlap with plaintiffs' other constitutional claims, the Court declines to use the hybrid theory to trigger strict scrutiny in this case.

**III.    Defendants are entitled to summary judgment on plaintiffs' compelled speech claims in Count III.[35]**

The First Amendment Free Speech Clause provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  It protects not only "the right to speak freely," but also "the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *see also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).  It therefore offers protection to parties subject to government compelled speech, permitting them in certain situations to remain silent.  *See, e.g.*, *Rumsfeld v. Forum for Academic & Institutional Rights, Inc. ("FAIR")*, 547 U.S. 47 (2006); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974).

Here, plaintiffs claim that the contraceptive mandate unconstitutionally compels them to speak in two ways:  first, plaintiffs assert that the contraceptive mandate violates the First Amendment because it compels them to provide, pay for, and facilitate access to counseling in favor of the use of contraceptive services, which they do not support.  Compl. ¶¶ 269–83; *see also* Pls.' Mot. at 33.  Second, plaintiffs assert that the accommodation, in conjunction with the contraceptive mandate, compels them to engage in speech – the self-certification form – that simultaneously results in the provision of contraceptive services to which they object while depriving them of the freedom to speak on the issue of abortion and contraception on their own terms.  *Id.*  Although at bottom both claims deal with the constitutionality of compelled speech, they differ enough to warrant separate treatment because the former addresses the government's ability to compel a party to support third-party speech whereas the latter alleges an imposition on these plaintiffs.  Neither aspect of the regulations offends the First Amendment.

---

35    The Archdiocese is completely exempt from the contraceptive mandate and therefore cannot assert a compelled speech claim.

A. **Providing access to counseling about contraceptive services through plaintiffs' healthcare plan does not violate plaintiffs' free speech rights.**[36]

Plaintiffs assert that the contraceptive mandate violates their free speech rights because it compels them to provide, pay for,[37] and facilitate access to counseling that encourages, promotes, or facilitates the use of contraceptive services. Compl. ¶ 275; *see also* Pls.' Mot. at 33. More specifically, they complain that, by compelling them to provide a health insurance plan that covers third-party counseling on the topic of contraceptive services, the contraceptive mandate forces plaintiffs to facilitate third-party speech in "*favor* of such practices" and therefore violates plaintiffs' free speech rights by forcing them to "speak" in a manner inconsistent with their beliefs. Pls.' Mot. at 33 (emphasis in original).

The Court notes at the outset that the definition of preventive services incorporated into the mandate includes "patient education and counseling for all women with reproductive

---

36    To the extent that Catholic University asserts this argument as part of its compelled speech claim, the argument fails because the contraceptive mandate does not require the University to offer a health plan that includes contraceptive services coverage. *See* 29 C.F.R. § 2590.715–2713A(c)(2)(i)(A). Similarly, the facts do not support the argument that the church plan plaintiffs are compelled to provide access to counseling about contraceptive services because there is no indication that the coverage will be provided to their employees. *See supra* section I.C. The only remaining plaintiff is Thomas Aquinas.

37    Throughout their briefs, plaintiffs imply that the contraceptive mandate requires them to pay for their employees' contraceptive services. That characterization is inaccurate in light of the accommodation, for which all plaintiffs admittedly qualify. Compl. ¶ 10. Under the accommodation, eligible organizations – including plaintiffs – are not required to pay for contraceptive services. 29 C.F.R. § 2590.715–2713A(b)(1)(ii)(A), (b)(2), (c)(2). Moreover, the regulations explicitly prohibit insurers or third-party administrators from passing the cost of those services through to the employer. *Id.* § 2590.715–2713A(b)(2), (c)(2); 78 Fed. Reg. at 39877, 39879. The regulations provide for separate accounting of the money used to pay for contraceptive services in order to ensure that plaintiffs' fear that their other insurance premiums would suspiciously increase does not come to fruition. 29 C.F.R. § 2590.715–2713A(d); 78 Fed. Reg. at 39877, 39879. Thus, there can be no argument that the contraceptive mandate and the accommodation violate plaintiffs' free speech rights by requiring them to subsidize third-party speech that has a content to which they object.

capacity," and not advocacy "in favor of" anything, so plaintiffs' characterization is not entirely accurate.   *See* Women's Preventive Services Guidelines, HRSA, http://www.hrsa.gov/ womensguidelines/ (last visited Dec. 12, 2013).   But assuming that, in some circumstances, information and counseling about contraception could also include advice, encouragement, or instructions, the Court will consider this claim on its merits.   Since plaintiffs are not obliged to personally deliver the counseling,[38] their claim is best understood as an objection to forced accommodation of third-party speech.

The government violates the First Amendment when it compels "one speaker to host or accommodate another speaker's message."   *FAIR*, 547 U.S. at 63 ("Our compelled-speech cases are not limited to the situation in which an individual must personally speak the government's message."); *see also Pacific Gas & Elec. Co v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 20–21 (1986) (plurality opinion); *Tornillo*, 418 U.S. at 258.   This is so because such governmental compulsion would deprive the compelled speaker of "the autonomy to choose the content of his own message."   *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 573 (1995) ("[O]ne who chooses to speak may also decide 'what not to say.'").

In *Rumsfeld v. FAIR*, the Supreme Court concluded that a law requiring law schools to provide military recruiters with equal access to their students by "hosting" the recruiters did not violate the schools' free speech rights.   547 U.S. at 61–68.   In *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, however, the Supreme Court reached the opposite

---

38     This is not a case where plaintiffs are being asked to personally convey a third-party or government message.   *See Pacific Gas*, 475 U.S. at 20–21; *Tornillo*, 418 U.S. at 258.   They are not disseminating counseling regarding the use of contraceptive services by handing out or posting pre-made materials, and they are not engaging in the counseling themselves.   In fact, the regulations take pains to ensure that plaintiffs are in no way involved in the dissemination of material regarding the coverage of contraceptive services.   29 C.F.R. § 2590.715–2713A(d); 78 Fed. Reg. at 39876, 39880.   Consequently, cases like *Pacific Gas* and *Tornillo* are distinguishable and do not govern this case.

conclusion, finding that a Massachusetts law that, in effect, "require[d] private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey," violated the parade organizers' First Amendment free speech rights.  515 U.S. at 559.

In each case, the Court called for the same initial showing:  (1) that the objecting party itself was engaged in speech and (2) that accommodating the third-party speech would alter the message of the objecting party's speech.  *FAIR*, 547 U.S. at 63; *Hurley*, 515 U.S. at 576–77; *see also PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 87 (1980).  Without satisfying this essential element, the Court suggested that there could be no compelled accommodation claim: "The compelled-speech violation in each of our prior cases . . . resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *FAIR*, 547 U.S. at 63.

The second factor considered by the Court in *FAIR* and *Hurley* was whether there was a risk that the third party's objectionable speech might be attributed to the objecting host speaker. *FAIR*, 547 U.S. at 65; *Hurley*, 515 U.S. at 575; *see also Turner Broad.*, 512 U.S. at 655; *PruneYard*, 447 U.S. at 87.  And the third factor considered by the Court was whether, as applied, the provision compelling a host speaker to accommodate the other's speech had any legitimate, nonspeech related purpose.  *Hurley*, 515 U.S. at 578.

Here, there is no evidence that the contraceptive mandate unconstitutionally requires plaintiffs to accommodate objectionable third-party speech.  Plaintiffs are not engaging in speech

or inherently expressive conduct when they provide their employees with health insurance.[39]   *See*

*FAIR*, 547 U.S. at 64 (noting that "accommodating the military's message [did] not affect the

law schools' speech, because the schools are not speaking when they host interviews and

recruiting receptions").   So plaintiffs' compelled-accommodation claim is missing the first

essential element:  plaintiffs' own speech is not being used as the vehicle through which a third-

party's speech is communicated. *See FAIR*, 547 U.S. at 63; *Hurley*, 515 U.S. at 576; *PruneYard*,

447 U.S. at 87; *see also Hurley*, 515 U.S. at 568, 572 (noting that "parades are . . . a form of

expression, not just motion," and that "every participating unit [in the parade] affects the

message conveyed by the private organizers").   Therefore, the compelled-accommodation claim

in Count III fails.

Moreover, even if plaintiffs were engaging in speech that could be altered by the

availability of counseling for women about contraceptive services, any compelled

accommodation of that counseling is not constitutionally problematic.  First, it is unlikely that

any objectionable third-party counseling would be attributed to plaintiffs simply because access

to that counseling was obtained through an employer-provided health insurance plan.   The

Catholic Church is widely known to oppose the use of contraceptive services, and as plaintiffs

assert, their faith is central to everything they do.  *See* Aff. of CCA ¶¶ 7, 14; Aff. of ACHS ¶¶ 7,

---

39     The conduct compelled by the employer mandate and contraceptive mandate is the
provision of health insurance to eligible employees that contains coverage for contraceptive
services.  Although the First Amendment's protections extend to inherently expressive conduct,
*see, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 404 (1989), providing health insurance is not
inherently expressive and is therefore not First Amendment speech.   No insurance provider
intends "to convey a particularized message" by providing insurance, and there is virtually no
likelihood "that the message would be understood [as communicating a particular stance] by
those who viewed it." *Id.*; *see also FAIR*, 547 U.S. at 64 (finding no third-party speech
accommodation problem because "a law school's decision to allow recruiters on campus is not
inherently expressive" and instead is made to facilitate recruitment and "assist their students in
obtaining jobs," not express a point of view).   Consequently, this case does not involve speech or
inherently expressive conduct.

14; Aff. of Don Bosco ¶¶ 7, 14; Aff. of Mary of Nazareth ¶¶ 7, 14;  Aff. of Catholic Charities ¶¶ 7, 14; Aff. of ACHS ¶¶ 7, 14; Aff. of Victory Housing ¶¶ 7, 14; Aff. of CIC ¶¶ 7, 14; Aff. of CUA ¶ 13; Aff. of TAC ¶ 11.  Second, the contraceptive mandate has a legitimate, nonspeech-related purpose of providing women with access to preventive services to improve the health of women and newborn children, and it is devoid of any purpose to target speech.  Plaintiffs remain completely free to espouse their beliefs against the use of contraception as well as to encourage their employees not to utilize those services.[40]  So plaintiffs' free speech claim is also missing the other hallmarks of unconstitutional accommodation claims.  The Court therefore concludes that any requirement placed on plaintiffs to accommodate the speech of third-party healthcare professionals does not interfere with plaintiffs' speech and therefore does not violate plaintiffs' First Amendment rights.[41]

### B.    The self-certification form does not violate plaintiffs' free speech rights.

Plaintiffs also argue that requiring them to file a self-certification form in order to invoke the protections of the accommodation amounts to compelled speech in violation of their free

---

[40]    Plaintiffs argue that the freedom to express their beliefs outside the regulatory scheme does not alleviate the compelled speech problem in this case.  Pls.' Opp. & Cross-Mot. at 36. Although this Court recognizes that the freedom to express views in another context will not prevent all compelled speech from being constitutionally suspect, the Supreme Court has recognized that it is a factor that can be considered in determining whether there is a Free Speech Clause violation.  *FAIR*, 547 U.S. at 65 (finding no free speech violation because the law schools remained free to say what they wished about the military's objectionable policies); *PruneYard*, 447 U.S. at 87 (noting that the mall owners remained free to express their own ideas).

[41]    This conclusion is not weakened by plaintiffs' argument that requiring them to accommodate the speech of third-party counselors regarding the use of contraception violates their free speech rights because it forces them to "affirm in one breath that which they deny in the next."  Pls.' Opp. & Cross-Mot. at 36, quoting *Pacific Gas*, 475 U.S. at 15–16.  Plaintiffs are not affirming anything:  offering health insurance that includes coverage for contraceptive services counseling is not speech.  Moreover, under the terms of the accommodation, neither Catholic University, the Archdiocese, nor any of the church plan plaintiffs would be providing these services as part of their plans.  To the extent that they are referring to the self-certification form, the Court addresses that argument below.

speech rights.   Compl. ¶ 276; Pls.' Mot. at 33.   First, they state that the self-certification requirement forces them "to engage in speech that triggers the provision of products and services to which they object," Pls.' Opp. & Cross-Mot. at 37, and second, "it deprives them of the freedom to speak on the issue of abortion and contraception on their own terms, at a time and place of their own choosing, outside of the confines of the Government's regulatory scheme." Pls.' Mot. at 33–34.   Neither argument, however, supports plaintiffs' claim that the accommodation's self-certification requirement violates the Free Speech Clause.

1.   <u>Requiring plaintiffs to file a self-certification form that ultimately results in the provision of contraceptive services coverage does not violate plaintiffs' free speech rights.</u>[42]

Plaintiffs point to the consequences of the self-certification form and argue that requiring them to file the form is compelled speech because it makes their speech the "trigger" for the provision of contraceptive services.  *Id.* at 33.  To support this consequence-based argument, they direct this Court's attention to the Supreme Court's decision in *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806 (2011).  *See* Pls.' Opp. & Cross-Mot. at 37.  Plaintiffs' reliance on *Bennett* is misplaced.

In *Bennett*, the Supreme Court addressed the constitutionality of an Arizona law that gave publicly financed political candidates matching funds for every dollar donated to, or spent on behalf of, a privately funded candidate.  131 S. Ct. at 2813.  The Court concluded that "the matching funds provision 'impose[d] an unprecedented penalty on any candidate who robustly exercise[d] [his] First Amendment right[s]'" by creating a situation where, simply by engaging in

---

[42]    To the extent that the church plan plaintiffs assert this argument as part of their compelled speech claim, the argument fails because there is no indication that filing the self-certification form will result in the provision of contraceptive services coverage to the church plan plaintiffs' employees.  *See supra* section I.C.  As a result, "plaintiffs" in this subsection refers only to Catholic University and Thomas Aquinas College.

free speech, the privately funded candidate guaranteed that his or her opponent would receive a cash subsidy from the state of Arizona.  *Id.* at 2818, quoting *Davis v. FEC*, 554 U.S. 724, 739 (2008) (second and third alterations in original).  In other words, the Court determined that the law created a "trigger effect" by which a privately funded candidate's speech was penalized, thus resulting in a chilling effect on that political speech.  *Id.* at 2824.  Consequently, the Court determined that strict scrutiny should apply even though the challenged law did not fit into the typical compelled speech or subsidized speech fact pattern.  *Id.*

The contraceptive mandate, the accommodation, and the self-certification form do not create a similar penalty in this case.  In *Bennett*, the publicly funded candidate was only entitled to matching funds if the privately funded candidate expressed himself by expending his own funds, so the privately funded candidate's speech was the actual trigger for payment, and the Court's concern was that his speech would therefore be inhibited.  *Id.* at 2821.  Here, the self-certification form is not the actual trigger for coverage of contraceptive services, and there is no speech of the plaintiffs that is being chilled.  Instead, the source of the contraceptive services coverage is the ACA itself, which mandates that all health insurance plans that are not exempt must include cost-free coverage for women's preventive services.  *See* 42 U.S.C. § 300gg-13(a)(4).  This statutory right to contraceptive services coverage exists and attaches prior to and independent of any speech by an employer; any speech associated with the self-certification form is merely designed to relieve the religious employer of any obligation to fund the services itself

and to transfer the burden of providing the coverage.[43]   Since there is nothing about the consequences of filing the self-certification form that chills or inhibits plaintiffs' speech, the situation in this case is a far cry from the one in *Bennett*.

> 2.   Compelling plaintiffs to state their religious objections to the provision of contraceptive services coverage does not violate plaintiffs' free speech rights.

In addition to their consequences-based argument, plaintiffs assert that the self-certification form is unconstitutionally compelled speech "because it deprives them of the freedom to speak on the issue of abortion and contraception on their own terms, at a time and place of their own choosing, outside of the confines of the Government's regulatory scheme." Pls.' Mot. at 33–34.   In other words, plaintiffs argue that the self-certification form is speech, that it is compelled because they must file the form in order to receive the benefits of the accommodation, and that it violates their free speech rights because they should be able to decide when to speak and when to stay silent.   Although it is well-settled that the Free Speech Clause protects the freedom to speak as well as the freedom to remain silent, *Barnette*, 319 U.S. at 633–34; *see also Wooley*, 430 U.S. at 714, the Court concludes that the self-certification form requirement does not violate plaintiffs' rights.

Under the regulations, the self-certification form must include the following information: (1) that the self-certifying organization "opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious

---

43      It makes no difference to this Court's analysis that plaintiffs may block access to contraceptive services coverage by not filing the self-certification form – and therefore not engaging in speech – and by agreeing instead to pay the applicable penalties.   Once again, the underlying statutory right to coverage for contraceptive services remains in existence despite plaintiffs' choice of whether to "speak;" regardless of whether the self-certification form is filed, plaintiffs' employees are entitled to cost-free contraceptive services coverage and plaintiff will either have to provide that coverage, pay penalties, or file the self-certification form. Consequently, this is simply not a case where some expressive act by plaintiffs is the absolute and only trigger for consequences that are inimical to their interests as in *Bennett*.

objections;" (2) that the organization "is organized and operates as a nonprofit;" and (3) that the organization "holds itself out as a religious organization."   29 C.F.R. § 2590.715–2713A(a). Plaintiffs do not object to the content of these statements; instead, as discussed above, they object that the consequence of these statements is the provision of coverage for contraceptive services by others.   Pls.' Mot. at 9; *see also* Compl. ¶ 276 ("The U.S. Government Mandate would compel Plaintiffs to issue a certification of their beliefs that, in turn, would result in the provision of objectionable products and services to Plaintiffs' employees.").

Since it is undisputed that, to the extent the form transmits any content at all, it accurately reflects plaintiffs' beliefs, the First Amendment is not implicated.   The Supreme Court has explicitly stated that a compelled speech claim involves a situation where "an individual is obliged personally to express a message he *disagrees* with, imposed by the government." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005) (emphasis added); *see also FAIR*, 547 U.S. at 62; *Turner Broad.*, 512 U.S. at 641.   And a review of other compelled speech precedent further demonstrates that the free speech clause has been historically invoked to protect against compelling an individual from speaking or endorsing a message with which the speaker disagrees.   *See, e.g.*, *Wooley*, 430 U.S. at 715 (finding a free speech violation where a state law compelled an individual to display a license plate motto that articulated an "ideological point of view [the plaintiff found] unacceptable"); *Barnette*, 319 U.S. at 634 ("To sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind.").

The self-certification does not require plaintiffs to say anything with which they disagree; instead, it merely asks them to assert that they have a religious objection to the provision of

contraceptive services – a statement that is entirely consistent with their beliefs.  *See* 29 C.F.R. § 2590.715–2713A(a).   The self-certification form does not contain a government-preferred message, and it does not force plaintiffs to serve as a mouthpiece to spread adherence to the government's ideological goals.[44]  *See Johanns*, 544 U.S. at 557.  The self-certification form is simply part of a regulatory scheme that requires plaintiffs to state their objections on the record in order to be exempted from the regulations.  *See FAIR*, 547 U.S. at 62 (finding that the Solomon Amendment did not raise free speech concerns because any compelled speech was merely incidental to the regulation of conduct).   Viewed in this context, the self-certification form is no different than requiring conscientious objectors to state their objections to war in order to be excused from the draft or requiring nonprofit organizations to fill out a form to apply for section 501(c)(3) tax-exempt status.   Therefore, the Court concludes that requiring plaintiffs to file the self-certification form does not violate their free speech rights, and defendants are entitled to summary judgment on Count III.

**IV.    Plaintiffs are entitled to summary judgment on their claim that the accommodation places an unconstitutional restriction on their free speech rights in Count IV.[45]**

Plaintiffs also argue that defendants violated their free speech rights by enacting what plaintiffs hyperbolically refer to as a "gag order" as part of the accommodation.  Compl. ¶¶ 284–88.  The challenged provision applies only to organizations that are self-insured and use third-

---

44    *Evergreen Ass'n v. City of New York* and *Centro Tepeyac v. Montgomery County* are distinguishable on that ground because the regulations in those cases required the plaintiffs to present a government-preferred message.  801 F. Supp. 2d 197, 201 (S.D.N.Y. 2011); 779 F. Supp. 2d 456, 458–59 (D. Md. 2011), *aff'd in part, rev'd in part*, 683 F.3d 591 (4th Cir. 2012).

45    Catholic University does not have standing to challenge this provision because it offers health insurance through a group health plan maintained by an insurer.  *See* Aff. of CUA ¶¶ 8, 10.  The Archdiocese also does not have standing to bring this claim because it is entirely exempt from the contraceptive mandate.  *See* Aff. of Archdiocese ¶ 18.

party administrators, and it provides that, once an organization self-certifies under the accommodation, it "must not, directly or indirectly, seek to interfere with a third-party administrator's arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements."[46]   29 C.F.R. § 2590.715–2713A(b)(1)(iii).

Plaintiffs do not challenge the constitutionality of the first half of the provision, which prohibits the eligible organization from interfering with a third-party administrator's provision of the contraceptive services coverage.   But they are concerned with the broad scope of the second part of the provision, which provides that a religious organization may not "directly or indirectly" influence the third-party administrator's decision as to whether it will agree to remain in a contractual relationship with the organization and assume the responsibility to provide the coverage.   The Court finds that the regulation imposes a content-based limit on the religious

---

[46]    There is no complementary provision for organizations participating in group health insurance plans because an insurer has an automatic obligation to provide coverage upon receipt of a self-certification form, unlike a third-party administrator who may ultimately decide to not enter into, or remain in, a contractual relationship with a self-certifying organization.  *Compare* 29 C.F.R. § 2590.715–2713A(b)(2), *with id.* § 2590.7152713A(c)(2).

organizations involved that directly burdens, chills, and inhibits their free speech.[47]  *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (noting that the "principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys").  This type of restriction on speech is "'presumptively invalid' and subject to strict scrutiny."  *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009), quoting *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188 (2007); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

To satisfy strict scrutiny, a law or regulation must further a compelling interest, and it must be narrowly tailored to achieve that interest.  *Bennett*, 131 S. Ct. at 2817; *FEC v. Wis. Right to Life*, 551 U.S. 449, 464 (2007).  The Court may not consider any potential interest that may support the challenged provision; instead, the Court's strict scrutiny analysis is limited to the interests proffered by the government.  *See First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 786 (1978) (noting that "the burden is on the government to show the existence of [a compelling] interest").

Here, defendants argue that the speech restriction is meant to prevent a self-certifying organization from using its economic power to coerce a third-party administrator into declining

---

[47]     Although on its face the regulation does not limit its prohibition only to speech seeking to dissuade the third-party administrator from providing coverage for contraceptive services, viewed in the regulatory context, there is no question that this is a content-based restriction.  The restriction on speech only arises after an eligible organization self-certifies that it objects to the provision of contraceptive services and effectively shifts the burden of providing those services – or at least creates a decision as to whether the third-party administrator will accept the burden to provide those services – onto the third-party administrator.  *See* 29 C.F.R. § 2590.715–2713A(b)(1)(iii).  As a result, the only organizations subject to the restriction on speech are those organizations that have already specifically stated that they object to the provision of contraceptive services.  Thus, any argument that the restriction – at bottom – equally applies to speech that seeks to influence third-party administrators to cover contraceptive services, and not just speech that seeks to discourage that coverage, is frivolous.  A party who self-certifies that it *objects* for religious reasons to providing coverage for contraceptive services simply will not turn around and try to encourage a third-party administrator to provide that coverage.

to assume responsibility for providing contraceptive services coverage to the organization's employees.  Defs.' Mem. at 36.  This interest against economic coercion was deemed compelling in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618–19 (1969).  But the provision does not survive strict scrutiny because it does not simply ban threats or coercion, and it is not narrowly tailored or the least restrictive means to achieve the government's interest.

The ban contained in the provision – that self-certifying organizations "must not, directly or indirectly, seek to influence the third party administrator's decision" – is broader than it needs to be to serve the proffered interest:  it restricts not only economic coercion but also any attempt to calmly discuss the moral implications of providing contraception with a third-party administrator.  A rule that prohibits more expression than is needed to advance the government's goal is not narrowly tailored.[48]

The Court therefore finds that the portion of 29 C.F.R. § 2590.715–2713A(b)(1)(iii) that provides that an eligible organization "must not, directly or indirectly, seek to influence the third-party administrator's decision to make . . . arrangements" for contraceptive services coverage violates the Free Speech Clause since it is not narrowly tailored to achieve the government's asserted compelling interest.  Plaintiffs are entitled to summary judgment on Count IV.

---

[48]    Moreover, it is not clear whether the interest against economic coercion is actually compelling in this context.  Under the current regulatory framework, a self-certifying organization has no incentive to threaten to cut ties with a third-party administrator because, if the pressure is successful, the organization simply becomes obliged to find another third-party administrator to provide that coverage, or it must operate its self-insured plan on its own.  Mot. Hr'g Tr. 13–14.  It is also not clear that the challenged speech restriction is related to the stated interest in preventing economic coercion because, if the third-party administrator decides on its own – free from coercion – that it does not want to assume the responsibility of providing contraceptive coverage, the regulations provide that the third-party administrator must terminate its contractual relationship with the self-certifying organization.  *See* 29 C.F.R. § 2590.715– 2713A(b)(2).  In other words, the economic consequence for the third-party administrator is the same whether the religious organization has applied pressure or not.

V.      **Plaintiffs' First Amendment Establishment Clause claims asserted in Count V fail.**[49]

The First Amendment Establishment Clause states that "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  Plaintiffs claim that this clause has been violated in two ways:  (1) the religious employer exemption creates an impermissible denominational preference; and (2) the religious employer exemption results in excessive entanglement between the government and the Catholic Church.  Compl. ¶¶ 289–96; *see also* Pls.' Mot. at 35–38.

A.      **The religious employer exemption does not amount to denominational discrimination.**

Plaintiffs claim that the religious employer exemption violates the Establishment Clause because it creates a preference for one type of religious organization over another.  Compl. ¶ 293.  They argue that, when the regulations define "religious employer" to include only houses of worship, they disfavor all other types of religious organizations, such as charities or schools.  Citing *Larson v. Valente*, 456 U.S. 228 (1982), plaintiffs argue that this preferential treatment is subject to strict scrutiny.  Pls.' Mot. at 35–36.

Under *Larson*, the reviewing court must first determine "whether the law facially differentiates among religions."  *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 695 (1989).  If the answer is yes, then the law is subject to strict scrutiny.  *Id.*  If the answer is no, the reviewing court must apply *Larson*'s second step, which requires the court to evaluate the challenged law under the three-prong test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  The Court finds that the religious employer exemption does not facially discriminate among

---

49      In this section, "plaintiffs" refers only to Catholic University and Thomas Aquinas College.  The Archdiocese qualifies for the religious employer exemption and the church plan plaintiffs are, in essence, completely exempt as well.  *See supra* section I.C.

religions, so strict scrutiny does not apply.   In addition, the regulation satisfies the three-prong *Lemon* test.

      1.      <u>The religious employer exemption is not subject to strict scrutiny because it does not facially discriminate among religions.</u>

A law facially discriminates among religions when it treats similarly situated religious organizations differently, resulting in benefits to some religious denominations but not to others. *See Larson*, 456 U.S. at 246 & n.23; *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1256 (10th Cir. 2008).   The law need not explicitly state a preference for one religion over the other; facial discrimination exists so long as the law treats similarly situated religious organizations differently.[50]   *Larson*, 456 U.S. at 246 n.23.

For example, in *Larson*, the Supreme Court held that a law that subjected only those religious organizations that received over fifty percent of their charitable donations from nonmembers to disclosure requirements facially discriminated among religions.   *Id.* at 246–47. The Court explained that, unlike cases where a statute had merely a "'disparate impact' upon

---

[50]     Actual discrimination among religions is necessary to find facial discrimination; disparate impact alone is not enough.   For example, in *Hernandez v. Commissioner of Internal Revenue*, the Supreme Court held that section 170 of the Internal Revenue Code of 1954 ("IRC"), 26 U.S.C. § 170, was not facially discriminatory despite its disparate treatment of religious activities.   490 U.S. at 695–96.   The plaintiffs in that case challenged the constitutionality of section 170, which creates a tax deduction for charitable contributions, on the grounds that it violated the Establishment Clause because the IRS's decision to define charitable contribution as a contribution or gift, but not a transfer for consideration, meant that members of the Church of Scientology could not deduct the "fixed donations" they paid in order to receive services known as "auditing" or "training."   *Id.* at 685.   These fixed donations made up the bulk of the Church's revenue.   *Id.*   Although the definition of charitable contributions had a disproportionate effect on the members of the Church of Scientology, the Court found that section 170 did not facially discriminate among religions because the line drawn "between deductible and nondeductible payments to statutorily qualified organizations [did] not differentiate among sects."   *Id.* at 695. In other words, section 170 did not facially discriminate because the disparate treatment resulting from the statute arose from the way the IRS defined charitable contributions and not from the IRS explicitly deciding which religious organizations would benefit from the deductions and which would not.   *Id.*

different religious organizations," the statute at issue in *Larson* made "explicit and deliberate distinctions between different religious organizations" because "the provision effectively distinguishe[d] between 'well-established churches' that have 'achieved strong but not total financial support from their members,' on the one hand, and 'churches which are new and lacking in a constituency, or which, as a matter of policy, may favor public solicitation over general reliance on financial support from members,' on the other hand." *Id.* at 246 n.23, quoting *Valente v. Larson*, 637 F.2d 562, 566 (8th Cir. 1981). Different treatment of the same type of religious organization – in *Larson*, houses of worship – amounted to facial discrimination among religious denominations and therefore resulted in the discrimination that was subject to strict scrutiny. *Id.* at 246–47.

Similarly, in *Colorado Christian University v. Weaver*, the Tenth Circuit found that Colorado's scholarship program facially discriminated among religions. 534 F.3d at 1256. Under the scholarship program, institutions of higher education – including many religious schools – were entitled to receive scholarship money for qualifying students. *Id.* at 1250. But the statute exempted from the definition of institution of higher education "any college that [was] 'pervasively sectarian' as a matter of state law." *Id.* As a result, certain religious schools – such as a Catholic school and a Methodist school – were eligible to receive scholarship money while other schools – such as a nondenominational school and a Buddhist school – were not eligible. *Id.* at 1258. The court concluded that the law facially discriminated among religions because it provided aid to some sectarian schools while excluding others as "pervasively sectarian." *Id.* at 1256. In other words, the statute facially discriminated among religions when it explicitly treated religious schools of different denominations differently.

Here, plaintiffs argue that the religious employer exemption amounts to denominational discrimination for two reasons.  First, they object that the religious employer exemption treats religious organizations differently based on how they are structured or organized:  Catholic houses of worship are exempt whereas Catholic educational and charitable organizations are not. Pls.' Mot. at 36; Pls.' Opp. & Cross-Mot. at 38–39.  Second, they make the claim that the religious employer exemption unfairly discriminates against Catholics in particular because, unlike "denominations that exercise religion principally through 'churches, synagogues, mosques, and other houses of worship, and religious orders,'" Catholics like plaintiffs "*also* exercise their religion through schools, health care facilities, charitable organizations, and other ministries."  Pls.' Reply at 21 (emphasis in original); *see also* Pls.' Mot. at 36.

Plaintiffs' first argument – that the Establishment Clause prohibits distinctions among different types of organizations affiliated with the same faith – finds no support in Establishment Clause case law.  In *Larson*, the Supreme Court repeatedly spoke in terms of *denominational* discrimination or discrimination *among religions*, not structural discrimination:

- "The clearest command of the Establishment Clause is that one religious *denomination* cannot be officially preferred over another."  456 U.S. at 244 (emphasis added).

- "[N]o State can 'pass laws which aid one *religion*' or that 'prefer one *religion* over another.'" *Id.* at 246 (emphases added) (citation omitted).

- "This principle of *denominational* neutrality has been restated on many occasions." *Id.* (emphasis added).

- "[T]he government must be neutral when it comes to competition between *sects*."  *Id.* (emphasis added) (citation omitted).

- "The First Amendment mandates governmental neutrality between *religion* and *religion*." *Id.* (emphases added) (citation omitted).

- "[W]hen we are presented with a state law granting a *denominational* preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality."  *Id.* (emphasis added).

- "The fifty percent rule of § 309.515, subd. 1(b), clearly grants *denominational preferences* of the sort consistently and firmly deprecated in our precedents." *Id.* (emphasis added).

The Court's focus on denominational discrimination or discrimination among religions derives directly from the history and purpose of the Establishment Clause. *See Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 668 (1970) (noting that, "for the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity" that resulted in the establishment of one state church and the suppression of all others). So plaintiffs have failed to state a violation of the Establishment Clause on these grounds.[51]

The Court also rejects plaintiffs' second argument that the religious employer exemption amounts to denominational discrimination because it accords special treatment to religions that primarily exercise their faith through houses of worship, while discriminating against religions – such as Catholicism – that also practice their religion through charitable and educational efforts. Putting aside the fact that plaintiffs offer no evidence to support their uninformed suggestion that there is something unique about Catholics because good deeds and teaching others are intrinsic to their faith, plaintiffs' claim fails because it is essentially their first argument dressed in new clothes: that the religious employer exemption discriminates against those plaintiffs that are organized as charities and not as houses of worship. Even if it is true that Catholicism is one of the religions that exercises its faith through charitable and educational works, that fact does not

---

51      The Tenth Circuit's decision in *Weaver* is entirely consistent with this Court's decision because, at bottom, the issue present in that case was that Colorado's scholarship statute took a similar type of religious organization – in that case, religious schools – and treated them differently based on whether they were merely sectarian or "pervasively sectarian." 534 F.3d at 1250. Here, all religious charities are ineligible for the religious employer exemption.

transform what might be an effect on Catholicism and those other religions into discrimination among religions.

Since the religious employer exemption is available to religious employers of all denominations, including the Archdiocese, it does not facially discriminate among religions, and strict scrutiny does not apply to plaintiffs' denominational discrimination claim.  Instead, the Court must analyze the claim under the *Lemon* three-prong test.  *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 339 (1987), quoting *Larson*, 456 U.S. at 252 ("[L]aws 'affording a uniform benefit to *all* religions' should be analyzed under *Lemon*," and "where a statute is neutral on its face and motivated by a permissible purpose of limiting governmental interference with the exercise of religion, [there is] no justification for applying strict scrutiny to a statute that passes the *Lemon* test.").

> 2.      The religious employer exemption is valid under *Lemon*.

In *Lemon v. Kurtzman*, the Supreme Court created a three-prong Establishment Clause test based on factors that it "gleaned from [its prior] cases."  403 U.S. at 612.  The first prong provides that "the statute must have a secular legislative purpose."  *Id.*  The second prong requires that the statute's "principal or primary effect must be one that neither advances nor inhibits religion."  *Id.*  And the third prong states that "the statute must not foster 'an excessive government entanglement with religion.'"  *Id.* at 613, quoting *Walz*, 397 U.S. at 674.  The religious employer exemption to the contraceptive mandate satisfies each prong.

The religious employer exemption has a secular legislative purpose even though it explicitly refers to religion.  "*Lemon's* 'purpose' requirement aims at preventing the relevant governmental decisionmaker . . . from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters."  *Amos*, 483 U.S. at 335.  It does not

require a law's purpose "be unrelated to religion," *id.*, or "that the government show a callous indifference to religious groups." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952). Instead, "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to . . . carry out their religious missions." *Amos*, 483 U.S. at 329, 335 (finding that section 702 of the Civil Rights Act of 1964, which "exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion," had a secular purpose under *Lemon*'s first prong).

Here, the religious employer exemption is meant to alleviate the burden imposed on religious employers so that they may "carry out their religious mission." As discussed above, there is no indication that defendants created the religious employer exemption in an effort to disfavor any particular religion; the religious employer exemption is available to all houses of worship, religious sects, and integrated auxiliaries that qualify under the tax code regardless of their religious denomination. *See* 26 U.S.C. § 6033(a)(3)(A)(i), (iii); 45 C.F.R. § 147.131(a). Thus, the religious employer exemption satisfies *Lemon*'s first prong. *See Hernandez*, 490 U.S. at 696 (finding that section 170 of the IRC had a secular purpose because it was not "born of animus to religion in general or Scientology in particular").

It also satisfies *Lemon*'s second prong. "For a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence," not simply that the law puts religious organizations in a position where they are now better able to advance their own purposes. *Amos*, 483 U.S. at 336–37 (finding that, although religious employers were better able to promote their religion if they could discriminate based on religion with respect to their employees, the law's primary effect neither advanced nor inhibited religion because the government took no action to do so). Additionally, "a statute

primarily having a secular effect does not violate the Establishment Clause merely because it 'happens to coincide or harmonize with the tenets of some or all religions.'" *Hernandez*, 490 U.S. at 696, quoting *McGowan v. Maryland*, 366 U.S. 420, 442 (1961).

Here, the religious employer exemption has a principal or primary effect that neither advances nor inhibits religion. Although it relieves certain religious employers of the obligation to provide their employees with access to coverage for contraceptive services, and thus arguably aids their ability to advance a religious purpose, it is the religious employer that actually invokes the exemption and takes the steps towards fulfilling its religious goal. *See Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 10 (1993) (allowing a State to provide a sign language interpreter to a deaf student attending a Catholic school because, even though the interpreter aided religious instruction, the fact that the IDEA made an interpreter available to all students regardless of what school they attend meant that the interpreter's presence in a sectarian school was the "result of the private decision of individual parents" and could not "be attributed to *state* decisionmaking"). Moreover, the limited scope of the religious employer exemption and the government's implementation of an accommodation that will enable employees of many religious organizations to obtain coverage for contraceptive services demonstrate that the government has not taken steps to promote religious views.

Finally, the religious employer exemption satisfies *Lemon*'s third prong because it does not result in unlawful entanglement. "Interaction between church and state is inevitable;" therefore an "[e]ntanglement must be excessive before it runs afoul of the Establishment Clause." *Agostini v. Felton*, 521 U.S. 203, 233 (1997). Here, the exemption does not entail any sort of continuing or invasive relationship between the government and a religious employer, such as where the government investigates a party's religious belief to determine if it is

"sufficiently religious." *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1342–43 (D.C. Cir. 2002). Eligibility for the religious employer exemption is based solely on the organizational structure of a party and is determined through reliance on IRC section 6033(a)(3)(A)(i) or (iii). *See* 45 C.F.R. § 147.131(a).

The religious employer exemption also does not create an ongoing or problematic relationship between church and state because, once an employer qualifies for the exemption, the matter is finished, and there is no need for any monitoring of that organization. *Cf. Agostini*, 521 U.S. at 233–34 (finding that, despite the ongoing relationship between church and state, there was no excessive entanglement problem with Title I's provision of funds to inner-city private schools); *Hernandez*, 490 U.S. at 696–97 (explaining that "routine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no detailed monitoring . . . between secular and religious bodies, does not of itself violate the nonentanglement command") (citations and internal quotation marks omitted). So there is no basis to find that the religious employer exemption fosters excessive entanglement between the government and religion, and defendants are therefore entitled to summary judgment on plaintiffs' denominational discrimination claim in Count V.

**B.    Plaintiffs do not have standing to argue that the IRS's fourteen-factor test violates the Establishment Clause.**

Plaintiffs claim that the religious employer exemption violates the Establishment Clause because it defines a "religious employer" by reference to section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code, which the Internal Revenue Service ("IRS") sometimes implements through reference to a nonexhaustive list of fourteen factors when determining whether the applicant organization is a house of worship or other qualifying organization. Pls.' Mot. at 37–38; Pls.' Opp. & Cross-Mot. at 39–41. According to plaintiffs, it

is the probing nature of the fourteen-factor test that fosters excessive entanglement between the government and religious employers.  Pls.' Mot. at 37–38; Pls.' Opp. & Cross-Mot. at 39–41. Defendants respond that, to the extent that plaintiffs' Establishment Clause claim rests on the constitutionality of a nonbinding, nonexhaustive list of factors found in the Internal Revenue Manual that has not yet been applied to any plaintiff in this case, it is not ripe and must be dismissed.  Defs.' Mem. at 39–40.

The Court agrees that plaintiffs' Establishment Clause challenge to the definition of religious employer is not justiciable at this time, either for lack of ripeness or lack of the cognizable injury necessary to give rise to standing.  As discussed above, the injury prong of standing requires plaintiffs to establish that they have a concrete and personalized injury that is either actual or imminent.  *Lujan*, 504 U.S. at 560.  Here, plaintiffs' excessive entanglement claim rests on the notion that application of the fourteen-factor test could involve an invasive inquiry into their religious beliefs, giving rise to a constitutional injury.  Pls.' Mot. at 37–38; Pls.' Opp. & Cross-Mot. at 39–41.  But plaintiffs have not actually suffered that injury, and there is no imminent risk that they will.  As defendants note, all plaintiffs in this case have matter-of-factly self-identified as being eligible or not eligible for the religious employer exemption.[52] Aff. of Archdiocese ¶ 18; Aff. of CCA ¶ 6; Aff. of ACHS ¶ 6; Aff. of Don Bosco ¶ 6; Aff. of

---

[52]    The Court also finds it telling that plaintiffs have not previously challenged the fourteen-factor test as it underlies 26 U.S.C. § 6033, which excuses certain nonprofit religious employers from the requirement to file a tax return.  At the motions hearing, plaintiffs claimed that there has been no such challenge in the past because the consequences of not being eligible under section 6033(a)(1)(A)(i), (iii) were not as severe as they are when that section is used to determine whether an organization is exempt from the contraceptive mandate.  *See* Mot. Hr'g Tr. 89–91. Although that may be true from plaintiffs' point of view, it has no bearing on plaintiffs' excessive entanglement claim because, if the fourteen factors are unconstitutionally intrusive, they would be unconstitutionally intrusive regardless of whether the result was being exempt from a tax filing or being exempt from the contraceptive mandate.

Mary of Nazareth ¶ 6; Aff. of Catholic Charities ¶ 6; Aff. of Victory Housing ¶ 6; Aff. of CIC ¶ 6; Aff. of CUA ¶ 6; Aff. of TAC ¶ 6.  The government does not dispute any of those assertions.

Plaintiffs point out that the government or an individual may someday bring an action challenging their self-identification in which the fourteen-factor test might be applied.  But this is a highly speculative proposition.  Plaintiffs would have to change their minds and claim that they qualify for the religious employer exemption; the government or a private party would have to disagree; and the government or the court would have to choose to apply the fourteen-factor test to resolve the dispute, instead of relying upon case law interpreting the statute or the plain language of the statute itself.

Plaintiffs have presented no grounds to believe that this chain of events would unfold. First, it is difficult to imagine that plaintiffs do not already know whether or not they are an organization listed in section 6033(a)(1)(A)(i), (iii) because they need to know this information to determine whether they are required to file a tax return despite their tax exempt status. Second, it is easily determined, and all plaintiffs in this case readily admit, that they are charitable organizations, not houses of worship, and that they are separately incorporated from the Roman Catholic Church, *see supra* section V.A., so it is unlikely that the government or any court would need to invoke the fourteen-factor test or expend any effort whatsoever examining their religious beliefs.  Third, plaintiffs have already self-identified as qualifying or not qualifying, and the only plaintiff that has self-identified as qualifying for the religious employer exemption at this point is the Archdiocese, which is undisputedly a church within the plain meaning of the exemption.  *See* Aff. of Archdiocese ¶ 18.  Since plaintiffs have not suffered an injury-in-fact and this claim is not ripe, they lack standing to bring their excessive entanglement

challenge to the fourteen-factor test.[53]   The Court will therefore dismiss the excessive entanglement challenge in Count V.

## VI.   Defendants are entitled to summary judgment on plaintiffs' Internal Church Governance claim in Count VI.

Plaintiffs argue that the contraceptive mandate violates both the Free Exercise Clause and the Establishment Clause of the First Amendment because it interferes with the internal governance of the Roman Catholic Church and its religious affiliates.  Compl. ¶¶ 297–312; *see also* Pls.' Mot. at 38–40.  It is true that the Supreme Court has recognized that the religion clauses of the First Amendment provide special protection to a religious organization's right to internally govern itself without interference from the government, *see, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 706 (2012), but the operation of the exemption and the accommodation does not violate that principle.

Plaintiffs claim that the religious employer exemption to the mandate essentially divides the Catholic Church into two parts – a religious wing that is eligible for the exemption and a charitable and educational wing that is not.  They say that this limits the Church's ability to supervise its religious affiliates to ensure that they are complying with its teachings, but they are referring to just one particular aspect of that relationship:  the fact that a number of plaintiffs insure their employees through the Archdiocese's self-insured health plan.  Pls.' Mot. at 39–40.  Specifically, plaintiffs voice the concern that the contraceptive mandate disrupts this internal insurance arrangement by putting the Archdiocese in a position where it must choose between continuing to sponsor its affiliates' plans, which must include contraceptive services coverage, or dropping those affiliates from the plan, subjecting the affiliates to fines unless they contract for

---

53      Because plaintiffs cannot satisfy the injury-in-fact requirement, there is no need for the Court to address the causation and redressability prongs of standing.  *See Lujan*, 504 U.S. at 560–61.

the objectionable coverage on their own.  But that is not how the regulations operate, and the Archdiocese is not in a position where it must make that decision.  So, assuming that this count even alleges an injury-in-fact, defendants are entitled to summary judgment on Count VI.

The government has assured the Court that it has no power to require the third-party administrator of the Archdiocese's plan to provide contraceptive services on behalf of the church plan plaintiffs, and there is no indication that the Archdiocese's third-party administrator will assume that responsibility voluntarily.  As defendants stated in response to the Court's questions on this issue:

> The third party administrator (TPA) of the Archdiocese's self-insured church plan is not bound to provide or arrange for payments under section [2590.715–2713A(b)(2)].  As explained in defendants' earlier briefing, the government's authority to require TPAs to make such payments derives from ERISA, and church plans are specifically excluded from regulation under ERISA.  Self-certification remains a requirement that the non-Archdiocese plaintiffs must satisfy if they wish to be considered "eligible organization[s]" and thereby comply with the regulations, but the regulations do not require a self-insured church plan or any [third-party administrator] of the plan to make payments for contraceptive services for plan participants and beneficiaries.

Defs.' Resp. to Ct. Order at 2–3 (second alternation in original) (citations omitted); *see also supra* section I.C.  The government also concedes that, regardless of whether or not the Archdiocese's third-party administrator provides the coverage, the church plan plaintiffs "are *not* required to identify another [third-party administrator] to perform that function," and the Archdiocese's third-party administrator may still remain in its position:

> QUESTION BY THE COURT:  If the church plan plaintiffs "submit the self-certification to the third-party administrator of the Archdiocese plan, and the third-party administrator does not agree to provide or arrange for payment for contraceptive services for [those] plaintiffs' employees, may that third-party administrator remain in its contractual relationship with the Archdiocese as the administrator of the church plan? Are the self-certifying organizations permitted to continue to provide coverage to their employees through that plan? May the third-party administrator continue to serve as the third-party administrator for the self-certifying organization?"

> DEFENDANTS: "Yes to all."

Defs.' Resp. to Ct. Order at 3.  Thus, the regulations do not interfere with the Archdiocese's management of its plan according to the tenets of its faith or its decision to invite its affiliates to offer health insurance through the same plan.

## VII.   Defendants are entitled to summary judgment on plaintiffs' APA contrary to law claim in Count VII.[54]

Plaintiffs argue that the contraceptive mandate violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*[55]  Compl. ¶¶ 313–26; *see also* Pls.' Mot. at 40–41.  They direct this Court's attention to the Weldon Amendment and the ACA's 42 U.S.C. § 18118(c), and argue that the contraceptive mandate is contrary to those laws because it includes coverage for emergency contraceptives, which – according to plaintiffs – are a form of abortion.  Pls.' Mot. at 40.  The burden is on plaintiffs to show that the law they challenge is not in accordance with the law, *Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 722 (D.C. Cir. 2009); *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002), and plaintiffs have not met that burden in this case.

---

54    "Plaintiffs" refers only to Catholic University and Thomas Aquinas College.  The Archdiocese is completely exempt and it is entirely speculative that the church plan plaintiffs' employees will actually receive coverage for the objected-to contraceptive services.

55    The APA directs that this Court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706(2)(A).

A.      **The contraceptive mandate is consistent with the Weldon Amendment.**

The Weldon Amendment is an appropriations rider that restricts a government agency's funding if that agency "subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."  Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111.  Plaintiffs argue that the contraceptive mandate discriminates against plaintiffs based on their refusal to cover emergency contraceptives, such as "Plan B" or "ella," which they contend induce abortions.  Pls.' Mot. at 40.  Defendants argue, based on the FDA's long-standing view, that emergency contraceptives act as contraceptives, not abortions, and they are therefore not within the prohibition of the Weldon Amendment.  Defs.' Mem. at 42–44.  So, the parties' dispute on this issue boils down to whether the word "abortion," used but not defined by the Weldon Amendment, includes emergency contraceptives.

But the Court does not need to wade into this blend of science and theology and decide whether emergency contraceptives are "abortion-inducing" products or simply contraceptives in order to find that the mandate is consistent with the Weldon Amendment.  Although both parties agree that plaintiffs are among the healthcare entities to which the Weldon Amendment refers, there is no indication that the contraceptive mandate discriminates against them because they do not provide, pay for, provide coverage of, or refer for abortions.  It is undisputed that the Archdiocese is completely exempt from the contraceptive services coverage requirement and that all other plaintiffs are eligible for the accommodation.  Aff. of Archdiocese ¶ 18; Compl. ¶ 10.  Once an eligible organization seeks the accommodation, it no longer has any responsibility to "provide, pay for, provide coverage of, or refer" for *any* contraceptive services, let alone emergency contraceptives.  29 C.F.R. § 2590.715-2713A(a), (b), (c).  That responsibility shifts to

a willing third-party administrator or group insurer, and any penalty the eligible organization faces for failing to provide for the required services evaporates.  *Id.*  With the elimination of the penalty for failing to provide coverage for contraceptive services, the accommodation eliminates any potential discrimination against plaintiffs for exercising their religious views and makes it irrelevant whether the word "abortion," as used in the Weldon Amendment, includes emergency contraceptives or not.  Plaintiffs therefore fail to meet their burden to show that the contraceptive mandate – as applied to them – is contrary to law.

### B.   The contraceptive mandate is not contrary to 42 U.S.C. § 18118(c).

Plaintiffs also argue that the contraceptive mandate is contrary to section 18118(c) of the ACA, which states that no provision in title 42 "shall be construed to prohibit an institution of higher education . . . from offering a student health insurance plan."  42 U.S.C. § 18118(c); *see also* Compl. ¶ 323; Pls.' Mot. at 40.   Plaintiffs contend that the contraceptive mandate contravenes this provision because it effectively prohibits Catholic University from offering a student health insurance plan since the University's religious beliefs prohibit it from facilitating access to contraceptive services coverage through that healthcare plan.[56]  Compl. ¶ 323; *see also* Pls.' Mot. at 40–41.  The Court disagrees.

First, plaintiffs make no attempt to meet their burden to establish that the contraceptive mandate is contrary to section 18118(c).  In their motion for a preliminary injunction, they summarily state that the contraceptive mandate "has the effect of prohibiting CUA from offering a student health-insurance plan, since such plan would have to provide access to coverage to which CUA objects based on its sincerely-held religious beliefs," Pls.' Mot. at 41, and they briefly repeat that notion in their reply brief.  Pls.' Reply at 23.  They do not mention section

---

56      It is only Catholic University, then, that has standing to press this claim.

18118(c) in their combined opposition and cross-motion for summary judgment, *see* Pls.' Opp. & Cross-Mot. at 43–44, so the Court could consider that claim to be waived.

In any event, the contraceptive mandate does not "prohibit" Catholic University from covering its students or "force" it to provide a student healthcare plan that includes coverage for contraceptive services:  the accommodation effectively severs the tie between the University's healthcare plan and the provision of that coverage once the self-certification form is filed.  *See supra* section I.A.

Moreover – even if the provision of contraceptive services was not completely severed from Catholic University's student health insurance plan – the Court would still conclude that the contraceptive mandate is consistent with section 18118(c).  As defendants explain – and plaintiffs fail to refute – section 18118(c) was promulgated in order to render certain requirements of the Public Health Services Act and the ACA inapplicable to student health insurance programs, such as provisions that would allow students to remain indefinitely on the school's healthcare plan (even after graduation) and provisions that would allow nonstudents to enroll, because application of those requirements to student health insurance plans would make the provision of that plan economically unfeasible.  Defs.' Mem. at 43–44.  By contrast, the contraceptive mandate, as modified by the accommodation, does not have the direct effect of making it impossible for an organization of higher education to provide a student health insurance plan.  With this argument left uncontested, the Court finds that the contraceptive mandate is consistent with 42 U.S.C. § 18118(c).  Defendants are therefore entitled to summary judgment on Count VII.

**VIII.   Plaintiffs do not have standing to bring the APA erroneous interpretation claim in Count VIII.[57]**

Plaintiffs contend that defendants violated the APA when they erroneously interpreted the religious employer exemption to apply on an employer-by-employer basis, rather than a plan-by-plan basis.  Compl. ¶¶ 327–39; *see also* Pls.' Mot. at 41–43.  They challenge the statement in the preamble to the new accommodation regulations that states:  "[t]he final regulations continue to provide that the availability of the exemption or an accommodation be determined on an employer-by-employer basis, which the Departments continue to believe best balances the interests of religious employers and eligible organizations and those of employees and their dependents."  78 Fed. Reg. at 39886.

Plaintiffs claim they are injured by this interpretation because, if the exemption applied on a plan-by-plan basis, all of the church plan plaintiffs would be exempt along with the Archdiocese that sponsors their plan, and they would not be required to engage in actions that they claim would facilitate access to contraceptive services in violation of their religious beliefs.  *See* Pls.' Mot. at 41–43.  But, as the Court explained above, given the manner that the accommodation operates, the church plan plaintiffs are not required to perform any acts that would facilitate access to those services.  Once the church plan plaintiffs certify their opposition to contraceptive coverage to the Archdiocese's third-party administrator, their plans will be in compliance with the mandate.  Defs.' Resp. to Ct. Order at 3.  There will be no obligation placed on the third-party administrator that can be enforced under ERISA, and the church plan plaintiffs

---

57      In this section, "plaintiffs" refers only to the church plan plaintiffs.  Catholic University and Thomas Aquinas College do not have standing to challenge the government's interpretation of the religious employer exemption as applying on an employer-by-employer basis because they do not participate in a multi-employer health plan and therefore are not injured by that interpretation.  The Archdiocese also does not have standing to bring this claim because it is exempt under the contraceptive mandate.

will not have to contract with another.   *Id.*   As a result, the church plan plaintiffs attain relief from the contraceptive mandate via the accommodation, and they have not shown that they are injured by defendants' interpretation of the religious employer exemption.   Without a cognizable injury that is fairly traceable to defendants' conduct, the church plan plaintiffs lack standing to bring their APA claim.   *Lujan*, 504 U.S. at 560–61.   The Court will therefore dismiss Count VIII.[58]

## CONCLUSION

For the reasons stated above, the Court will grant defendants' motion for summary judgment with respect to Catholic University's RFRA claim in Count I, and all of the plaintiffs' Free Exercise claims in Count II, compelled speech claims in Count III, denominational preference claims in Count V, internal church governance claims in Count VI, and APA contrary to law claims in Count VII, and the Court will therefore deny plaintiffs' cross-motion for summary judgment with respect to those counts.   The Court will grant defendants' motion to dismiss the church plan plaintiffs' RFRA claims in Count I, and all of the plaintiffs' Establishment Clause challenges to the IRS factors in Count V and APA erroneous interpretation claims in Count VIII for lack of jurisdiction.   Plaintiffs' cross-motion for summary judgment on those counts is therefore moot.   Finally, the Court will grant Thomas Aquinas College's cross-motion for summary judgment on its RFRA claim in Count I and all of the plaintiffs' cross-

---

58      The Court also notes that, in this claim, plaintiffs are taking issue with a statement of agency policy or intent that is contained in the preamble to the accommodation regulations, but not a regulation itself, and plaintiffs have not identified any situation in which the interpretation has actually been applied or enforced to any of their detriment.   While the government has explained what it meant to accomplish by reading its regulations in this matter, it is unclear to the Court how this will operate in practice, particularly since the obligation to offer employees a healthcare insurance plan (the "employer mandate") is imposed on employers, but the obligation to include coverage for contraceptive services (the "contraceptive mandate") is imposed by law on the plans.

motions for summary judgment on their Free Speech claims asserted in Count IV, and it will therefore deny defendants' motion for summary judgment with respect to those counts.   A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  December 20, 2013